1

2

3

4

5

6

7

8

9

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

10 | MKB CONSTRUCTORS,

CASE NO. C13-0611JLR

11 |      Plaintiff,

ORDER

12 |    v.

13 | AMERICAN ZURICH INSURANCE
COMPANY,

14

     Defendant.

15

## I.   INTRODUCTION

16

  Before the court is Plaintiffs MKB Constructor's ("MKB") third motion to compel

17

the production of documents related to David Edsey and withheld by Defendant

18

American Zurich Insurance Company ("Zurich") on grounds of attorney-client privilege

19

and/or the work product doctrine. (Mot. (Dkt. # 79).) The court has reviewed the

20

motion, all submissions filed in support of the motion and in opposition thereto, the

21

22

ORDER- 1

1   balance of the record, and the applicable law.  Being fully advised, the court GRANTS in

2   part and DENIES in part MKB's motion.

## II.   BACKGROUND

4        This case concerns an insurance coverage dispute involving a "Builders Risk"

5   policy.  MKB contracted with the Lower Yukon School District ("LYSD") for a project,

6   which included "the procurement, delivery and placement of gravel fill" for a new

7   building pad and driveway upon which a school building would be built.  (Am. Compl.

8   (Dkt. # 35) ¶ 6.)  The project had a final completion date of September 15, 2012.  (*See*

9   5/23/14 Videa Decl. (Dkt. # 62) Ex. F.)  Defendant American Zurich Insurance Company

10  ("American Zurich") issued a "Builders Risk" policy to MKB for the period June 15,

11  2012, to October 31, 2012.  (Am. Compl. ¶ 8.)  Following a dispute concerning the

12  amount of gravel fill required for the project and an alleged earth movement or settlement

13  problem with the building pad, LYSD terminated its contract with MKB.  (*Id.* ¶ 18.)

14  MKB notified American Zurich (*see id.* ¶¶ 16, 18), but American Zurich ultimately

15  denied MKB's claim (*id.* ¶ 20).  This lawsuit ensued.

16       MKB initially sued American Zurich for breach of contract.  (Compl. (Dkt # 1)

17  ¶ 20.)  MKB subsequently amended its complaint to bring additional claims for violation

18  of Washington's Insurance Fair Conduct Act, RCW 48.30.015, breach of the duty of

19  good faith and fair dealing, and violation of Washington's Consumer Protection Act,

20  RCW 19.86.  (*See generally* Am. Compl.)  After MKB filed its amended complaint

21  alleging that Zurich had breached its duty of good faith and fair dealing (commonly

22  referred to as a "bad faith" claim), MKB asserted that Zurich could no longer withhold

1  certain documents that were otherwise responsive to its discovery requests based on

2  assertions of attorney-client privilege and the work product doctrine.  (*See* 3/27/13 Mot.

3  (Dkt. # 42).)

4       Presently before the court is MKB's third motion seeking production of

5  documents related to Zurich's communications with its legal counsel, David Edsey,

6  which Zurich has withheld on grounds of attorney-client privilege and the work product

7  doctrine.   (*See* Mot.)  MKB has based all three of its discovery motions on *Cedell v.*

8  *Farmers Insurance Company of Washington*, 295 P.3d 239 (Wash. 2013), which is a

9  recent Washington Supreme Court case that significantly altered application of both the

10  privilege and the doctrine in the context of first-party bad faith insurance disputes in

11  Washington State.  (*See generally* 3/27/13 Mot.; 5/23/14 Mot. (Dkt. # 55); Mot.)

12       On May 27, 2014, the court issued an order concerning MKB's first motion to

13  compel that extensively addressed the applicability of the various substantive and

14  procedural aspects of *Cedell* in federal district court.  *MKB Constructors v. Am. Zurich*

15  *Ins. Co.*, No. C13-0611JLR, 2014 WL 2526901, at *5-9 (W.D. Wash. May 27, 2014).

16  The court also ordered Zurich to produce an amended privilege log, *id.* at *10-11, and

17  struck MKB's second motion to compel because the issues it raised were overlapping

18  with its first motion and subject to the court's rulings therein, *id.* at *11 n.13.  The court,

19  however, provided MKB with the opportunity to file a renewed motion to compel if

20  disputed issues remained following Zurich's production of its amended privilege log.  *Id.*

21       MKB has now filed its renewed motion to compel.  (*See* Mot.)  Based on Zurich's

22  amended privilege log and discovery conferences with opposing counsel, MKB has

ORDER- 3

1   narrowed its motion to documents on Zurich's amended log that were authored before

2   Zurich's March 26, 2013, letter denying MKB's claim and reference communications

3   with Mr. Edsey.  (*See* Mot. at 2.)  Based on *Cedell*, MKB asserts two grounds for the

4   production of these documents related to Mr. Edsey despite Zurich's assertion of the

5   attorney-client privilege.  First, MKB argues that Zurich's communications with Mr.

6   Edsey are discoverable under *Cedell* because Mr. Edsey participated in quasi-fiduciary

7   tasks such as investigating and processing MKB's claim.[1]  (*See* Mot. at 2, 5-6, 8-11;

8   Reply (Dkt. # 86) at 2, 5-6.)  Second, MKB argues that Zurich's communications with

9   Mr. Edsey are discoverable based on the civil fraud exception described in *Cedell*.[2]

10  (Mot. at 11-13.)  The court sets forth the facts relevant to these arguments below.[3]

11

12

13

14      [1] Under *Cedell*, there is a presumption that there is no attorney-client privilege between
15  an insured and the insurer in the claims adjusting process unless the insurer can show that the
    attorney was not engaged in the quasi-fiduciary tasks, such as investigating or processing the
16  claim, but instead was providing the insurer counsel as to the insurer's own liability.  *Cedell*, 295
    P.3d at 246.

17      [2] In arguing that the attorney-client privilege should be pierced based on the civil fraud
    exception found in *Cedell*, the parties essentially present the court with the evidence they have
18  amassed to date on both sides of the "bad faith" issue.  (*See generally* Mot.; Resp. (Dkt. # 82).)
    As a result, in order to sort out this discovery dispute under *Cedell*, the court is faced with
19  evaluating evidence concerning MKB's "bad faith" claim that would ordinarily be considered at
    trial by the jury.

20      [3] In addition to the attorney-client privilege, Zurich also asserts the federal work product
    doctrine with respect to a smaller subset of documents related to Mr. Edsey.  In its motion, MKB
21  asserts a "compelling need" for Zurich's pre-denial communications with Mr. Edsey despite
    Zurich's assertion of work product.  (*See* Mot. at 13-15 (citing *Holmgren v. State Farm Mut.*
22  *Auto. Ins. Co.*, 976 F.2d 573, 577 (9th Cir. 1992).)

ORDER- 4

**A.      Evidence Concerning Mr. Edsey's Performance of Quasi-Fiduciary Tasks**

MKB makes three factual arguments concerning Mr. Edsey's alleged performance

of "the quasi-fiduciary tasks of investigating and evaluating or processing the claim."

*See Cedell*, 295 P.3d at 246.  First, MKB argues that Mr. Edsey investigated MKB's

claim by participating in "roundtable" discussions or conference calls with Richard Dugo,

the Zurich claims adjuster handling MKB's claim, and Steve Kennedy, Mr. Dugo's

supervisor, several times prior to Zurich's formal denial of MKB's claim on March 26,

2013.  (Mot. at 8-9 (citing 5/23/14 Mullinex Decl. (Dkt. # 56) Ex. 1 ("Dugo Dep.") at

70:19-20; 71:17; 160:5-11; 204:3-11).)

Zurich responds that participating in discussions with claims adjusters about the

investigation is not the same as engaging in the task of investigating the claim.  (Resp.

(Dkt. # 82) at 2, 9-10.)  There is no evidence that Mr. Edsey took sworn statements,

conducted any interviews, or had any contact with MKB.  Indeed, Mr. Edsey testified that

Mr. Dugo and Mr. Kennedy "were responsible for the investigation, evaluation and

processing of [MKB's] claim," and "made the decisions regarding the claim."  (Edsey

Decl. (Dkt. # 83) ¶ 3.)  He further testified that he "did not take an examination under

oath or do any other investigation on the claim," and "did not make any claim decisions."

(*Id.* ¶ 4.)  Mr. Edsey testified that his role was limited to "in-house coverage counsel"

who "Mr. Dugo consulted for advice on . . . Zurich's coverage liability for MKB's

claim."  (*Id.*)  Indeed, Mr. Dugo testified in his deposition that, although "claims legal"

may give an opinion concerning the "legal obligation" at issue, "they wouldn't make the

1   final decision." (Dugo Dep. at 74:23-75:17.)  Instead, Mr. Dugo testified that he and Mr.

2   Kennedy made the final decisions concerning claims.  (*Id.* at 75:19-23.)

3       In addition, to participation in "roundtable" discussions, MKB also asserts that the

4   timing of certain telephone calls between Mr. Dugo and Mr. Edsey "suggests" that Mr.

5   Edsey participated in or even "directed" the hiring of one of Zurich's geotechnical

6   consultants, Ninyo & Moore ("N&M").  (Mot. at 5-6.)  However, MKB fails to mention

7   that Mr. Dugo testified that he did not "think David Edsey was involved in the initial

8   process of hiring [N&M]," rather "[i]t was Steve Kennedy [who] got [him] in touch with

9   [N&M]." (Dugo Dep. at 199:14-17.)  In addition, Mr. Kennedy testified that he "actually

10  hired [N&M] because [he] believed they were more qualified" than the engineer initially

11  hired by Zurich's subrogation department.  (*See* 6/30/14 Videa Decl. (Dkt. # 85) Ex. O

12  ("Kennedy Dep.") at 43:1-12.)  In the face of this direct testimony, the court finds the

13  evidence MKB offers concerning the timing of phone calls to be a thin reed upon which

14  to build its position.

15      Finally, MKB asserts that Mr. Edsey also participated in Zurich's determination

16  concerning whether earth movement was the "dominant cause" of MKB's loss under the

17  policy's language.  (Mot. at 11.)  MKB bases this assertion on Mr. Dugo's testimony that

18  if there were competing causes with respect to MKB's loss, then "claims legal" would

19  "provide an opinion" as to whether a given cause was the dominant cause under an

20  endorsement to the policy.  (*Id.* at 9 (citing Dugo Dep. at 65:24-66:10; 74:23-75:17).)

21  Nevertheless, this argument ignores Mr. Dugo's testimony, referenced above, that

22  although "claims legal" provided "opinions," they did not make any final decisions.  (*See*

ORDER- 6

1    Dugo Dep. at 74:23-75:17.)  According to Mr. Dugo, he and his supervisor, Mr.

2    Kennedy, made those decisions.  (*Id.* at 75:19-23.)

3    **B.      Evidence from which a Reasonable Person Could Reasonably Conclude that
            Zurich Engaged in Bad Faith Tantamount to Civil Fraud**

4          MKB also argues that Zurich's communications with Mr. Edsey are discoverable

5    based on the civil fraud exception to the attorney-client privilege described in *Cedell.*

6    (Mot. at 11-13.)  MKB argues that Zurich engaged in "bad faith tantamount to civil

7    fraud" when it processed MKB's claim by "attempt[ing] to defeat a meritorious claim."

8    (*See id.* at 13 (quoting *Cedell*, 295 P.3d at 246).)  MKB cites a variety of evidence in

9    support of this assertion.  (*See* Mot. at 3-5, 6-8, 11-13.)

10         1.   Evidence that Zurich "Buried" Expert VanDerostyne's Report

11         First, MKB argues that Zurich buried the report from its initial expert, David

12   VanDerostyne.  (Mot. at 3-5, 12.)  Zurich's subrogation adjuster, Kathleen LaVallie,

13   retained Mr. VanDerostyne "to assist in determining the cause of the sinking."  (6/16/14

14   Mullenix Decl. (Dkt. # 80) Ex. 9 at 1.)  On October 3, 2012, Mr. VanDerostyne provided

15   his preliminary report, which was based on his review of an earlier, February 16, 2012,

16   geotechnical report, his review of the invitation to bid the project, and his discussions

17   with Mr. Jensen of MBK. (6/30/14 Videa Decl. Ex. R at 1.)  Mr. VanDerostyne stated:

18         . . . MKB . . . appropriately used the information contained in the
           referenced documents . . . in their bids and in planning and execution of
19         their work.

20   (*Id.* at 3.)  MKB asserts that this statement was favorable to its position and the report

21   should have been disclosed.  (Mot. at 4.)  Nevertheless, MKB asserts that Mr. Dugo never

22

ORDER- 7

1  disclosed Mr. VanDerostyne's report to MKB prior to Zurich's denial of MKB's claim.

2  (Mot. at 4.)[4]

3        Zurich responds that Mr. VanDerostyne was not hired by Zurich's claims

4  department but rather its subrogation department, although Zurich admits that Mr. Dugo

5  did communicate with Mr. VanDerostyne and received his preliminary findings.  (Resp.

6  (Dkt. # 82) at 8.)  Indeed, after he received Mr. VanDerostyne's preliminary findings, Mr.

7  Dugo asked Mr. VanDerostyne to confirm that "the loss was not due to workmanship,

8  materials or design."  (6/30/14 Videa Decl. Ex. S at 1.)  Mr. VanDerostyne replied:

9        We see no indications that this was due to workmanship or materials.
      However, poor design information provided by the geotechnical engineer
10       caused MKB to import more soil than they anticipated.  While design
      information did not cause the settlement, it did not properly identify it.
11
(*Id.*)  Zurich argues that Mr. VanDerostyne's statements are consistent with Zurich's
12
March 26, 2013, denial letter.  (Resp. at 13-14.)  Zurich argues that Mr. VanDerostyne's
13
statement that "poor design  . . . caused MKB to import more soil than they anticipated"
14
(6/16/14 Videa Decl. Ex. S) establishes that MKB's loss, if it had one, was caused by
15
defective planning or design, which was an excluded cause of loss under the policy and set
16
forth in Zurich's March 26, 2013, denial letter.  (Resp. at 13-14.)  Thus, Zurich asserts that
17
Mr. VanDerostyne's report is not inconsistent with the positions it takes in its March 26,
18

19
        [4] MKB asserts that Mr. Dugo admitted in his deposition that Mr. Vanderostyne's report
20  "probably should have been provided."  (Mot. at 4.)  The pages of Mr. Dugo's deposition that
   MKB cites in support of this fact, however, do not contain this statement (*see* 6/16/14 Mullinex
21  Decl. Ex. 15 at 186:6-7), nor could the court find the statement elsewhere in the record.  *See*
   *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) (per curium) ("[J]udges are not like
22  pigs, hunting for truffles buried in briefs.").  Thus, the court will not consider this "fact" in its
   evaluation of MKB's motion.

ORDER- 8

1  2013, denial letter.  (*See id.*)  In any event, Zurich asserts that Mr. VanDerostyne's report

2  was preliminary in nature, and that Mr. VanDerostyne expressly states in his report that

3  "[a]dditional evaluation is need . . . to further refine our preliminary evaluation as to the

4  cause of the settlement."  (6/30/14 Videa Decl. Ex. R at 3-4.)  The fact remains, however,

5  that Zurich did not reveal the report to MKB prior to its March 26, 2013, denial letter.

6        2.  Mr. Dugo's Deposition Testimony Concerning the N&M Report

7        MKB also argues that its assertion of civil fraud is supported by (1) Mr. Dugo's

8  deposition testimony that if the building pad in fact settled more than two inches that

9  Zurich should have paid MKB's claim and (2) Mr. Dugo's inability to "explain why he

10  rejected [the N&M] findings" of five and a half inches of settlement.  (*See id.* at 7, 13.)

11  Further, MKB asserts that Zurich's March 16, 2013, denial letter was "premised on the

12  conclusion that no settlement beyond the expected two inches had occurred."  (Mot. at 6-

13  7.)  MKB also argues that Mr. Dugo testified that a "consensus" was developed at one of

14  the "roundtable" discussions rejecting the conclusion in the N&M report concerning five

15  and a half inches of excess settlement—apparently implicating Mr. Edsey in MKB's

16  allegations of bad faith tantamount to civil fraud.  (*See* Mot. at 8 (citing Dugo Dep. at

17  160:5-11).)

18        Zurich counters that the primary reason for its denial of MKB's claim was that

19  MKB had not suffered physical loss or damage.  (Resp. at 11-12.)  Zurich points out that

20  N&M advised Zurich that MKB needed 46,000 tons of gravel to comply with MKB's

21  contract with LYSD, but that MKB had only purchased 45,658 tons.  (6/16/14 Videa Decl.

22  Ex. B at 12-13.)  Thus, Zurich asserts that MKB had not yet suffered a loss at the time

ORDER- 9

1  MKB submitted its claim.[5]  (Resp. at 4-5, 11-12.)  Further, Zurich notes that its denial

2  letter expressly acknowledged that, although LYSD specified that MKB should supply

3  enough gravel for two inches of settlement, approximately five and a half inches of

4  settlement occurred.  (6/16/14 Videa Decl. Ex. A at 1.)

5          Zurich also counters that MKB's description of Mr. Dugo's testimony—that if the

6  building pad settled more than two inches, then Zurich should have paid the claim—is not

7  a strictly accurate account.  (*See* Resp. at 11 ("MKB pieces together a false coverage

8  position for  . . . Zurich based on its interpretation of deposition answers to ambiguous or

9  hypothetical questions.").)  Although both counsel's questions and Mr. Dugo's responses

10  are less than crystal clear during the course of his deposition, the court agrees that MKB's

11  characterization of Mr. Dugo's deposition testimony stretches it further than it can be

12  comfortably pulled.  First, although it is true that Mr. Dugo states unequivocally that he

13  disagreed with the conclusion in the N&M report concerning five and a half inches of

14  settlement (Dugo Dep. at 138:6-12; 147:10-20), he nevertheless also states that he relayed

15  the report's conclusion in the March 26, 2013, denial letter to MKB because Zurich had

16  the report (*id.* at 146:20-25) and "it impacted the coverage decision" (*id.* 147:10-15).

17

18  _____

19          [5] Zurich also asserts that in N&M's later June 7, 2013, report, N&M used a finer
measurement rendered a more accurate calculation and found that the fill MKB imported to the
20  site was short of the contract's requirements by over 6,000 tons of gravel.  (6/16/14 Videa Decl.
Ex. E.)  Zurich also asserts that the finer measurement reduced the amount of unaccounted for
21  gravel (i.e., gravel that settled more than two inches) from five and half inches to three-fourths of
an inch.  (*See id.* Ex. D ("Johnson Dep.") at 15.)  MKB, however, points out that Zurich obtained
this additional information after it had sent its March 26, 2013, denial letter, and therefore, this
22  information could not have served as a foundation for Zurich's denial of MKB's claim.

ORDER- 10

1    Further, in at least two portions of Mr. Dugo's deposition testimony, Mr. Dugo

2   clearly states, contrary to MKB's position, that there are two factors in play with respect

3   to N&M's report:  (1) the five and a half inch settlement, and (2) the shortage of fill

4   purchased by MKB.  Although his testimony is somewhat muddled, he states on more

5   than one occasion that, irrespective of whether the earth settled beyond two inches or not,

6   he would have denied MKB's claim because MKB did not suffer a loss due to its failure

7   to import sufficient gravel fill to meet the contract's requirements.  Specifically, Mr. Dugo

8   testifies:

9        Q:  . . . If the building pad sank more than two inches . . . , tha's a covered
         loss that should have been immediately evaluated and paid, correct?

10

11       A:  If it sunk—if we actually had proof positive that we have a settling of
         the soil to whatever degree beyond 2 inches, is that a compensable loss you
         are asking me?

12

         Q:  Right.

13

         A:  I would have to say it might be.  Yeah, it might be.

14

         Q:  Okay.  Would it be?

15

                              **********

16

         A:  Possibly.  Again, if you don't have other factors—and I go back to the
17       report.  There's two domains.  One is the question of five and a half inches
         or whatever it is.  The other is shortage of fill.  We have two things in play.
18       It's an opinion . . . espoused by the expert.

19                              **********

20       Q:  You are saying there are two domains, correct?

21       A:  Correct.

22

ORDER- 11

1    Q:  One of the domains is maybe MKB underestimated how much fill it
     would need?

2

3    A:  Correct.

     Q:  . . . Even if MKB did underestimate how much fill it needed to bring,
4    the earth still sank, correct?

5                                    **********

6    A:  Possibly.  We have an expert that says it sank.  That doesn't mean that
     he is correct.

7
(Dugo Dep. at 142:14-144:8.)  In another portion of his deposition testimony, Mr. Dugo

8
again states that even if he believed N&M's conclusion concerning five and a half inches

9
of settlement, he would have still denied MKB's claim because he believed MKB had not

10
suffered a loss due to the shortage of fill MKB had brought to the site.  (Dugo Dep. at

11
136:21-137:11.)  Thus, the court cannot conclude that Mr. Dugo unequivocally "admitted

12
that more than two inches of settlement would have triggered coverage."  (*See* Mot. at 7.)

13
His deposition testimony is subject to interpretation and possibly clarification at trial.

14
        Finally, the court also disagrees with MKB characterization of Mr. Dugo's

15
deposition testimony that "a 'consensus' was developed at one of the roundtables that the

16
[N&M] finding of [5.5 inches of excess settlement] was incorrect."  (*See* Mot. at 8.)  Mr.

17
Dugo testifies that "it was the consensus that we did not have a settlement issue, but a

18
loss of fill issue," that he thinks the "roundtable" looked at the N&M report, and that

19
Zurich conducted a roundtable discussion of coverage before it sent the denial letter to

20
MKB.  (*See* Dugo Dep. at 160.)  Nevertheless, the court could find no clear statement in

21
the portion of Mr. Dugo's deposition cited by MKB that a "consensus" was developed at

22

ORDER- 12

1   a "roundtable" discussion that N&M's conclusion of five and a half inches of excess

2   settlement was factually incorrect.  (*See id.*)  Indeed, under Zurich's analysis of MKB's

3   claim in its denial letter (6/16/14 Videa Decl. Ex. A), it would not be necessary for

4   Zurich to reject N&M's conclusions for Zurich to deny MKB's claim.  Instead, Zurich

5   argues that, irrespective of any excess settlement, MKB could not demonstrate it had

6   incurred expenses beyond its performance of the contract or suffered a loss under the

7   policy because MKB had not yet imported sufficient quantities of gravel fill to meet the

8   contract's requirements.  (*See* Resp. at 12.)

9                              **III.     ANALYSIS**

10          As the court discussed in its previous order in this case involving MKB's first

11   motion to compel, *Cedell* significantly altered application of the attorney-client privilege

12   in the context of first-party bad faith claims in Washington State.  *See MKB*, 2014 WL

13   2526901, at *4.  Most significantly, in such cases, *Cedell* creates a "presumption that

14   there is no attorney-client privilege relevant between the insured and the insurer in the

15   claims adjusting process, and that the attorney-client . . . privilege[ is] generally not

16   relevant." *Id.* (citing *Cedell*, 295 P.3d at 246).  Nonetheless, an insurer may overcome

17   *Cedell's* new "presumption of discoverability by showing its attorney was not engaged in

18   the quasi-fiduciary tasks of investigation and evaluating or processing the claim, but

19   instead in providing the insurer with counsel as to its own liability:  for example, whether

20   or not coverage exists under the law." *Cedell*, 295 P.3d at 246.

21          Even if, however, an insurer demonstrates that an attorney was not serving in a

22   quasi-fiduciary role, under *Cedell*, an insured may still be able to pierce the insurer's

1  assertion of attorney-client privilege.  *See MKB*, 2014 WL 2526901, at *4.  If the insured

2  asserts that the insurer has engaged "in an act of bad faith tantamount to civil fraud" and

3  makes "a showing that a reasonable person would have a reasonable belief that an act of

4  bad faith has occurred" or that "an insurer [has] engage[d] in bad faith in attempt to

5  defeat a meritorious claim," then the insurer will be deemed to have waived the privilege.

6  *See Cedell*, 295 P.3d at 246-47.  Obviously, something more than an honest disagreement

7  between the insurer and the insured about coverage under the policy must be at play here.

8         In *Cedell*, the Washington Supreme Court directs state trial courts to conduct *in*

9  *camera* reviews of the disputed privileged documents at two points in the forgoing

10  process—when the insurer asserts that its attorney was not engaged in quasi-fiduciary

11  tasks, *id.* at 246, and when the insured asserts that the insurer has engaged in an act of

12  bad faith tantamount to civil fraud, *id.* at 246-47.  Unfortunately, in both circumstances,

13  the Washington Supreme Court is not clear whether demonstrating the required showing

14  is a prerequisite to the *in camera* review or whether evidence gleaned from the *in camera*

15  review can be utilized to make the necessary showing.  *See id.*; *see also MKB*, 2014 WL

16  2526901, at *4 (discussing this inconsistency in the *Cedell* opinion).  In any event, in

17  *MKB*, this court determined that *Cedell*'s *in camera* review requirement was procedural

18  in nature and thus not mandatory in federal court.  *MKB*, 2014 WL 2526901, at *7

19  ("[T]he court may conduct *in camera* reviews as described by the Washington Supreme

20  Court in *Cedell*, but it is not bound to do so.").

21         The court also held that *Cedell*'s rulings with respect to the work product doctrine

22  were not applicable in federal court.  *MKB*, 2014 WL 2526901, at *8.  This is so because

ORDER- 14

1  "[a]lthough the attorney-client privilege is a substantive evidentiary privilege, the work

2  product doctrine is a procedural immunity governed by the Federal Rules of Civil

3  Procedure, specifically Rule 26(b)(3)."  *Id.*  Thus, to the extent that MKB seeks any

4  documents that Zurich withholds on grounds of the work product doctrine, federal law—

5  not *Cedell*—governs Zurich's right to withhold those documents.

6        MKB has accepted Zurich's counsel's representation that each of the pre-denial

7  work product claims are for opinion work product.  (Mot. at 14, n.68.)  The Ninth Circuit

8  has held, in the context of a bad faith settlement insurance coverage dispute, that "on a

9  case-by-case basis" an insured may be able to obtain opinion work product.  *See*

10 *Holmgren v. State Farm Mut. Ins. Co.*, 976 F.2d 573, 577 (9th Cir. 1992).  The insured,

11 however, must not show simply a "substantial need" for the documents, but rather must

12 show that the attorney's mental impressions are at issue and the insured's need for the

13 documents is "compelling."  *Id.*

14        With these general principles in mind, the court now discusses the specific

15 documents in dispute here.  In its order on MKB's first motion to compel, the court found

16 that Zurich had met its initial burden of showing that Mr. Edsey was not engaged in "the

17 quasi-fiduciary tasks . . . , but instead in providing the insurer with counsel as to its own

18 liability:  for example, whether or not coverage exists under the law," *MKB*, 2013 WL

19 2526901, at *9 (citing *Cedell*, 295 P.3d at 246).  The court noted that Mr. Edsey did not

20 take any witness examinations under oath or conduct any other investigatory activities.

21 *Id.*  In the context of the present motion, Mr. Edsey again testifies that he "did not take an

22 examination under oath or do any other investigation on the claim."  (Edsey Decl. (Dkt.

ORDER- 15

83) ¶ 4.)  He testifies that he "did not make any claim decisions."  (*Id.*)  He states that "provided legal services and advice concerning . . . Zurich's liability for MKB's insurance claim under the insurance policy and applicable law."  (*Id.*)

In its present motion, MKB tries to undermine Zurich's showing by presenting evidence that Mr. Edsey was involved in several "roundtable" discussions or conference calls with Mr. Dugo and Mr. Kennedy concerning MKB's claim and that these "roundtable" discussions occurred just prior to critical junctures in Zurich's claim handling process.  (*See generally* Mot. at 10-11.)  The court, however, does not find the number of communications nor their timing surprising if Mr. Edsey was to provide counsel to Zurich as to its own liability concerning coverage under the law or with respect to its handling of MKB's claim.  In order to provide advice on these issues, Mr. Edsey would necessarily need to be informed concerning the development of evidence surrounding MKB's claim and Zurich's methods for acquiring and evaluating that evidence.  This does not mean that Mr. Edsey was engaged in investigating the claim himself.  These are simply facts Mr. Edsey would need to know to provide Zurich with the best legal advice concerning its own liability in this matter.

In several of the cases upon which MKB relies, the activities of attorneys found to have engaged in quasi-fiduciary activities and to have waived any privilege far exceeds the evidence concerning Mr. Edsey's activities here.  For example, in *Cedell*, the insurer's attorney examined witnesses under oath.  *Cedell*, 295 P.33d at 242.  He also communicated directly with the insured, authored and signed the insurer's denial letter, and initiated settlement negotiations with the insured.  *See id.*; *see also Hilborn v. Metro.*

1  *Group Prop. & Cas. Ins. Co.*, No. 2:12–cv–00636–BLW, 2013 WL 6055215, at *3 (D.

2  Idaho Nov. 15, 2013) (attorneys admitted that they were retained to investigate the claim

3  and one attorney placed a phone call to a third party to investigate the claim); *HSS*

4  *Enters., LLC v. Amco Ins. Co.*, No. C06-1485-JPD, 2008 WL 163669, at *1-2 (W.D.

5  Wash. Jan. 14, 2008) (attorneys conducted examinations under oath, assisted the insurer

6  with its factual investigation, and adjusted the claim); *Ivy Hotel San Diego, LLC v.*

7  *Houston Cas. Co.*, No. 10cv2183-L (BGS), 2011 WL 4914941, at *5 (S.D. Cal. Oct. 17,

8  2011) (attorney became primary point of contact with insured regarding insured's claim).

9  There is no evidence that Mr. Edsey engaged in any of these types of activities.  The

10  court finds that MKB has not overcome Zurich's showing that Mr. Edsey was not

11  engaged in quasi-fiduciary activities.

12      Nevertheless, the court is concerned about some of the evidence that MKB

13  presents concerning *Cedell*'s civil fraud exception.  In particular, the court is concerned

14  with Zurich's failure to disclose Mr. VanDerostyne's report to MKB.  The court does not

15  conclude that Mr. VanDerostyne's report renders Zurich's coverage decision incorrect.

16  Indeed, the court has made no determination concerning the coverage issues at all in this

17  proceeding.   The court also does not conclude at this point in time that Zurich's failure to

18  reference the report was deliberate or that reference to the report was even necessarily

19  required.  The court simply finds the omission sufficiently troubling that, in this instance,

20  it will exercise its discretion and order an *in camera* review of the documents that MKB

21  has placeed at issue with respect to Mr. Edsey.  As noted in its prior order, in federal

22  district court, the *in camera* review required under *Cedell* remains discretionary.  *MKB*,

ORDER- 17

1   2014 WL 2526901, at *6-7.  MKB has persuaded the court that, in this instance, the court

2   should exercise that discretion.  In addition, the court will review *in camera* those

3   documents that Zurich also withholds on grounds of work product to better assess MKB's

4   assertion of compelling need for their production.

5          The court orders MKB to produce these documents to the court for *in camera*

6   inspection no later than 12:00 noon, on Thursday, July 31, 2014.[6]  After the court has

7   received these documents and reviewed them, it will issue a further order concerning

8   their continued protection under the attorney-client privilege and/or work product

9   doctrine or their production to MKB.  The court will also consider MKB's request to

10  reopen the deposition of Mr. Edsey after it has conducted its *in camera* review.

11         There is one further issue to address.  In its order on MKB's first discovery

12  motion, the court held that Zurich did not have to produce any of the communications

13  with its subrogation counsel, George Shumsky.  *MKB*, 2014 WL 2526901, at *9.  Zurich

14  had asserted the work product doctrine with respect to all documents referencing

15  communications with Mr. Shumsky.  The court held that Zurich had met its burden under

16  the federal work product doctrine with respect to these documents because subrogation

17  activity anticipates litigation through its very purpose—recovering insurance payments

18  from responsible third parties—often through litigation or the threat of litigation.  *Id.*  The

19  

20         [6] The court recognizes that this deadline requires counsel to respond quickly.  Ordinarily,
    the court would provide more time.  The case schedule, however, demands a quick response.
21  The dispositive motions deadline has already passed, and trial is scheduled to commence on
    October 20, 2014.  If the court is to maintain the parties' trial date, it must resolve this remaining
    discovery dispute as quickly as possible.  Presumably, Zurich has these documents already
22  segregated, and thus it should be able to comply even given the short time provided.

ORDER- 18

1 court also held that MKB had not met its burden of showing a compelling need for the

2 production of these documents despite their work product nature. *Id.*

3        Zurich asserts, once again, that the documents on its privilege log related to Mr.

4 Shumsky are protected under both the attorney-client privilege and the federal work

5 product doctrine and that MKB "makes no showing of need" to overcome this protection.

6 (Resp. at 15-16.)  In its reply memorandum, MKB admits that it "does not seek Shumsky

7 documents" in this motion, but rather only documents related to Mr. Edsey.  (Reply (Dkt.

8 # 86) at 2.)  The court notes, however, that several entries on Zurich's amended privilege

9 log that MKB places at issue in this motion appear to relate only to communications with

10 Mr. Shumsky or subrogation counsel.  (*See* Mullinex Decl. Ex. 1 (Entry Nos. AZ 00919;

11 AZ 00921; AZ 01230; AZ 01544; AZ 01546; AZ 01939; AZ 01987; AZ 01991; AZ

12 03961).)  Assuming that these entries do not involve Mr. Edsey or communications with

13 Mr. Edsey, then based on MKB's statement above, Zurich need not produce these

14 documents for *in camera* review.  If, however, these documents do involve Mr. Edsey,

15 then Zurich should produce them for *in camera* review at the time ordered above.

16 //

17 //

18 //

19 //

20 //

21 //

22 //

ORDER- 19

1

## IV.   CONCLUSION

2      Based on the foregoing, the court GRANTS in part and DENIES in part MKB's

3    third motion to compel (Dkt. # 79).

4      Dated this 28th day of July, 2014.

5

6

7    _____

      JAMES L. ROBART

8    United States District Judge

9

10

11

12

13

14

15

16

17

18

19

20

21

22

ORDER- 20