1

2

3

4

5

6

7

8

9

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

10

MKB CONSTRUCTORS,

CASE NO. C13-0611JLR

11

Plaintiff,

ORDER ON CROSS MOTIONS
FOR SUMMARY JUDGMENT

12

v.

13

AMERICAN ZURICH INSURANCE
COMPANY,

14

15

Defendant.

## I.    INTROCUTION

16

17

    This order addresses two motions:  (1) Plaintiff MKB Constructors' ("MKB")

18

motion for partial summary judgment (MKB Mot. (Dkt. # 91)), and (2) Defendant

19

American Zurich Insurance Company's ("American Zurich") motion for summary

20

judgment (AZ Mot. (Dkt. # 93)).  The court has review the motions, all submissions filed

21

22

1   in support of and opposition thereto, the balance of the record, and the applicable law.

2   Being fully advised,[1] the court GRANTS in part and DENIES in part both motions.

3   ## II.   BACKGROUND

4   This case is an insurance coverage dispute involving a "Builders Risk" policy.

5   MKB contracted with the Lower Yukon School District ("LYSD") for Phase I of a

6   project that involved "the procurement, delivery and placement of gravel fill" for a new

7   building pad and driveway upon which a school building would be erected in Emmanak,

8   Alaska ("the Project").  (Am. Compl. (Dkt. # 35) ¶ 6; 7/22/14 Videa Decl. (Dkt. # 94) Ex.

9   1 at 2.)  In March 2012, LYSD requested contractors to bid on Phase I of the Project and

10  provided the bidding contractors information, including topographical maps or drawings

11  that showed the elevation of the original ground and the elevation to which the gravel pad

12

13  [1] American Zurich requests oral argument with respect to its own motion for partial
    summary judgment.  (*See* AZ Mot. (title page).)  MKB did not request oral argument in its
    opposition to American Zurich's motion.  (*See* MKB Resp. (Dkt. # 107) at 1.)  Neither party
14  requested oral argument regarding MKB's motion.  (*See* MKB Mot. at 1; AZ Resp. (Dkt. # 105)
    (title page).)  "[A] district court may not . . . deny . . . a request [for oral argument] when made
15  by a party opposing the motion unless the motion for summary judgment is denied."  *Dredge
    Corp. v. Penny*, 338 F.2d 456, 462 (9th Cir. 1964).  Here, no party opposing a motion for
16  summary judgment has requested oral argument.  Further, a district court's denial of a request for
    oral argument on a motion for summary judgment does not constitute reversible error in the
    absence of prejudice.  *Partridge v. Reich*, 141 F.3d 920, 926 (9th Cir. 1998) (citing *Fernhoff v.
17  Tahoe Reg'l Planning Agency*, 803 F.2d 979, 983 (9th Cir. 1986)).  There is no prejudice in
    refusing to grant oral argument where the parties are represented by counsel and have had ample
18  opportunity to develop their legal and factual arguments through written submissions to the
    court.  *Partridge*, 141 F.3d at 926 ("When a party has [had] an adequate opportunity to provide
19  the trial court with evidence and a memorandum of law, there is no prejudice [in refusing to
    grant oral argument] . . . .") (quoting *Lake at Las Vegas Investors Grp., Inc. v. Pac. Malibu Dev.
20  Corp.*, 933 F.2d 724, 729 (9th Cir. 1991)) (alterations in *Partridge*).  The issues in the parties'
    cross motions have been thoroughly briefed by both American Zurich and MKB, and the court
21  has determined that oral argument would not be of assistance in deciding either motion.  *See*
    Local Rules W.D. Wash. LCR 7(b)(4).  Accordingly, the court denies American Zurich's request
22  for oral argument.

1   was to be built.  (Carl Decl. (Dkt. # 96) ¶ 5.)  From this information, LYSD expected

2   bidding contractors to calculate the volume of compacted gravel that would be required

3   to complete Phase I of the Project.  (*See id.*)  The maps and drawings were incorporated

4   into and made a part of the Phase I contract.  (*Id.*)

5          The Project site was built on tundra that melted during the summer, becoming

6   marshy and pocketed by pools of standing water.  (*See* 7/22/14 Videa Decl. Ex. 3

7   (Nesheim Dep.) at 28:9-14, Ex. 4 (Romine Dep.) at 33:9-12; Ex. 6 (Wilson Dep.) at

8   170:4 ("It's a swamp.").)  LYSD provided the bidding contractors with a geotechnical

9   report that stated:  "Settlements of 3 to 9 inches should be expected in area [sic] with 30

10  inches of fill and 5 to 12 inches in areas with 72 inches of fill."  (*Id.* Ex. 7 (attaching

11  February 2012 Revised Northern Geotechnical Engineering Report) at 5.)  The

12  geotechnical report did not give the rate of settlement.  (*See generally id.*)  LYSD,

13  however, also issued Addendum 2, which stated:

14          There will be some initial settlement of about two inches that will occur
            during construction but the majority of the settlement will occur over a few
15          years.  The Phase I contractor is expected to bring the gravel to the grades
            shown on the drawings, concluding with substantially [sic] completion on
16          September 15, 2012.  The final topping and finish grading will be done by
            the Phase II contractor after the old HS building is demolished; this Phase
17          II work will correct for any additional settlement occurring after Phase I
            substantial completion.

18
    (*Id.* Ex. 8 (attaching Addendum 2) at 3 of 5; 7/22/14 Mullenix Decl. (Dkt. # 92) Ex. 14 at
19
    3 of 5.)  LYSD intended to pay for additional gravel that the contractor placed due to
20
    more than two inches of settlement.  (7/22/14 Videa Decl. Ex. 34 (John Dep.) at 44:2-8;
21
    John Decl. (Dkt. # 96) ¶ 18.)
22

1   LYSD placed the drawings showing the topographical elevation contours of the

2   original existing ground and the elevation to which the gravel pad would be built on a

3   website called "The Plans Room."  (John Decl. ¶ 5.)  The drawings on the website were

4   not distorted (7/22/14 Videa Decl. Ex. 12 ("Fortunato Dep.") at 97:14-17), but they

5   became so when MKB printed hardcopies of the drawings on its office printer (*id.* Ex. 9

6   ("12/17/13 Jensen Dep.") at 47:16-23, 115: 10-20; Ex. 13 ("8/27/13 Jensen Dep.") at

7   8:15-17, 9:20-23).  MKB assigns responsibility for the distorted drawings to LYSD.  (*See*

8   Jensen Decl. (Dkt. # 110) ¶ 13.)  In any event, MKB used the distorted drawings to

9   estimate that it would need a volume of 23,626 cubic yards of compacted gravel for

10   Phase I of the Project.  (12/17/13 Jensen Dep. at 47:16-49:2, 126:2-5.)  Based on MKB's

11   bid of $5,582,887.00, LYSD awarded the Phase I contract to MKB.  (John Decl. ¶ 8;

12   7/22/14 Videa Decl. Ex. 14; 7/22/14 Mullenix Decl. Ex. 10.)

13   After winning the bid, MKB hired a computer-aided earthwork calculations

14   specialist, Earthwork Services ("Earthworks"), which determined that the required

15   volume of compacted gravel for Phase I was 26,767 cubic yards.  (*See* 7/22/14 Videa

16   Decl. Ex. 15 ("Zimmerman Dep.") at 39:5-15; *id.* Ex. 16 at 2; *see* 7/22/14 Mullenix Decl.

17   Ex. 12 ("12/17/13 Jensen Dep.") at 26:12-21.)  As a part of its analysis, Earthworks

18   pointed out to MKB that the drawings MKB had relied upon in making its bid to LYSD

19   were distorted.  (7/22/14 Mullenix Decl. Ex. 21.)  As a result, MKB "question[ed] the

20   sufficiency of its bid quantities."  (MKB Mot. at 3-4 (citing 7/22/14 Mullinex Decl. Ex.

21   22).)

22   On May 17, 2012, MKB sent a letter to LYSD's engineer stating:

MKB performed the bid takeoff for import fill utilizing drawing C1.0.  We have confirmed drawing C1.0 to be in error based on the CADD [sic] files forwarded to MKB.  We estimate the total volume difference, base and alternates, to be approximately 4,700 CY [cubic yards].

MKB would appreciate the opportunity to sit down and discuss this issue in greater detail and negotiate an equitable price adjustment fair to both parties.

(7/22/14 Videa Decl. Ex. 18.)

On June 5, 2012, MKB sent another letter to LYSD's engineer explaining that the drawing MKB had used to determine the required volume of compacted gravel was distorted.  (*Id.* Ex. 19; 7/22/14 Mullenix Decl. Ex. 22.)  The letter explained that the distorted drawing resulted in a faulty estimate of 23,896 cubic yards of gravel while the "Total Corrected Cubic Yardage" should be 30,479 for a difference of 6,583 cubic yards.  (7/22/14 Videa Decl. Ex. 19 at MKB001112; 7/22/14 Mullenix Decl. Ex. 22 at RNA00374.)  MKB estimated the "TOTAL COST IMPACTS" to be $482,757.00.  (*Id.*)

As an alternative to the "lump sum payment of impacts noted above," MKB offered two alternative solutions to the situation, as follows:

1.  Settlement in excess of the noted two (2") inches will most likely occur based on regional settlement results.  MKB can furnish and place the quantity of fill as originally bid.  In consideration of such the LYSD would revise the Phase II bid proposal to include the unit quantity and pricing for additional fill.  This allows for any and all additional fill to be furnished and place [sic] at an agreed to unit price subject to LYSD direction.

2.  MKB's estimated costs to furnish and place are subject to change based on actual production.  MKB would be agreeable to furnishing and placing additional fill under actual cost conditions utilizing the contract markup provisions for change orders.

1   (7/22/14 Decl. Ex. 19 at MKB001114; 7/22/14 Mullenix Decl. Ex. 22 at RNA00375.)

2   MKB closed the letter by stating that it "certif[ied] the above and attached information to

3   be true and copied without edit." (*Id.*)

4          On July 11, 2014, LYSD responded to MKB, stating that it would not agree

5   to increase the contract price:

6          It is my decision as the District's (Owner's) Representative for this project,
       that MKB's claim is without merit. MKB admittedly based its bid upon an
7          "import fill takeoff from drawing C1.0.". . . . That alleged underestimation
       has not been shown to be the result of any error by the District. The claim
8          is denied.

9   (7/22/14 Videa Decl. Ex. 20.)

10          MKB started placing gravel on the Emmonak site in the second half of July. (*See*

11  *id.* Ex. 22 (attaching July 23, 2012 MKB daily log); Ex. 3 (Nesheim Dep.) at 71:2-8; Ex.

12  4 (Romine Dep.) at 82:6-7.) After about a month, MKB performed an interim survey

13  which indicated less progress at placing fill than expected. (7/22/14 Mullinex Decl. Ex.

14  23 (Wilson Dep.) at 48:25-49:18.) As a result, MKB dug potholes at the site down to the

15  geotextile fabric it had laid at the beginning of the project, and 19 out of 24 of these

16  potholes indicated settlement at the site beyond two inches. (*Id.* Ex. 24, Ex. 25 (Hayden

17  Dep.) at 98:7-99:22.)[2] During the course of the summer, MKB also lost the ability to

18  obtain additional gravel from its original source and was forced to barge in gravel from

19

20  _____

21          [2]The Project engineer's surveyor does not dispute the results of the pothole survey except
    to question the location or distribution of the potholes. (7/22/14 Mullinex Decl. Ex. 25 at 98:7-
22  99:22.) However, MKB has stated that it will not rely on the pothole survey to prove the extent
    of total settlement at the site. (MKB Mot. at 4, n.22.)

1    Nome, Alaska, at a higher cost.  (*See* 7/22/14 Videa Decl. Ex. 4 (Romine Dep.) at 214:

2    16-24; Ex. 24.)

3         On August 28, 2012, MKB wrote to LYSD that it anticipated "an import fill

4    overrun approaching 100% of the estimated quantities," with "cost impacts" near or

5    exceeding $2,000,000.00.  (*Id.* Ex. 26.)  In the letter, MKB stated that it had determined

6    based on a survey performed the weekend of August 22, 2012, that "settlement was a

7    contributing factor" that justified contract relief as a change in conditions.  (*Id.*)  LYSD

8    responded on August 29, 2012, that MKB had provided "no documented evidence" that

9    settlement was a contributing factor to the overruns.   (*Id.* Ex. 27.)

10        On August 30, 2012, MKB replied:

11        Based on preliminary survey data the site is experiencing settlement during
         construction in excess of [the description contained in Addendum 02] with
12        only half the revised quantities placed to date.  The addition of fill will only
         magnify and accelerate settlement conditions.

13

14   (*Id.* Ex. 28.)  As a result, MKB requested "a time extension and payment of all costs

15   resulting from deficient specifications/drawings and change conditions."  (*Id.*)  On the

16   same day, LYSD wrote that it would "work with MKB to the extent possible on

17   justifiable gravel settlement," but noted that "MKB has failed to substantially

18   demonstrate that there is indeed settlement in the quantities presently being asserted."

19   (*Id.* Ex. 28.)

20        Although MKB worked for nearly a month past the substantial completion

21   deadline, the gravel it placed on the pad was still significantly below the levels required

22   by the contract.  (*See* MKB Mot. at 5 (citing 7/22/14 Mullenix Decl. Ex. 30).)  LYSD

1    sent MKB a letter on October 15, 2012, transmitting "the as constructed survey results of

2    the Phase I Emmonak Site." (7/22/14 Videa Decl. Ex. 31.) The letter states that the

3    "survey reflects MKB's substantial and material failure to meet its contractual obligations

4    to complete the work by October 1, 2012." (*Id.*) On November 8, 2012, LYSD sent a

5    letter to MKB terminating the contract. (*Id.* Ex. 32.) LYSD also withheld the final

6    contract payment of $1,436,419.40. (*See id.* Ex. 33 at 13.) At this point in time, MKB

7    was unable to retrieve its equipment from the site before the Yukon River, which was

8    used to access the site, was frozen over. (*See* 7/22/14 Mullenix Decl. ¶ 2.cc, Ex. 29

9    ("2/18/14 Jensen Dep.") at 80:18-23.)

10          In December, 2012, MKB processed a change order for the Phase II contractor, for

11   placement of 7,000 cubic yards of fill to satisfy the specification requirements of Phase I

12   construction. (7/22/14 Mullenix Decl. Ex. 9.) The price for the change order was

13   $1,737,152.00. (*Id.*)

14          On December 21, 2012, MKB sent a letter to LYSD demanding "compensation

15   related to earth subsidence, settlement, of the native soils in accordance with the . . .

16   contract by and between the LYSD and MKB . . . ." (*Id.* at 1.) MKB asserted in the

17   letter that it was "legally entitled to the following cost recovery:"

18          Remaining Contract Balance:           $ 1,436,419.40
             Earth Movement Claim . . . :          $    669,508.99
19          Incidental Costs to Changed Conditions: $    464,286.10
             Markup & Overhead                      $    208,880.62
20          Legal and Professional Fee              $           TBD
             TOTAL                                  $ 2,779,095.11
21
     (*Id.* at 13.)
22

ORDER- 8

1    MKB initiated arbitration proceedings against LYSD.  (7/22/14 Videa Decl. Ex.

2    35 at 1; John Decl. ¶ 21.)  MKB settled the arbitration after LYSD agreed to pay MKB

3    $1,436,419.40,[3] which is the same amount that LYSD withheld from MKB as the

4    remaining Phase I contract balance.  (*Id.* at 2.)  Mr. Mark Jensen, MKB's Federal Rule of

5    Civil Procedure 30(b)(6) deponent, testified that MKB was paid the contract balance by

6    LYSD in arbitration proceedings.  (*Id.* Ex. 36 ("2/18/14 Jensen Dep.") at 22:7-9 ("MKB

7    was paid – in arbitration proceedings, MKB was paid the contract balance by [LYSD].")

8    This testimony is consistent with LYSD's understanding of the settlement amount.  (*See*

9    John Decl. ¶ 21 ("LYSD did not intend to pay for anything else in the settlement other

10   than the withheld contract payment. . . . LYSD decided to settle the arbitration by paying

11   the withheld contract payment because of business reasons.").)

12        Despite Mr. Jensen's Rule 30(b)(6) deposition testimony, MKB submits that there

13   were numerous claims besides just the withheld contract payment that were resolved by

14   the settlement agreement.  (Nourse Decl. (Dkt. # 109) ¶ 12.)  Indeed, following his Rule

15   30(b)(6) deposition on behalf of MKB, Mr. Jensen submitted a declaration in which he

16   states that "MKB has never been paid 'the withheld contract payment' from LYSD."

17   (Jensen Decl. (Dkt. # 110) ¶ 4.)

18        On June 15, 2012, American Zurich issued Builders Risk Policy No. EC04372092

19   ("the Policy") to MKB.  (7/22/14 Videa Decl. Ex. 38 at Zurich Policy 03.)  The Policy

20   provides that American Zurich "will pay for direct physical loss or damage to Covered

21   _____

22        [3] LYSD also agreed to pay MKB an additional $80,502.57 for work MKB performed
under a separate work order contract in April, 2013.  (7/22/14 Videa Decl. Ex. 35 at 1-2.)

ORDER- 9

1  Property caused by or resulting from a Covered Cause of Loss . . . ." (*Id.* at Zurich Policy

2  038.)  "Covered Causes of Loss means risk of direct physical loss or damage unless the

3  loss or damage is otherwise excluded or limited in this Coverage Form." (*Id.*)  Earth

4  movement is ordinarily an excluded Cause of Loss under the Policy (*id.* at Zurich Policy

5  041), but MKB paid extra for the addition of an "Earth Movement" endorsement to the

6  Policy (Mullinex Decl. Ex. 16 at 6).  The definition of "earth movement" includes "earth

7  sinking . . . or shifting."  (7/22/14 Videa Decl. Ex. 38 at Zurich Policy 010.)

8         On August 30, 2012, MKB gave American Zurich notice of a claim but did not

9  specify the nature of the loss except to say:  "MKB has contract for site preparation work

10  at Emmonak School.  Potential design issue resulted in damage to the foundation work."

11  (*Id.* Ex. 39; 7/22/14 Mullinex Decl. Ex. 27.)  On December 28, 2012, MKB submitted the

12  specific items it was claiming to American Zurich.  (7/22/14 Videa Decl. Ex. 40 at 2.)

13  These items included:

| | | | |
|---|---|---|---|
| A. Contract Balance: | $ 1,436,419.40 | (Tab A) |
| B. Additional Foundational Materials: | $ 669,508.99 | (Tab B) |
| C. Incidental Costs: | $ 464,268.10 | (Tab B) |
| Markup & Overhead: | $ 208,880.62 | |
| Policy Deductible (Earth Movement): | $ -100,000.00 | |
| Legal and Professional Fee: | $        TBD | |
| | $ 2,679.095.11 | |

18  (7/22/14 Videa Decl. Ex. 40 at AZ01047.)  Mr. Jensen has acknowledged that MKB's

19  claim against LYSD is the same as MKB's claim against American Zurich.  (*Id.* Ex. 9

20  ("12/17/13 Jensen Dep.") at 68:14-23 ("It's the same claim.").)

21

22

1        American Zurich conducted a coverage investigation, and ultimately denied

2  MKB's claim in a letter dated March 26, 2013.  (Mullinex Decl. Ex. 4; 7/22/14 Videa

3  Decl. Ex. 41.)  American Zurich's March 26, 2003, letter states, in part:

> Our investigation has not revealed that the building pad was ever damaged.
> MKB simply did not order enough fill material to complete the project.  As
> the project was ongoing and MKB realized the 30,000 tons of gravel fill it
> had ordered was not going to be enough, it ordered approximately 15,000
> additional tons of fill.  This shortage of gravel fill material does not
> constitute "physical loss or damage" under the Policy so as to give rise to a
> covered claim.

8  (7/22/14 Videa Decl. Ex. 2 at AZ3736.)  In addition, the letter states that, even if MKB's

9  claim represents damage under the Policy, a number of policy exclusions apply to negate

10  any coverage.  (*Id.* at AZ3737-38.)

11        During the course of American Zurich's investigation, Ninyo & Moore issued a

12  March 8, 2013, report indicating that the volume of gravel needed to complete the Phase I

13  contract was 23,775 cubic yards.  (7/22/14 Johnson Decl. (Dkt. # 95) ¶ 6.)  In a June 7,

14  2013, report, Ninyo & Moore revised its calculations and came to the conclusion that

15  26,983 cubic feet of gravel were required to complete Phase I.  (*Id.* ¶¶ 10-11.)  Ninyo &

16  Moore did not revise its calculations, however, until after American Zurich had denied

17  coverage to MKB.

18        The March 8, 2013, Ninyo & Moore report also stated that "one factor in the

19  shortage of gravel fill needed to complete the project is the MKB under-estimated the

20  quantity of fill, based on weight, required to construct the building pad."  (8/18/14 Videa

21  Decl. (Dkt. # 106) Ex. 10 at 13; *see also id.* at 15 ("[T]he shortage of gravel fill to

22  complete the building pad was due to the following factors:  1) MKB under-estimated the

weight of gravel to be purchased for the project, and 2) settlement of the ground surface

beneath the fill.").)

Following American Zurich's denial of MKB's claim, this lawsuit ensued. The

parties' cross motions for summary judgment or partial summary judgment are presently

before the court. American Zurich asks the court to rule as a matter of law that each of

the individual cost items claimed by MKB is not a covered loss under the Policy. (AZ

Mot. at 12-18.) American Zurich also asks the court to grant summary judgment that

Alaska law governs MKB's common law and statutory claims for bad faith and then to

dismiss those claims pursuant to Alaska's legitimate dispute doctrine. (*Id.* at 18-23.)

MKB asks the court to grant partial summary judgment on five issues. First, MKB

asks the court to rule as a matter of law that it need not prove full performance of the

Phase I contract with LYSD to establish a covered loss under the Policy. (MKB Mot. at

6-11.) Second, MKB asks for a ruling that none of the Policy exclusions apply because

earth movement was necessarily the dominant cause of its loss under the Policy. (*Id.* at

12-14.) Third, MKB asks the court to grant summary judgment that none of the Policy

exclusions asserted by American Zurich are applicable. (*Id.* at 14-19.) Fourth, MKB

asks the court to rule on summary judgment that the fortuity doctrine is inapplicable. (*Id.*

at 19-23.) Finally, MKB asks the court to rule as a matter of law that it has met the

statutory preconditions for bringing a claim under Washington's Insurance Fair Conduct

Act ("IFCA"), RCW 48.30.015. (*Id.* at 23.)

The court addresses each of these issues in turn.

//

1

### III.   ANALYSIS

2

**A.  Standards**

3       The standards governing motions for summary judgment under Federal Rule of

4  Civil Procedure 56 are familiar.  Summary judgment is appropriate if the evidence, when

5  viewed in the light most favorable to the non-moving party, demonstrates "that there is

6  no genuine dispute as to any material fact and the movant is entitled to judgment as a

7  matter of law."  Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322

8  (1986); *Galen v. Cnty. of L.A.*, 477 F.3d 652, 658 (9th Cir. 2007).  Where cross motions

9  are at issue, the court must "evaluate each motion separately, giving the nonmoving party

10  in each instance the benefit of all reasonable inferences."  *ACLU of Nev. v. City of Las*

11  *Vegas*, 466 F.3d 784, 790-91 (9th Cir. 2006) (citations omitted); *see also Friends of*

12  *Columbia Gorge, Inc. v. Schafer*, 624 F. Supp. 2d 1253, 1263 (D. Or. 2008).

13

**B. American Zurich's Motion**

14       American Zurich moves for summary judgment with respect to the items of cost

15  that MKB contends it is owed under the Policy.  American Zurich also moves for a ruling

16  on summary judgment that Alaska and not Washington law applies to MKB's common

17  law and statutory claims for bad faith, and that these claims therefore should be dismissed

18  under Alaska's legitimate dispute doctrine.

19

**1.   MKB's Items of Cost**

20       In its December 28, 2012, letter to American Zurich, MKB asserted that it was

21  entitled to the following "specific monetary damages" under the Policy "as a direct result

22  of earth movement:" (1) the "Contract Balance" of $1,436,419.40, (2) the cost of

"Additional Foundation Materials" totaling "$669, 508.99, (3) "Incidental Costs" totaling $464,286.10, and (4) legal and professional fees in an amount to be determined.[4] (7/22/14 Videa Decl. Ex. 40; 7/22/14 Mullenix Decl. Ex. 22.)

Throughout this litigation, MKB has repeatedly affirmed that it is claiming the foregoing specific cost items originally listed in its December 28, 2012, letter to American Zurich.  In its May 31, 2013, Initial Disclosures, MKB identified the same costs as those listed in its December 28, 2012, letter.[5]  (MKB Initial Disclosures (Dkt. # 115-6).)  On August 21, 2013, in response to American Zurich's First Set of Interrogatories, which asked MKB to "[i]dentify with specificity each and every item of cost MKB contends it is owed under the Policy," MKB again referenced its December 28, 2012, letter to American Zurich and its Initial Disclosures.  (MKB Int. Resp. (Dkt. # 115-6) at 5.)  Finally, on February 18, 2014, during the course of American Zurich's Rule 30(b)(6) deposition of Mr. Jensen on behalf of MKB, MKB's counsel stated, "Let me just tell you MKB's legal position which is that we're seeking everything in this December 28th letter . . . ."  (2/18/14 Jensen Dep. (Dkt. # 115-7) at 35:3-5.)

---

[4] MKB also asserts a $208,880.62 claim for markup and overhead in its December 28, 2012, letter (7/22/14 Videa Decl. Ex. 40), but these costs are not addressed in American Zurich's motion.

[5] MKB's Initial Disclosures also asserted a claim for $500,000.00 as "Additional Amounts Claimed by LYSD."  (MKB Initial Disclosures Ex. A.)  This claim is no longer at issue because MKB did not pay LYSD for any liability in the arbitration.  MKB's Initial Disclosures also include various mark-ups as a percentage of the MKB's claims for "Earth Movement" and the "Incidental Costs."  (*See id.*)

1        Based on these representations, American Zurich moves for summary judgment

2   with respect to each of the foregoing items of cost alleged by MKB.  The court will

3   address American Zurich's motion with respect to each cost item.[6]

4            **a.   Arbitration Costs**

5        MKB initially claimed that an unspecified amount of its arbitration costs or "legal

6   and professional fees" were covered under the Policy.  (*See* 7/22/14 Videa Decl. Ex. 40 at

7   AZ01047 (attaching 12/28/12 claim letter from MKB to American Zurich stating claim

8   for "Legal and Professional Fee" in an amount "TBD").)  In its response to American

9   Zurich's motion for summary judgment, however, MKB states:  "Zurich is right that

10  arbitration costs are not covered by the policy."  (MKB Resp. at 14.)  Thus, MKB has

11  expressly abandoned this element of damages with respect to its claim for

12  indemnification under the Policy.  Accordingly, the court grants this portion of American

13  Zurich's motion for summary judgment.[7]

14  ───────────────

15      [6] Subsequent to the present summary judgment motions, American Zurich filed a motion

16  to preclude certain evidence at trial related to a supplemental discovery response that MKB
    served after the discovery deadline.  (*See* Mot. to Exclude (Dkt. # 115).)  In the supplemental
    discovery response, MKB identified "$1,384,324.63 in costs just for foundational materials due

17  to earth movement beyond two inches."  (MKB 2d Supp. Int. Resp. (Dkt. # 115-8) at 9.)  This
    figure is one that MKB had never previously provided in response to American Zurich's

18  discovery requests.  The court will address American Zurich's motion to preclude evidence
    concerning this new cost figure later in a separate order.

19      [7] MKB nevertheless asserts that its arbitration costs are relevant with respect to its claims

20  for bad faith and for alleged violations of IFCA and Washington's Consumer Protection Act
    ("CPA"), RCW ch. 19.86.  (MKB Resp. at 14.)  MKB asserts that it would not have been forced

21  to pursue its arbitration against LYSD had American Zurich paid its claim promptly rather than
    denied it.  (*Id.*)  American Zurich's motion asks the court to determine whether MKB's
    arbitration costs were costs covered under the Policy and therefore are recoverable pursuant to

22  MKB's claim for indemnification or breach of contract.  That is the only issue determined by the

### b.  The $1,436,419.40 Contract Balance

MKB also asserts a claim under the Policy for the "Contract Balance" of $1,436,419.40.  (Videa Decl. Ex. 40.)   It is undisputed that LYSD paid MKB $1,436,419.40 in settlement following the initiation of arbitration proceedings by MKB against LYSD.  It is undisputed that this amount is identical to the contract balance withheld by LYSD when it declared MKB to be in material breach of the Phase I contract.  Indeed, MKB's Rule 30(b)(6) deponent, Mr. Jensen, has admitted that "MKB was paid—in the arbitration proceedings— . . . the contract balance by [LYSD]."  (Videa Decl. Ex. 36 (2/18/14 Jensen Dep.) at 22:7-9.)[8]

---

court on this motion.  Whether these costs are relevant to MKB's bad faith, IFCA, or CPA claims is not an issue that the court has been asked to decide at this time.

[8] In addition, Mr. Jensen testified as follows:

Q:  . . . Is MKB . . . still claiming as of today that American Zurich owes MKB . . . $1,436,419.40 for its contract balance with [LYSD]?

A:  I can tell you this:  I can tell you we were paid by the school district.  I do not understand the legal ramifications of what we—what we are legally owed and not, that would be up to—I have to speak with Peter and Richard about that.

(Videa Decl. Ex. 36 (2/18/14 Jensen Dep.) at 22:17-23:2.)

Q: . . . And I'd like to refer you to the second page.  And under the payment section, the settlement agreement is saying that [LYSD] is paying MKB . . . $1,436.719.40 in full satisfaction of MKB's claims, correct?

A:  It really doesn't state that.  That's part of the payment.

Q:  That's part of the payment, correct?

A:  Yes, it's part of the—yes.

(*Id.* at 24:8-16.)

1       The court need not consider the parties' dueling arguments concerning whether

2   this specific cost item—the contract balance—is covered or excluded under various

3   provisions of the Policy.  Irrespective of whether the contract balance is collectable under

4   the Policy as "direct physical loss or damage to Covered Property caused by or resulting

5   from [earth movement]," or excluded under some other provision, American Zurich

6   argues that it is entitled to summary judgment because LYSD paid MKB the remaining

7   contract price of $1,436,419.40, and MKB, therefore, has suffered no loss with respect to

8   this specific item of alleged damage.  (AZ Mot. at 12-13.)  The court agrees with

9   American Zurich's position as explained below.

10   

11      Q:  So can you give me any explanation as you sit here today why MKB . . . believes
    American Zurich is responsible for paying $1,436,419.40 of the contract balance under . . . .

12  [LYSD's] contract?

13                   **********

14      A:  I never made the statement that MKB believed that it was due those funds. . . . . I
    simply said that I have not spoke with Richard and Peter as to our legal rights and remedies

15  regarding what is to backed out of the claim, if anything. . . .

16  (*Id.* at 25:6-18.)

17      Q:  . . . Can you explain to me, factually, what is the factual basis for MKB claiming it is
    owed a double—what is essentially a double recovery, the amount it's already recovered from

18  [LYSD]?

19      A:  I never said that MKB was owed a double recovery.  What I simply stated was I
    don't know the legality of what we're entitled to and what we're not entitled to under the law.

20  (*Id.* at 40:15-23.)

21      Mr. Jensen's testimony concerning MKB's settlement with LYSD is also consistent with
    LYSD's view of that the arbitration settlement amount represented the contract payment that

22  was withheld by LYSD.  (*See* John Decl. (Dkt. # 96) ¶ 21 ("LYSD did not intend to pay for
    anything else in the settlement other than the withheld contract payment.").)

1    "Under the indemnity principle of insurance, an insured receives only that amount

2    that will indemnify actual loss, not an additional windfall above this amount."

3    *Dombrosky v. Farmers Ins. Co.*, 928 P.2d 1127, 1136, n.4 (Wash. Ct. App. 1997).  In

4    *Dombrosky*, the insureds' home was damaged in a fire and a dispute arose between the

5    insureds and their insurance company as to the amounts owed under the insureds'

6    homeowners' policy.  *Id.* at 1131-33.  Following the fire, the insureds did not repair or

7    replace the damaged home.  *Id.* at 1132-33.  They nevertheless sought payment from their

8    carrier for costs related to repairing the structure rather that they had not actually

9    incurred.  *Id.*  Specifically, they sought payment for additional replacement costs

10   mandated by recently enacted building codes.  *Id.* at 1135.  The Washington Court of

11   Appeals stated that even if these additional costs were covered under the policy, "the

12   matter is moot because the [insureds] suffered no loss due to the building code."  *Id.* at

13   1136, n.4.  The court reasoned that the insureds had not taken steps to rebuild the

14   structure and thus had not incurred the additional expense mandated by the new building

15   codes.  *Id.*  Accordingly, the court would not permit the insured to collect a "windfall."

16   *Id.*

17       There is no dispute that LYSD paid MKB $1,436,419.40 in the arbitration

18   settlement.  (Nourse Decl. (Dkt. # 109) Ex. 8 (attaching Settlement Agreement and

19   Release) ("LYSD agrees to pay MKB . . . $1,436,719.40 . . . .").)  This is the precise

20   amount of the contact balance that MKB claimed in the arbitration and later in its claim

21   letter to American Zurich.  MKB therefore cannot be said to have suffered this loss.  If

22   MKB were to move forward with its claim that American Zurich should nevertheless

1    reimburse it for the contract balance that LYSD has already paid, then (like the insureds

2    in *Dombrosky*) MKB would be seeking a double recovery and a significant windfall, in

3    violation of the most basic principle of insurance.[9]

4        MKB nevertheless argues that *Dombrosky* is distinguishable because MKB "did

5    incur . . . cost with respect to the withheld payment from LYSD." (MKB Resp. at 16.)

6    This may be true, and to the extent that MKB can prove it incurred costs—other than or

7    in addition to the amount of the contract balance—and those costs represent "direct

8    physical loss or damage to Covered Property caused by or resulting from [earth

9    movement]," then MKB may be entitled to recover them from American Zurich. MKB is

10   not, however, entitled to claim items under the Policy for which it suffered no loss—

11   namely the contract balance of $1,436,719.40.

12       MKB nevertheless makes the extraordinary argument that it is entitled to present

13   the $1,436,419.40 contract balance as damages to the jury because American Zurich may

14   only claim an offset for this amount in a post-trial proceeding. (MKB Resp. at 14-15.)

15   MKB asserts that until it has been made whole for all of its alleged damages, American

16   Zurich is not entitled to claim any offset for amounts paid by LYSD. (*Id.*) According to

17   MKB, the court must permit MKB to present this claim to the jury, American Zurich

18   must expend time and resources defending the claim, and the jury must expend time and

19   resources considering and deciding the claim, all before American Zurich is entitled to

20   _____

21       [9] Permitting MKB to claim an amount for which it has already been reimbursed also
     appears to violate a term of the Policy which MKB has acknowledged states that American
     Zurich "will not be liable for any part of a loss that has been paid or made good by others."
22   (MKB Reply (Dkt. # 112) at 3 (citing 7/22/14 Mullinex Decl. Ex. 3 (AZ Policy) at 34).)

ORDER- 19

1  present undisputed facts to the court in a post-trial motion that LYSD has in fact paid this

2  exact amount to MKB.  This is nonsensical, and the court declines to engage in such a

3  colossal waste of the parties', the jury's, and the court's time and resources.

4      In asserting this extraordinary argument, MKB relies primarily on *Puget Sound*

5  *Energy, Inc. v. Alba General Insurance Co.*, 68 P.3d 1061 (Wash. 2003).[10]  (*See* MKB

6  Resp. at 14-15.)  *Alba* is readily distinguishable.  *Alba* involved an environmental

7  insurance coverage action for six cleanup sites in Washington.  68 P.3d at 1062.  The

8  plaintiff settled with a number of its insurers prior to trial.  *Id.*  The non-settling carriers

9  moved for summary judgment asserting that the plaintiff had already recovered sufficient

10  funds from the settling insurers to cover its liabilities.  *Id.*  The plaintiff, however, argued

11  that the settlements covered additional sites not in Washington and that it could not

12  definitively determine what its future cleanup costs would be at each Washington site.

13  *Id.*  The Washington Supreme Court held that the non-settling insurers bore the burden of

14  establishing that the plaintiff had been whole and the burden of establishing "the right to

15  and amount of any offsets necessary to avoid double recovery by [the plaintiff]."  68 P.3d

16  at 1064.  Because there were issues of fact concerning whether the plaintiff had been

17  _____

18  [10] MKB also relies upon *Thiringer v. American Motors Insurance Co.*, 588 P.2d 191
(Wash. 1978).  *Thiringer* and its progeny arise in the particular context of Personal Injury

19  Protection ("PIP") and Unisured Motorist ("UIM") insurance, which "are both creatures of
public policy."  *Sherry v. Fin. Indem. Co.*, 160 P.3d 31, 35 (Wash. 2007).  Policy provisions and

20  exclusions that are permitted in other contexts may be void in the contexts of PIP or UIM
policies.  *Id.*  The court is not persuaded that *Thiringer* is applicable to the present dispute, which

21  does not involve these types of coverages or a third-party tortfeasor, but rather a Builders Risk
first-party property policy.  *See Cook v. USAA Cas. Ins. Co.*, 90 P.3d 1154, 1156-57 (Wash. Ct.

22  App. 2004) ("Nothing in [the various cases applying *Thiringer*] contemplated application of the
full compensation principles set forth in *Thiringer* where there was no tortfeasor.").

1   made whole by the prior settlements with its other carriers in the context of this complex

2   environmental coverage action, the court remanded the case to the trial court.  *Id.*

3   　　　The issues of fact and complexities present in *Alba* are simply not present here.

4   This case does not involve multiple sites in multiple states with the uncertain future

5   damages often associated with environmental cleanup sites.  Here the issue is

6   straightforward:  Did LYSD fully reimburse MKB for the remaining contract balance of

7   $1,436,419.40 such that MKB may not assert that it has suffered this loss or collect it a

8   second time from American Zurich?  As noted above, MKB's Rule 30(b)(6) deponent

9   unambiguously testified that MKB "was paid—in the arbitration proceedings— . . . the

10  contract balance by [LYSD]."  (Videa Decl. Ex. 36 (2/18/14 Jensen Dep.)  at 22:7-9.)

11  More importantly, the settlement agreement between LYSD and MKB recites that LYSD

12  paid MKB $1,436,719.40.  (Nourse Decl. Ex. 8 at 2.)  Thus, undisputed evidence

13  forecloses any answer to the foregoing question other than "yes."  Accordingly, unlike

14  the carriers in *Alba*, American Zurich has met its burden "of establishing what part of the

15  settlement was attributable to the claim it seeks to offset."  *Id.*

16  　　　Nevertheless, in an apparent attempt to create an issue of fact with respect to this

17  issue, Mr. Jensen submits a declaration that contradicts his prior Rule 30(b)(6) deposition

18  testimony.  In his declaration, he states that "MKB has never been paid 'the withheld

19  contract payment' from LYSD."  (Jensen Decl. (Dkt. # 110) ¶ 4.)  In the Ninth Circuit,

20  the "sham affidavit rule" prevents a party from creating an issue of material fact by

21  introducing an affidavit that contradicts prior deposition testimony.  *Kennedy v. Allied*

22  *Mutual Ins. Co.,* 952 F.2d 262, 266-67 (9th Cir. 1991).  The rule, however, is in tension

1    with the principle that a court's role in deciding a motion on summary judgment is not to

2    make credibility determinations or to weigh evidence. *Van Asdale v. Int'l Game Tech.*,

3    577 F.3d 989, 998 (9th Cir. 2009). Therefore, it should be applied with caution.

4    Inconsistencies in a party's statements must be clear and unambiguous to justify striking

5    an affidavit. *Id.*

6            The court has little difficulty in finding that Mr. Jensen's statement that "MKB has

7    never been paid 'the withheld contract payment' from LYSD" (Jensen Decl. ¶ 4) is

8    clearly and unambiguously inconsistent with his prior deposition testimony that "MKB

9    was paid—in the arbitration proceedings— . . . the contract balance by [LYSD]" (Videa

10   Decl. Ex. 36 ("2/18/14 Jensen Dep.)  at 22:7-9).  Nowhere in his declaration does Mr.

11   Jensen reference or try to explain his prior inconsistent deposition testimony or try to

12   harmonize the two statements.  (*See generally* Jensen Decl.)  Rather, he simply states

13   that "MKB resolved a number of claims and counterclaims with LYSD," and MKB's

14   "claim in the arbitration far exceeded the amount we ultimately compromised that claim

15   for." (*Id.* ¶ 4.)  Although these additional facts may be true, they do not alter the parties'

16   mutual understandings that LYSD's payment in arbitration represented the withheld

17   contract price.  (*See* John Decl. ¶ 21; Videa Decl. Ex. 36 (2/18/14 Jensen Dep.) at

18   22:7-9.)  The court, therefore, finds that Mr. Jensen's subsequent inconsistent

19   declaration creates nothing more than a sham issue of fact.  *See Kennedy.*952 F.2d at

20   267; *Radobenko v. Automated Equip. Corp.*, 520 F.2d 540, 544 (9th Cir. 1975).  Thus,

21

22

1  the court may rely on the Mr. Jensen's deposition testimony in granting summary

2  judgment on this issue.[11]

3      In addition to Mr. Jensen's subsequent declaration, MKB also submits the

4  declaration of Stephen L. Nourse, who was counsel for MKB in its dispute with LYSD

5  concerning the Phase I contract.  (Nourse Decl. ¶ 1.)  Mr. Nourse also testifies that the

6  settlement with LYSD resolved numerous claims and that "[i]f MKB had prevailed on all

7  of its claims in the arbitration, it would have received far more than the amount received

8  as a result of the settlement agreement."  (*Id.* ¶ 12.)  As the court has indicated above, this

9  fact may well be true, and if so, then MKB may entitled to recover those amounts from

10  American Zurich, assuming that they are costs covered under the Policy and not

---

11  [11] Some courts suggest that a corporation is bound by the testimony of its Rule 30(b)(6)

12  designee. *See, e.g.*, *Mitchell Eng'g v. City & Cnty. of S.F.*, 2010 WL 455290, at *1 (N.D. Cal. Feb. 2, 2010) ("A 30(b)(6) witness testifies as a representative of the entity, his answers bind the

13  entity and he is responsible for providing all the relevant information known or reasonably available to the entity.") (quotation marks and citation omitted); *Great Am. Ins. Co. of N.Y. v. Vegas Constr. Co., Inc.*, 251 F.R.D. 534, 538 (D.Nev. 2008) (same).  Other courts hold that

14  "testimony given at a Rule 30(b)(6) deposition is evidence which, like any other deposition testimony, can be contradicted and used for impeachment purposes," and that such testimony

15  does not "bind" the designating entity "in the sense of [a] judicial admission."  *A.I. Credit Corp. v. Legion Ins. Co.*, 265 F.3d 630, 637 (7th Cir. 2001).  The Ninth Circuit has not yet decided the

16  issue.  *Coalition for a Sustainable Delta v. John McCamman*, 725 F.Supp.2d 1162, 1172 (E.D. Cal. 2010).  In the absence of specific direction from the Ninth Circuit, this court adopts a middle

17  ground and holds that a party cannot rebut the testimony of its Rule 30(b)(6) witness when, as here, the opposing party has relied on the Rule 30(b)(6) testimony, and there is no adequate

18  explanation for the rebuttal.  *See Hyde v. Stanley Tools*, 107 F. Supp. 2d 992, 993 (E.D. La. 2000), *aff'd* 31 Fed. App'x 151 (5th Cir. 2001) (per curiam) (unpublished); *State Farm Mut.*

19  *Auto. Ins. Co. v. New Horizont*, 250 F.R.D. 203 (E.D. Pa. 2008) ("The better rule is that the testimony of a Rule 30(b)(6) representative, although admissible against the party that designates

20  the representative, is not a judicial admission absolutely binding on that party," but the party still may not "retract prior testimony with impunity" and courts can disregard inconsistent testimony

21  when the movant has relied on it); *Tex. Technical Inst. v. Silicon Valley, Inc.*, No. H-04-3349, 2006 WL 237027, at *5 (S.D. Tex. Jan. 31, 2006) (affidavit did not create an issue of material

22  fact because it conflicted without explanation with Rule 30(b)(6) testimony).

1   otherwise excluded.  The fact, however, that MKB was not compensated for some of its

2   claims in the arbitration with LYSD does not mean that it can assert items for which it

3   has been fully reimbursed and therefore suffered no loss.

4        Based on the foregoing, the court grants American Zurich's motion for summary

5   judgment with respect to MKB's claim that MKB is entitled to payment under the Policy

6   of the $1,436,419.40 contract balance.

7                  **c.   "Additional Foundation Materials" Totaling "$669,508**

8        MKB asserts that because the earth under the building pad sank more than two

9   inches, it was required to spend an additional $669,509 for purchasing, transporting and

10  placing gravel over and above what the contract required.  (*See* MKB Resp. at 9.)

11  American Zurich argues that it is entitled to summary judgment on this claim because

12  MKB never placed the full amount of gravel required under the contract in the first place,

13  and thus it could not have suffered a loss in excess of those amounts already required

14  under the Phase I contract.  (AZ Mot. at 15-16.)  For purposes of its motion, American

15  Zurich concedes that MKB placed 25,537 cubic yards of gravel at the site.  (*See* AZ Mot.

16  at 15-16 (relying on MKB's assertion that it delivered and placed 25,537 cubic yards of

17  gravel for purposes of its argument, but asserting that MKB will not be able to prove this

18  amount at trial.)  Even accepting American Zurich's argument that MKB must place all

19  the gravel required under the Project contract before MKB can assert a loss under the

20  Policy, the court finds that there are questions of fact that preclude summary judgment

21  here.

22

1   The problem with American Zurich's argument is that the Phase I contract did not

2   require a specific volume or tonnage of gravel.  (*See* Carl Decl ¶ 5 ("The contractors were

3   expected to calculate the volume of compacted gravel required for the Project by

4   determining the depth of gravel . . . and the square footage of the Project.").)  Rather,

5   LYSD expected each company that bid on the Project to make its own calculation from

6   drawings and maps that LYSD had placed on the Internet.  (*See id.*)  The parties have

7   submitted into evidence of numerous calculations of the volume of gravel that would be

8   required to complete the Project from a variety of entities.  Although it may have done so

9   in error, MKB originally calculated that the Phase I contract would require the placement

10  and compaction of 23,626 cubic yards of gravel.  (7/22/14 Videa Decl. Ex. 9 (12/17/13

11  Jensen Dep.) at 126:2-5.)  Earthworks, on behalf of MKB, later determined that the

12  required volume of compacted gravel for Phase I was 26,767 cubic yards.  (*See* 7/22/14

13  Videa Decl. Ex. 15 (Zimmerman Dep.) at 39:5-15; *id.* Ex. 16 at 2; *see* 7/22/14 Mullenix

14  Decl. Ex. 12 (12/17/13 Jensen Dep.) at 26:12-21.)  In addition, two other contractors,

15  using the drawings provided by LYSD, estimated the necessary volume of gravel for

16  completion of Phase I to be 24,220 and 26,170 cubic yards, respectively.  (*See* 7/22/14

17  Mullenix Decl. Ex 22 at 5, Ex. 36, Ex. 38 (12/28/13 Jensen Dep.) at 60:3-22).)  During

18  the course of American Zurich's investigation into MKB's claim, Ninyo & Moore

19  initially calculated the required volume of gravel to be 23,775 cubic yards (Johnson Decl.

20  ¶ 8), but later revised that calculation to 26,983 cubic yards (*id.* ¶¶ 10-11).  Finally,

21

22

1   American Zurich has retained another expert who has calculated the required volume to

2   be 26,734 cubic yards.[12]  (7/22/14 Videa Decl. Ex. 2 at 4.)  Depending on which

3   calculation persuades the jury, MKB either laid sufficient gravel to meet the Phase I

4   contract requirements absent "earth movement" or did it not.  This is a factual issue

5   reserved for the jury.  The court, therefore, denies American Zurich's motion with respect

6   to this cost item.

7          In addition, however, the underlying assumption of American Zurich in this

8   portion of its motion is that MKB cannot suffer a loss under the Policy until it has fully

9   performed the contract.  (AZ Mot. at 16 ("All gravel that MKB placed on the Emmonak

10  site was part of its performance of a contract that MKB never fully performed.  This is

11  not 'direct physical loss' and is not covered by the Policy's insuring clause.").)  The court

12  is not persuaded that MKB must prove that it laid sufficient gravel to fully perform the

13  Phase I contract before it can assert a claim under the Policy.  The court, however, will

14  discuss this issue when it turns to MKB's motion for summary judgment.  (*See infra*

15  § III.C.1.)

16         Finally, American Zurich also argues that any earth settlement that occurred under

17  the building pad is not covered because it was not a fortuitous event.  (AZ Mot. at 16.)

18  Insurance coverage under an all risk builders' risk insurance policy, requires a fortuitous

19  event.  *Frank Coluccio Const. Co., Inc. v. King Cnty.*, 150 P.3d 1147, 1156 (Wash. Ct.

20  ───────────────

21         [12] MKB also asserts that two other contractors who bid on the Phase I contract calculated
    that amount of necessary gravel to complete the contract to be 24,220 and 26,170 cubic yards,
22  respectively.  When the court checked the evidence MKB cited in support of this evidence, it
    could not find these figures cited and thus does not rely on this evidence.

App. 2007) ("As a condition precedent to coverage under an all risk builders' risk insurance policy, the loss-causing instrumentality must have been brought about as the result of a 'fortuitous event.'") (quoting 7A Lee R. Russ & Thomas F. Segalla, Couch on Insurance § 101:7 (3d ed. 2005)).  American Zurich asserts that there was no fortuitous event because everyone expected the earth under the building pad to sink.  (*See* 7/22/14 Videa Decl. Ex. 7 at 5, Ex. 8 at 3 of 5.)  MKB counters that any settlement over two inches during Phase I was fortuitous because LYSD had told the bidding contractors to expect settlement of only two inches during Phase I.  (*See* MKB Mot. at 19-23.)  The court also denies American Zurich's motion summary judgment on this ground because it believes that there are factual issues concerning fortuity that are reserved for the jury. *See Frank Coluccio Constr. Co.*, 150 P.3d at 1156 ("The test for fortuity is a subjective, not objective, one and involves questions of fact.").   The court, however, will discuss this issue more fully when it turns to MKB's motion for summary judgment.  (*See infra* § III.C.4.)

### d.  "Incidental Costs" Totaling $464,286.10

Several items that MKB claims as "incidental costs" under the Policy, American Zurich challenges as costs that MKB actually incurred to perform the Phase I contract. (AZ Mot. at 17-18.)  Specifically, American Zurich challenges costs MKB claims for barging gravel, for equipment that was left at the Project site in 2012, and for certain work performed by Edge Survey and Design.  (*Id.*)  MKB, however, has submitted evidence sufficient to raise genuine issues of material fact that MKB incurred these expenses not in performance of the Phase I contract but rather as a result of earth

1    movement beneath the building pad.  (*See, e.g.*, 8/18/14 Jensen Decl. ¶¶ 10-12.)

2    Accordingly, the court denies American Zurich's motion for summary judgment with

3    respect to this category of costs.

4           **2.  Choice of Law for MKB's Bad Faith, IFCA, and CPA Claims**

5           MKB alleges that American Zurich violated Washington's CPA and various

6    provisions of Washington's IFCA.  (Am. Compl. (Dkt. # 35) ¶¶ 30-33, 35.)  MKB also

7    alleges that American Zurich breached its duty of good faith and fair dealing under both

8    Washington law and Alaska law.  (*Id.* ¶¶ 34, 36-37.)  American Zurich moves for

9    summary judgment that Alaska law applies to these claims.  (AZ Mot. at 19-23.)  MKB

10   counters that Washington law applies.  (MKB Resp. at 19.)

11          When the laws of more than one state potentially apply, a federal district court

12   sitting in diversity applies choice of law rules from the forum state.  *See Klaxon Co. v.*

13   *Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496 (1941) (holding that a federal court sitting in

14   diversity applies the conflict-of-law rules of the state in which it sits).  Washington courts

15   follow the Restatement (Second) of Conflicts of Laws § 145 to determine which state's

16   law governs tort, IFCA, and CPA claims.  *Tilden-Coil Constructors, Inc. v. Landmark*

17   *Am. Ins. Co.*, 721 F. Supp. 2d 1007, 1016 (W.D. Wash. 2010) (citing *Rice v. Dow*

18   *Chemical Co.*, 875 P.2d 1213, 1217 (Wash. 1994) and analyzing choice of law for tort

19   and CPA claims); *Polygon Nw. Co. v. Nat'l Fire & Marine Ins. Co.*, No. 11-92Z, 2011

20

21

22

1  WL 2020749 (W.D. Wash. May 24, 2011) (analyzing choice of law for IFCA and CPA

2  claims).[13]

3        Section 145 of the Restatement (Second) of Conflicts of Laws directs the court to

4  determine the state with the most significant relationship to the occurrence and the parties

5  under the general principles stated in Section 6.  *See* Restatement (Second) of Conflict of

6  Laws § 145(1).  In doing so, the court should take into account the following four

7  contacts:  (a) the place where the injury occurred; (b) the place where the conduct causing

8  the injury occurred; (c) the domicil, residence, nationality, place of incorporation, and

9  place of business of the parties; and (d) the place where the relationship, if any, between

10  the parties is centered.  *Id.* § 145(2).  These contacts must be evaluated according to their

11  relative importance with respect to the issue at hand.  *Id.*  The most important Section 6

12  factors for torts claims are the needs of the interstate and international systems, the

13  relevant policies of the forum, the relevant policies of other interested states and

14  particularly of the state with the dominant interest in the determination of the particular

15  issue, and ease in the determination and application of the law to be applied.  *Id.* cmt. b.

16   

17      [13] American Zurich argues that there is a conflict between the law of Alaska and
   Washington with respect to all of MKB's statutory and tort claims.  (AZ Mot. at 19-20.)  MKB

18  concedes that there is a conflict of law between Alaska and Washington only with respect to its
   bad faith claim.  (MKB Resp. at 24.)  Ordinarily, the court must first determine if an actual

19  conflict exists between the laws of the applicable states before engaging in a choice of law
   analysis.  *Erwin v. Cotter Health Ctrs.*, 167 P.3d 1112, 1120 (Wash. 2007) ("When parties

20  dispute choice of law, there must be an actual conflict between the laws or interests of
   Washington and the laws or interests of another state before Washington courts will engage in a

21  conflict of laws analysis.") (quoting *Seizer v. Sessions*,  940 P.2d 261, 264 (Wash. 1997)).  Here,
   however, the court need not decide the issue, because, even if a conflict exists, Washington law

22  applies to MKB's bad faith, IFCA, and CPA claims.

American Zurich argues that the place where the injury occurred is Alaska because "the loss which is the subject matter of the coverage dispute, occurred in Emmonak, Alaska," the contract dispute between MKB and LYSD occurred in Alaska, the arbitration between LYSD and MKB occurred in Alaska, and MKB performed the Phase I contract there.  (AZ Mot. at 20-21.)  If the court were analyzing choice of law with respect to the contract dispute between LYSD and MKB, or MKB's contractual indemnity claim, then the location of the covered loss in Alaska might bear more weight.  *See* Restatement (Second) of Conflict of Laws, § 188 cmt. e (situs of subject matter of contract is significant for contracts that protect against localized risks).  The court, however, is analyzing MKB's tort and statutory claims for alleged IFCA and CPA violations.  With respect to MKB's tort and statutory claims, it is conceptually more difficult to place the injury in Alaska.  MKB's tort and statutory claims arise out of American Zurich's duties to MKB under the Policy.  MKB is a Washington joint venture company, with its principal place of business in Washington.  (8/18/14 Jensen Decl. ¶ 7.)  MKB is headquartered in Washington and has no permanent offices in Alaska.  (*Id.*)  MKB purchased the Policy at issue in Washington through its Washington agent.  (*Id.* at 8.)  Logically, when an insurance company acts in bad faith or violates IFCA or CPA, its insured will experience that injury where the insured is located.  Thus, the court concludes that the place where the injury occurred in this case is in both Alaska (where the site is located) and Washington (where the insured is located).  Washington, though, has a substantial interest in deterring bad faith conduct on the part of carriers towards Washington insureds—an interest that Alaska would not share.  Thus, although the court

1   concludes that some aspects of the injury are located in both Alaska and Washington, due

2   to Washington's interest in protecting Washington insureds from bad faith conduct, this

3   factor weighs slightly in favor of Washington.

4       The place where the conduct causing the alleged injury occurred is indisputably

5   California.  (*See* AZ Mot. at 22.)  American Zurich admits that "the claim was

6   investigated and adjusted by Richard Dugo, an American Zurich adjuster located in

7   Escalon, California."  (AZ Mot. at 21.)  Any bad faith or statutory violations in the

8   conduct of American Zurich's claims handling therefore occurred in California.  This

9   factor does not weigh in favor of Washington or Alaska, and therefore is neutral.

10      The next factor—the place of incorporation and the place of business of the

11  parties—weighs in favor of Washington law.  MKB is a Washington joint venture,

12  composed of two Washington companies, with its principal place of business in

13  Washington.  (Am. Compl. ¶ 1.)  American Zurich is an Illinois corporation with its

14  principal place of business in Illinois.  (Answer (Dkt. # 39) ¶ 2.) Nothing in this factor

15  recommends Alaska law, but the location of MKB supports application of Washington

16  law.

17      Finally, the center of the parties' relationship is split.  MKB is headquartered in

18  Washington and purchased the Policy in Washington.  American Zurich is an Illinois

19  company, but it adjusted MKB's claim from California concerning a project located in

20

21

22

1  Alaska.[14]  The court cannot conclude that the center of the parties' relationship weighs

2  heavily in favor of either Alaska or Washington.

3       Overall, two of the relevant factors weigh in favor of applying Washington law,

4  albeit marginally, while two are neutral.  The balance thus tips in favor of applying

5  Washington law.  However, when considering other significant § 6 factors—particularly

6  the relevant policies of the forum—the scale tips more clearly in favor of applying

7  Washington law.  *See* Restatement (Second) of Conflict of Laws § 6 (1971), *id.* § 145(2),

8  cmt. b.  Washington "has a strong interest in protecting insureds who must resort to

9  litigation to establish coverage."  *Axess Int'l, Ltd. V. Intercargo Ins. Co.*, 30 P.3d 1, 8

10  (Wash. Ct. App. 2001).  In light of this strong interest, the court concludes that

11  Washington law should apply with respect to MKB's claims for alleged bad faith and

12  alleged violations of IFCA and CPA, and denies American Zurich's motion for summary

13  judgment that Alaska law applies.

14       American Zurich also moves for summary judgment dismissing MKB's claim for

15  bad faith under Alaska's legitimate dispute doctrine.  (*See* AZ Mot. at 23 (citing *Guebara*

16  *v. Allstate Ins. Co.*, 237 F.3d 987, 992 (9th Cir. 2001).)  Because the court has concluded

17  that Washington law applies to this claim, and American Zurich has not asserted that a

18  similar doctrine exists under Washington law, the court denies this aspect of American

19  Zurich's motion as well.

20

21  _____

   [14] American Zurich also notes that the Policy itself references several Alaska
22  endorsements and regulations, although there is no express choice of law provision contained in
   it.  (*See generally* 7/22/14 Mullinex Decl. Ex. 3.)

ORDER- 32

1   **C.  MKB's Motion**

2       MKB moves for summary judgment on a variety of issues.  First, MKB asks the

3   court to rule as a matter of law that it need not prove it fully performed on its contract

4   with LYSD in order to prove a loss under the Policy.  (MKB Mot. at 6-11.)  Next, MKB

5   seeks a ruling on summary judgment that none of the exclusions in the Policy are

6   applicable to MKB's claim for earth movement.  (*Id.* at 12-19.)  Third, MKB seeks a

7   ruling as a matter of law that the fortuity doctrine does not apply.  (*Id.* at 19-23.)  Finally,

8   MKB moves for summary judgment that it has met the procedural prerequisites for

9   bringing an IFCA claim.  (*Id.* at 23.)  The court addresses each issue in turn.

10      **1.  Full Contract Performance**

11      MKB asks the court for a ruling as a matter of law that the MKB does not need to

12  show that it fully performed the Phase I contract with LYSD to have a covered claim

13  under the Policy.  (MKB Mot. at 6-11.)  The court agrees that nothing in the Policy

14  specifically requires MKB to submit such proof to have a covered claim.  To the extent

15  that this is the ruling that MKB seeks, the court grants its motion.

16      The issue in dispute between the parties, however, is not one of law but one of

17  fact.  Although MKB need not prove that it fully performed the Phase I contract, it must

18  prove that it suffered "direct physical loss or damage" to covered property.  (7/22/14

19  Mullinex Decl. Ex. 3 (AZ Policy) at 038.)  The parties have very different views of how

20  MKB's claim should be analyzed, and they each seek to introduce different evidence to

21  support their contentions.  MKB asserts that the ground settled under the building pad

22  which resulted in damage to covered property and losses that it is entitled to recover

1 under the Policy.  Thus, MKB seeks to introduce evidence of ground settlement to

2 support its contentions.  American Zurich, on the other hand, argues that the losses

3 incurred by MKB are not the result of any sinking that occurred beneath the building pad

4 but rather poor planning on MKB's part with respect to its contractual obligations.  (*See*

5 *id.* at 8.)  Thus, American Zurich seeks to introduce evidence that MKB miscalculated the

6 amount of gravel it would need and never imported sufficient quantities to fulfill its

7 underlying contractual obligations.  American Zurich wishes to use this evidence to

8 support its contention that poor planning as opposed to ground settlement is the source of

9 MKB's losses.  (*Id.*)

10      The jury is entitled to hear and weigh all of this evidence—to the extent that it is

11 otherwise admissible—with respect to both sides' contentions concerning the source or

12 sources of MKB's losses.  Thus, to the extent MKB's motion seeks to exclude American

13 Zurich from presenting otherwise admissible evidence to the jury concerning the

14 quantities of gravel fill that were required to complete Phase I of the Project or the

15 quantities of gravel that MKB actually imported to the site or placed on the building pad,

16 the court denies the motion.

17      **2.  Dominant Cause Clause**

18      In its March 26, 2013, denial of coverage letter, American Zurich identifies a

19 variety of Policy exclusions that it contends apply to MKB's claim.  (*See* 7/22/14 Videa

20 Decl. Ex. 41 at AZ3737-38.)  The Policy, however, carves out an exception to all Policy

21 exclusions, as follows:

22

1       If a Covered Cause of Loss is the dominant cause of such a loss, we will
2       not deny coverage on the basis that a secondary cause in that chain is not a
    Covered Cause of Loss.

3   (7/22/14 Mullinex Decl. Ex. 3 (AZ Policy) at 017.)  The parties refer to this provision as

4   the dominant cause clause.  American Zurich did not reference or discuss the dominant

5   cause clause in its March 26, 2013, denial letter.  Consequently, MKB argues that it is

6   entitled to summary judgment barring American Zurich from subsequently raising the

7   dominant cause provision to support application of the Policy's exclusions.  (*See* MKB

8   Mot. at 12-14.)  MKB misapprehends both the nature of the dominant cause clause and

9   the nature of American Zurich's obligations under the Washington Administrative Code

10  to notify MKB of the basis for its denial of MKB's claim.  The court therefore denies

11  MKB's motion for partial summary judgment on this issue as discussed below.

12        Under the Washington Administrative Code, American Zurich "must not deny a

13  claim on grounds of a specific policy provision, condition, or exclusion unless reference

14  to the specific provision, condition, or exclusion is included in the denial."  WAC 284-

15  30-380(1); *see also* WAC 284-30-330(13) (stating that it is an unfair or deceptive act or

16  practice if an insurer "fail[s] to promptly provide a reasonable explanation of the basis in

17  the insurance policy in relation to the facts or applicable law for denial of a claim").

18  MKB asserts that American Zurich's failure to address the dominant cause provision in

19  its denial letter was a violation of the foregoing Washington Administrative Code

20  provisions.  (*See* MKB Mot. at 13.)  The dominant cause clause, however, is not an

21  exclusion to coverage, but rather an exception to all of the exclusions in the Policy.  *See,*

22  *e.g.*, *Gen. Constr. Co. v. Zurich Am. Ins. Co.*, No. C03-5047FDB, 2004 WL 1707845, at

1   *3 (W.D. Wash. May 21, 2004) ("[A]n ensuing loss provision operates as an exception to

2   a policy exclusion").  As such American Zurich is not relying on the grounds contained in

3   the dominant cause clause to deny MKB's claim.  It seems axiomatic that an exception to

4   an exclusion, if applicable, would not provide a "basis in the insurance policy . . . for

5   denial of a claim."  *See* WAC 284-30-330(13).  The court finds no authority, nor does

6   MKB cite any, under which American Zurich is required to discuss the possible

7   exceptions to the Policy exclusions cited in its denial letter.

8          Such a requirement would also be inconsistent with other aspects of insurance

9   coverage law.  Although American Zurich bears the burden of proof with respect to

10  policy exclusions, *Diamaco, Inc. v. Aetna Cas. & Sur. C*o., 983 P.2d 707, 709 (Wash. Ct.

11  App. 1999), MKB, as the insured, bears the burden of proof with respect to exceptions to

12  Policy exclusions, *Mid-Continent Cas. Co. v. Titan Constr. Corp.*, No. 05-CV-1240 MJP,

13  2009 WL 1587215, at *5 (W.D. Wash. June 5, 2009) ("A large majority of . . . courts

14  hold[] that the burden of proof, which falls on the insured for coverage and shifts to the

15  insurer for an exclusion, shifts back to the insured for an exception to an exclusion.");

16  *Gen. Constr. Co.*, 2004 WL 1707845, at *3 ("Because the ensuing loss provision operates

17  as an exception to a policy exclusion, the insured bears the burden of establishing it

18  suffered a covered ensuing loss.").  Thus, although it logically follows that American

19  Zurich must notify MKB of any exclusions to coverage upon which it relies to deny

20  coverage, the same logic would not apply to exceptions to exclusions for which MKB

21

22

1   bears the burden.[15]  The court, therefore, denies this aspect of MKB's motion for partial

2   summary judgment.

3        **3.  Policy Exclusions**

4        MKB moves for summary judgment with respect to the Policy exclusions asserted

5   by American Zurich in its March 26, 2013, denial letter.  (MKB Mot. at 14-19.)

6   American Zurich asserted three exclusions as grounds for denying MKB's claim:  Policy

7   exclusions 3(c) and 2(a) and (f).  Policy exclusion 3(c) excludes coverage for "[f]aulty,

8   inadequate, or defective (1) Planning . . . , (2) Design, specifications, workmanship,

9   repair, construction, . . . grading, or compaction."  (7/22/14 Mullinex Decl. Ex. 3 (AZ

10  Policy) at 042; 8/18/14 Videa Decl. (Dkt. # 106) Ex. 2 at AZ3737.)  Policy exclusions

11  2(a) and (f) exclude coverage for "loss or damage caused directly or indirectly by or

12

13            [15] The court found no indication that Alaska differs in this regard.  *See Herr v.*

14  *Underwriters at Lloyds of London*, 97 F. Supp. 379, 379 (D. Alaska Terr. 1951) (ruling that the insurer bears the burden of proof on application of an exclusion in an insurance policy).

15            In its response to MKB's motion, American Zurich argues that Alaska law applies to

16  MKB's claim for coverage under the Policy.  (*See* MKB Resp. at 7-8.)  Neither party cites to any express choice of law provision in the Policy.  American Zurich argues that several

17  endorsements to the Policy that expressly adopt concepts of Alaska insurance contract law demonstrate the parties' mutual intent to apply Alaska law.  (AZ Resp. at 7 (citing 8/18/14 Videa

18  Decl. Ex. 23 (AZ Policy) at 017-019, 021-022.)  The court, however, is unconvinced that these provisions express anything other than the parties' intent for Alaska law to apply to these specific policy provisions.  Further, the only legal issue that American Zurich cites as creating an

19  actual conflict of law is the disparity between Alaska's dominant cause rule and Washington's proximate cause rule.  (AZ Resp. at 7 (citing Alaska Statute § 21.36.096; *Safeco Ins. Co. v.*

20  *Hirschman*, 773 P.2d 413, 416 (Wash. 1989).)  Yet, there is no dispute that Alaska law applies to this issue because the Policy explicitly incorporates the dominant cause language.  (*See* MKB

21  Reply (Dkt. # 112) at 5; 8/18/14 Videa Decl. Ex. 23 (AZ Policy) at 017.)  In any event, neither MKB nor American Zurich has expressly moved on the issue of choice of law with respect to

22  MKB's breach of contract claim, and the court does not find it necessary to determine choice of law on this claim to resolve the specific issues the parties raise in this motion.

1   resulting from . . . a. Delay, loss of use, loss of contract, loss of market or any other

2   'consequential loss'; [or] f. Penalties for noncompliance of, or delay in completion of,

3   any contract or failure to comply with contract conditions[.]"  (7/22/14 Mullinex Decl.

4   Ex. 3 (AZ Policy) at 041; 8/18/14 Videa Decl. Ex. 2 at AZ3737-38.)

5        MKB asserts that exclusion 3(c) for inadequate or faulty planning, design, and

6   specifications is inapplicable because MKB asserts a claim for earth movement and there

7   is no way that "bad planning could have caused the ground below the building pad to

8   move."  (MKB Mot. at 16.)  Specifically, MKB states that it "is not claiming that

9   [American] Zurich should pay for any financial loss MKB sustained because MKB or

10  LYSD made a mistake in planning the project."  (*Id.* at 17.)  Yet, as delineated in detail in

11  the background section of this order, this is a highly debated factual issue

12  notwithstanding MKB's disclaimer.  (*See supra* § II.)  Indeed, MKB does not deny that

13  there were errors in the drawings upon which it based its original bid.  (MKB Mot. at 19

14  ("Factual disputes . . . remain as to whether MKB correctly predicted the amount of

15  gravel for the project.").)  MKB cannot eliminate the factual issue surrounding the

16  application of exclusion 3(c) by simply stating that it is not claiming any financial loss

17  because of a mistake in planning the project.  There is certainly evidence in the record

18  from which a jury could conclude that the costs MKB has asserted as covered under the

19  Policy's insuring language and earth movement endorsement were actually incurred as a

20  result of MKB's "mistake[s] in planning the project."

21        After reviewing the parties' dueling motions for summary judgment, there is no

22  doubt that the parties view this case through very different analytical prisms.  How the

1    parties analyze the facts, however, does not alter the underlying reality that the record is

2    replete with material factual disputes that only the jury can resolve.  Determining whether

3    the costs that MKB submits with regard to its claim are (1) covered as "direct physical

4    loss or damage" to covered property due to earth movement (7/22/14 Mullinex Decl. Ex.

5    3 (AZ Policy) at 09-10, 038), or (2) excluded as resulting from "[f]aulty, inadequate, or

6    defective" planning, design, or specifications (*id.* at 042) requires the resolution of

7    material factual issues that must be reserved for the jury.

8          The same is true with respect to Policy exclusions 2(a) and (f).  The mere fact

9    that MKB baldly asserts that "consequential losses . . . are not part of the claim MKB will

10   present to the jury" does not make it so.  Again, whether the specific categories of

11   damages MKB asserts with respect to its claim fall within the Policy's coverage clause

12   and earth movement endorsement or are excluded under Policy exclusions 2(a) and (f)

13   requires the resolution of factual issues that would be inappropriate for the court to decide

14   on a motion for summary judgment.  Accordingly, the court denies MKB's motion for

15   partial summary judgment with respect to the exclusionary clauses at issue.

16       **4.  Fortuity**

17         MKB moves for summary judgment with respect to American Zurich's affirmative

18   defense that MKB's alleged loss was not fortuitous.  (MKB Mot. at 19-23.)  "The fortuity

19   principle is central to the notion of what constitutes insurance."  *Aluminum Co. of Am. v.*

20   *Aetna Cas. & Sur. Co.*, 998 P.2d 856, 878 (Wash. 2000) (quoting Eric Mills Holmes &

21   Mark S. Rhodes, 1 *Appleman On Insurance* 2D § 1.4, at 26 (1996)).  "The insurer will

22   not and should not be asked to provide coverage for a loss that is reasonably certain or

1   expected to occur within the policy period." *Id.*  The doctrine is "premised on the

2   principle that an insured cannot collect on an insurance claim for a loss that the insured

3   subjectively knew would occur at the time the insurance was purchased." *Hillhaven*

4   *Props. Ltd. v. Sellen Constr. Co., Inc.*, 948 P.2d 796, 799 (Wash. 1997) (extending the

5   fortuity principle to first-party insurance).  "[A]n all-risk policy might provide coverage

6   for all risks minus named exclusions, but never provides coverage for nonfortuitous

7   events, even though nonfortuitous events are not named exclusions in the policy."

8   *Aluminum Co.*, 998 P.2d at 879.  The Washington Supreme Court has held that an insurer

9   must prove the insured's actual knowledge of a "substantial probability" of a loss in order

10  to bar coverage.  *Pub. Util. Dist. No. 1 v. Int'l Ins. Co.*, 881 P.2d 1020, 1031 (Wash.

11  1994).

12          Generally, "whether a particular occurrence was expected by the insured before

13  the insurance coverage was obtained . . . is a question of fact." *Pub. Util. Dist. No. 1 of*

14  *Klickitat Cnty. v. Int'l Ins. Co.*, 881 P.2d 1020, 1030 (Wash. 1994); *see also Frank*

15  *Coluccio Constr. Co.*, 150 P.3d at 1156 ("The test for fortuity is a subjective, not

16  objective, one, and involves questions of fact.").  MKB nevertheless argues that it is

17  entitled to summary judgment primarily on the basis of a "prediction" in Addendum 2,

18  which was issued by LYSD to the bidding contractors on March 26, 2012.  (*See* MKB

19  Mot. at 20-22; Reply at 12.)  Addendum 2 predicts "about two inches" of settlement

20  under the building pad during Phase I.  (8/18/14 Videa Decl. Ex. 21 (attaching

21  Addendum 2) at 3 of 5.)  MKB argues that any settlement beyond two inches was

22  therefore fortuitous in nature, and there is no evidence that MKB should have expected

more than two inches of settlement during Phase I or the Policy period.[16]  (MKB Mot. at 20-23.)

Although a jury may well be convinced by MKB's argument, the court cannot conclude that there are not genuine issues of material fact with respect to fortuity.  First, MKB omits the full context of the portion of Addendum 2 upon which it relies.  Addendum 2 contains LYSD's responses to various questions from bidding contractors.  (*See* 8/18/14 Videa Decl. Ex. 21 at 2 of 5.)  The question at issue and LYSD's response are as follows:

> Q.3.  Projects in and around Emmonak have historically shown substantial settlement.  How do we account for this?  Are the elevations shown on the plan fill to and let it settle?  [sic]  Do we add for settlement and barge in more gravel?
>
> A.  There will be some initial settlement of about two inches that will occur during construction but the majority of the settlement will occur over a few years.  The Phase I contractor is expected to bring the gravel to the grades shown on the drawings, concluding with substantially [sic] completion on September 15, 2012.  The final topping and finish grading will be done by the Phase II contractor after the old HS building is demolished; this Phase II work will correct for any additional settlement occurring after Phase I substantial completion.

(*Id.* at 2 of 5 - 3 of 5.)  Thus, the question from the contractor informs the reader that Emmanok projects "have historically shown substantial settlement."  (*Id.* at 2 of 5.)  Further, LYSD's response that "[t]here will be some initial settlement of about two inches" is not the same as "there will be some initial settlement of no more than two inches."  Yet, this is the inference one draws from MKB's argument.

---

[16] The Policy period ran from June 15, 2012 to October 3, 2012.  (8/18/14 Videa Decl. Ex. 23 (AZ Policy) at 3.)

ORDER- 41

1    In addition, there is evidence in the record concerning fortuity that MKB does not

2  address.  On the same day that MKB received Addendum 2, MKB also received a

3  geotechnical engineering report from Larsen Consulting Group, Inc., advising that there

4  was going to be up to twelve inches of settlement at the Emmonak site.  (8/18/14 Videa

5  Decl. Ex. 17 at 5 of 8 (§ 7.3).)  The report states:

6         Settlements under driveways and parking areas are expected to vary.
        Proper earthwork is necessary to minimize the settlement potential.
7         Settlements of 3 to 9 inches should be expected in area [sic] with 30 inches
        of fill and 5 to 12 inches in areas with 72 inches of fill.
8
   (*Id.*)  Nothing in this document limits the timeframe of the expected settlement to Phase I
9
   of the Project.  More significantly, however, on June 5, 2012, ten days prior to the
10
   Policy's June 15, 2012, effective date, MKB sent a letter to LYSD, stating:  "Settlement
11
   in excess of the noted two (2") will most likely occur based on regional settlement
12
   results."  (7/22/14 Mullinex Decl. Ex. 22 at RNA00375.)  The factual record, therefore, is
13
   more complex and nuanced than MKB acknowledges in its motion.
14
        A reasonable juror might easily conclude from the foregoing evidence that MKB
15
   did not subjectively expect settlement in excess of two inches during the Policy period.
16
   Such a juror, however, could also infer from the same evidence that MKB had knowledge
17
   of a "substantial probability" that more than two inches of settlement would occur during
18
   Phase I of the Project or the Policy period.  Giving American Zurich, as the nonmoving
19
   party, "the benefit of all reasonable inferences," *see ACLU of Nev.*, 466 F.3d 790-91, the
20
   court cannot conclude that this issue should be removed from the province of the jury.
21

22

1    Accordingly, the court denies MKB's motion for summary judgment on the issue of

2    fortuity.

3        **5.  IFCA's Procedural Prerequisites**

4        On October 24, 2013, MKB amended its complaint to allege IFCA violations.

5    (Am. Compl. at ¶¶ 30-33.)  IFCA provides that "[a]ny first party claimant to a policy of

6    insurance who is unreasonably denied a claim for coverage or payment of benefits by an

7    insurer may bring an action in the superior court of this state to recover the actual

8    damages sustained, together with the costs of the action, including reasonable attorneys'

9    fees and litigation costs."  RCW 48.30.015(1).  The statute, however, also requires that

10   "[t]wenty days prior to filing an action based on this section, a first party claimant must

11   provide written notice of the basis for the cause of action to the insurer and office of the

12   insurance commissioner."  RCW 48.30.015(8)(a).

13       On April 4, 2013, more than five months prior to filing its amended complaint,

14   MKB sent a letter to Zurich, with a copy to the insurance commissioner, stating the bases

15   for MKB's IFCA claim.[17]  (*See* 7/22/14 Mullinex Decl. Exs. 34, 35.)  Based on this April

16   4, 2013, letter, MKB moves for a ruling on summary judgment that it has fulfilled the

17

18   _____

19       [17] MKB filed this action and its initial complaint on the same day that it sent its IFCA
     notice letter to American Zurich.  No party has addressed the issue of whether RCW
20   48.30.015(8)(a) requires an insured to send its IFCA notice letter 20-days prior to filing suit or
     20-days prior to filing the operative pleading that contains the insured's IFCA claim.  *See* RCW
21   48.30.015(8)(a) (referring to the "filing an action based on this section").  Instead, the parties
     have apparently assumed that the 20-day notice period applies to MKB's amended complaint, in
22   which MKB pleaded its IFCA cause of action for the first time.  (*See generally* MKB Mot. at 23;
     AZ Resp. at 18-23.)  Because the parties do not raise this issue, the court does not address it here.

1    RCW 48.30.015(8)(a) procedural prerequisite for bringing an IFCA claim.  (MKB Mot.

2    at 23.)  MKB is not seeking summary adjudication of the merits of its IFCA claim.  (*Id.*)

3         The court found no Washington authority construing IFCA's pre-suit notice

4    provision, and the parties cite none.  However, numerous federal decisions have

5    construed the provision to require dismissal of an IFCA claim that a plaintiff brought

6    without providing the prior the statutory notice.  *See Freeman v. State Farm Mut. Auto.*

7    *Ins. Co.*, No. No. C11-761RAJ, 2012 WL 2891167, at *4 (W.D. Wash. July 16, 2012);

8    *Hiller v. Allstate Prop. & Cas. Co.*, No. 11–cv–291–TOR, 2012 WL 2325603, at *9 (E.D.

9    Wash. Jun. 19, 2012); *see also Polygon Nw. Co. v. Nat'l Fire & Marine Ins. Co*., No.

10   C11-92Z, 2011 WL 2020749, at *2, n.3 (W.D. Wash. May 24, 2011) (dismissing IFCA

11   claim, as an alternative holding, where the plaintiff failed to wait 20 days after giving

12   notice before suing).  This court agrees that IFCA's pre-suit notice provision is a

13   mandatory condition precedent to an IFCA lawsuit.

14        American Zurich does not contest that it received MKB's April 4, 2013, letter or

15   that MKB provided a copy of the letter to the insurance commissioner.  (*See* AZ Resp. at

16   18-23.)  Indeed, MKB plainly marked the upper left-hand corner of the first page of the

17   letter with a legend, as follows:

18              ***20-day Notice of Violation***
               ***RCW 48.30.015 – Insurance Fair Conduct Act***

19

20   (7/22/14 Mullinex Decl. Ex. 34 at 1.)  The letter also identifies the specific provisions of

     the Washington Administrative Code that MKB asserts American Zurich violated and

21   contains a brief explanation of each alleged violation.  (*See generally id.*)

22

ORDER- 44

1    American Zurich complains that MKB's letter does not have "the necessary

2    substance to sufficiently provide notice of an actual improper claim practice."  (AZ Resp.

3    at 18-19.)  American Zurich, however, does not explain why the letter is insufficient to

4    provide "notice of the basis for the cause of action."  RCW 48.30.015(8)(a).  American

5    Zurich's bald complaints of insufficiency are inadequate to prevent summary judgment

6    on this issue.

7    The only other arguments that American Zurich raises go to the substance of

8    MKB's IFCA claim, including whether any alleged IFCA violations occurred, and

9    whether America Zurich responded and cured any such violations in a timely fashion.

10   (*See* AZ Resp. at 19-23.)  MKB, however, has not moved for summary adjudication of

11   these issues, and they remain for trial.  American Zurich has failed to raise any genuine

12   issue of fact with respect to MKB's compliance with the statutory notice requirements of

13   RCW 48.30.015(8)(a), and the court therefore grants this portion of MKB's motion.

## IV.  CONCLUSION

15   As delineated in detail above, the court GRANTS in part and DENIES in part both

16   American Zurich's motion for summary judgment (Dkt. # 93) and MKB's motion for

17   partial summary judgment (Dkt # 91).

18   Dated this 24th day of September, 2014.

JAMES L. ROBART
United States District Judge

ORDER- 45