UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| MKB CONSTRUCTORS, | CASE NO. C13-0611JLR |
| Plaintiff, | ORDER |
| v. | |
| AMERICAN ZURICH INSURANCE COMPANY, | |
| Defendant. | |

## I.    INTRODUCTION

Before the court are two motions by Defendant American Zurich Insurance

Company ("American Zurich"):  (1) a motion for a new trial under Federal Rule of Civil

Procedure 59 (Rule 59 Mot. (Dkt. 161)), and (2) a motion for judgment as a matter of law

under Federal Rule of Civil Procedure 50(b) (Rule 50(b) Mot. (Dkt. # 164)).  The court

has considered both motions, all submissions filed in support of and opposition to the

1  motions, the balance of the record, and the applicable law.  Being fully advised,[1] the

2  court GRANTS in part and DENIES in part American Zurich's Rule 50(b) motion and

3  DENIES American Zurich's Rule 59 motion.

## II.    BACKGROUND

5        The court conducted a jury trial in this matter from October 20 to October 24,

6  2014, on Plaintiff MKB Constructors' ("MKB") claims against Defendant American

7  Zurich Insurance Company ("American Zurich") for breach of contract, violation of the

8  Insurance Fair Conduct Act ("IFCA"), RCW 48.30.015, and breach of the covenant of

9  good faith and fair dealing.  (*See* Dkt. ## 142, 146-48.)  The jury returned a verdict in

10  MKB's favor.  (*See* Jury Verdict (Dkt. # 151).)  On October 24, 2014, the jury awarded

11  MKB a total of $2,357,906.71 in damages (*see* Judg. (Dkt. # 153)), which is comprised of

12  (1) $1,083,424.24 for American Zurich's breach of contract, (2) $274,482.47 for

13  American Zurich's violation of IFCA, (3) $862,000.00 in enhanced damages under the

14  same statute, and (4) $138,000.00 for American Zurich's failure to act in good faith (*see*

15  *generally* Jury Verdict).

16        At trial, MKB argued that American Zurich breached its builder's risk insurance

17  policy with MKB by denying MKB's claim for benefits when the building pad that MKB

18  was constructing for the Lower Yukon School District ("LYSD") sank into the ground.

19  MKB argued that it was entitled to payment for certain damages laid out in its December

20  28, 2012, letter to American Zurich, including:  (1) the costs for additional gravel, (2)

---

22  [1] Neither party requested oral argument, and the court deems it unnecessary for the disposition of either motion.

1   increased barging costs, (3) the costs for equipment left in Emmonak, Alaska, (4) certain

2   survey costs, and (5) markup and overhead costs.

3        The court instructed the jury on the nature of MKB's breach of contract claim and

4   American Zurich's affirmative defenses, as well as the elements of MKB's breach of

5   contract claim, American Zurich's affirmative defenses, and the parties' respective

6   burdens of proof.  (Jury Instr. (Dkt. # 149) Nos. 21-22.)  The court also provided

7   additional instructions with respect to MKB's breach of contract claim and American

8   Zurich's fortuity affirmative defense based on the court's rulings on summary judgment.

9   (*Id.* Nos. 23-24, 32-33.)  American Zurich objected to Instruction Nos. 22, 23, and 24 on

10  grounds that these instructions "instruct the jury to determine whether coverage exists

11  under the policy" and "requires the jury to interpret provisions of the policy."  (Dkt.

12  # 165-41 at 5.)[2]  American Zurich objected to the verdict form on these same grounds.

13  (*Id.* at 7.)

14       The court also instructed the jury with respect to MKB's claim under IFCA.  (Jury

15  Instr. No. 30.)  In addition, the court instructed the jury that it could award enhanced

16  damages under IFCA if it found a violation of the statute and additional requirements as

17  set forth in the statute.  (*Id.* No. 34.)  American Zurich objected to the later instruction

18  because it instructed the jury to make the determination on enhanced damages, and

19

20  ───────────────

21     [2] All references to docket number 165 are to the November 21, 2014, declaration of
    Elaine Videa that American Zurich filed in conjunction with its Rule 50(b) motion.  Because Ms.

22  Videa's declaration and its attachments are hundreds of pages long, the court will reference this
    declaration only by docket number and the specific attachment and page number at issue.

1   American Zurich argued that this determination should be made by the court.  (Dkt.

2   # 165-41 at 6.)

3       Finally, American Zurich took exception to the court's declination to give certain

4   non-pattern jury instructions that American Zurich had proposed.  (*See* Dkt. # 165-41 at

5   6.)   Namely, American Zurich objected to the court's declination to give American

6   Zurich's proposed instruction No. 29, which provided further definition of "direct

7   physical loss or damage" (Disputed Jury Instr. (Dkt. # 139) at 99), proposed instruction

8   No. 33, which was based on Alaska law and provided that earth movement is "not a man-

9   made occurrence" (*id.* at 102), proposed instruction No. 35, which provided that an

10   insurer may dispute claims as long as it has a "reasonable basis" (*id.* at 107), and

11   proposed instruction No. 36, which provided that an insurer should not be liable for

12   mistakes "made in good faith" (*id.* at 110).  (*See* Dkt. # 165-41 at 6.)

13       At the close of evidence, American Zurich made a motion pursuant to Federal

14   Rule Civil Procedure 50(a).  In its motion, American Zurich argued that it was entitled to

15   judgment as a matter of law with respect to MKB's claim for the cost of additional gravel

16   because (1) there was no earth movement under the policy, (2) there was insufficient

17   evidence that MKB's need for additional gravel was due to direct physical loss to covered

18   property as a result of earth movement, and (3) the evidence showed that MKB knew of

19   its gravel deficiency before it started work on the building pad, and therefore, the

20   deficiency was not unexpected or fortuitous and as a result was not covered under the

21   policy.  (Dkt. # 165-40 at 213:8-22.)  Specifically, American Zurich's counsel stated:

22

1   MR. VASQUEZ:  Yes, Your Honor, just for the record, we're moving for
2   judgment as a matter of law pursuant to Rule 50.  Defendants believe
    there's no sufficient evidentiary basis to find that MKB's purchase of
3   additional gravel was due to direct physical loss to covered property, i.e.
    there was no earth movement, therefore there's no coverage under the
4   policy.

5   MKB knew they needed more gravel before they entered into the contract
    with the Lower Yukon School District and prior to the effective date of the
6   insurance contract.  When they knew of the deficiency in gravel before they
    start working, bringing in more gravel is not an unexpected event.
7   Therefore, it's also not fortuitous, and not covered under the law, Your
    Honor.

8   THE COURT: All right. Thank you.

9   (*Id.*)  In its Rule 50(a) motion, American Zurich made no mention of the applicability of

10  any policy exclusions, causation issues regarding specific costs claimed by MKB (other

11  than for additional gravel), the sufficiency of the evidence with respect to MKB's claims

12  for bad faith or IFCA, or the propriety of submitting the issue of enhanced damages under

13  IFCA to the jury.  (*See id.*)

14       Following the jury's verdict, American Zurich timely filed both a motion for a

15  new trial under Federal Rule of Civil Procedure 59 and a renewed motion for judgment as

16  a matter of law under Federal Rule of Civil Procedure 50(b).  (*See generally* Rule 59

17  Mot.; Rule 50(b) Mot.)  In its renewed motion for judgment as a matter of law, American

18  Zurich argues that there was insufficient evidence at trial from which a reasonable jury

19  could find coverage under MKB's builder's risk policy for MKB's claims for the costs of

20  additional gravel, increased barging costs, the cost of the equipment MKB left in

21  Emmonak, Alaska, certain survey costs, and certain markup and overhead costs.  (Rule

22  50(b) Mot. at 4-23.)  In addition, American Zurich argues that there is insufficient

ORDER- 5

1    evidence to support the jury's verdict that American Zurich violated IFCA and that the

2    damages awarded to MKB for the violation were proximately caused thereby.  (*Id*. at 23-

3    30.)  American Zurich also argues that because its coverage decisions denying MKB's

4    claims were reasonable, there is insufficient evidence to support the jury's verdict on bad

5    faith and its award of bad faith damages.  (*Id.* at 31-32.)  Finally, American Zurich argues

6    that the jury's award of enhanced damages under IFCA was unreasonable and excessive

7    in amount.  (*Id.* at 32-36.)

8         In its Rule 59 motion for a new trial, American Zurich argues that it is entitled to a

9    new trial because (1) the court's instructions on breach of contract required the jury to

10   interpret provisions of an insurance contract in contravention to Washington law (Rule 59

11   Mot. at 3-10), (2) the court and not the jury should have decided the issue of enhanced

12   damages under IFCA (*id.* at 10-11), and (3) the verdict was not supported by the evidence

13   for all of the reasons stated in its Rule 50(b) motion (*id.* at 11).  MKB opposes both

14   motions.  (*See* Rule 59 Resp. (Dkt. # 175); Rule 50(b) Resp. (Dkt. # 176).)  The court

15   now considers American Zurich's motions.

### III.   ANALYSIS

16

17   **A.  Standards**

18        The court may grant American Zurich's renewed motion for judgment as a matter

19   of law if it "finds that a reasonable jury would not have a legally sufficient evidentiary

20   basis" to find for MKB.  *See* Fed. R. Civ. P. 50(a).  The court must view the evidence and

21   draw all reasonable inferences in favor of MKB—the party in whose favor the jury

22   returned its verdict.  *Ostad v. Oregon Health Sci. Univ*., 327 F.3d 876, 881 (9th Cir.

2003).  Granting a motion for judgment as a matter of law is proper if "the evidence permits only one reasonable conclusion, and the conclusion is contrary to that reached by the jury."  *Id.*  Judgment as a matter of law "is appropriate when the jury could have relied only on speculation to reach its verdict."  *Lakeside-Scott v. Multnomah Cnty.*, 556 F.3d 797, 802-03 (9th Cir. 2009).

Because it is a renewed motion for judgment as a matter of law, a proper post-verdict Rule 50(b) motion is limited to the grounds asserted in the pre-deliberation Rule 50(a) motion.  *EEOC v. GoDaddy Software, Inc.*, 581 F.3d 951, 961-62 (9th Cir. 2009).  Thus, a party cannot properly raise arguments in its post-trial motion under Rule 50(b) that it did not raise in its pre-verdict Rule 50(a) motion.  *Id.* (citing *Freund v. Nycomed Amersham*, 347 F.3d 752, 761 (9th Cir. 2003) and other cases).  In its Rule 50(a) motion American Zurich argued that there was insufficient evidence (1) of earth movement under the policy, (2) that MKB's claim for the cost of additional gravel arose out of loss or damage caused by earth movement, and (3) that MKB's claim was fortuitous.  (Dkt. # 165-40 at 213:8-22.)  These issues are properly before the court, and the court will consider them under the standards recited above.[3]

---

[3] American Zurich argues that the court should not strictly apply this rule but should broadly construe its Rule 50(a) motion to include all of the additional grounds now stated in its renewed motion under Rule 50(b) motion.  (Rule 50(b) Reply (Dkt. # 179) at 2-3.)  It is true that the Ninth Circuit has stated that "courts are somewhat more liberal about what constitutes a sufficient motion for a directed verdict at the close of all of the evidence."  *Farley Transp.Co., Inc. v. Santa Fe Trail Transp. Co.*, 786 F.2d 1342, 1347 (9th Cir. 1985) (citing a request for a jury instruction directing the verdict, an objection to a jury instruction on the ground of insufficient evidence, and "inartfully made or ambiguously stated" motions as examples of what may constitute a "sufficient approximation" of a Rule 50(a) motion).  Indeed, "[a]bsent such a liberal interpretation, 'the rule is a harsh one.'"  *GoDaddy Software*, 581 F.3d at 961.

1    American Zurich, however, did not move under Rule 50(a) with respect to the

2    applicability of any policy exclusions, causation issues regarding specific costs claimed

3    by MKB (other than for additional gravel), or the sufficiency of the evidence with respect

4    to MKB's claims for bad faith or IFCA or the jury's damages awards on those claims.

5    Thus, the court will review the remainder of American Zurich's motion under Rule 50(b)

6    only "for plain error, and [will] reverse only if such plain error would result in a manifest

7    miscarriage of justice."  *Id.* at 961.  "This exception permits only extraordinarily

8    deferential review that is limited to whether there was *any* evidence to support the jury's

9    verdict."  *Id.* at 961-62 (alterations in text omitted; italics in original) (citing *Yeti by*

10   *Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1109 (9th Cir. 2001)).

11   **B.  Grounds Preserved for Rule 50(b) Motion**

12       As noted above, American Zurich preserved only three issues in its Rule 50(a)

13   motion:  whether there was sufficient evidence (1) of earth movement under the policy,

14   (2) that MKB's claim for the cost of additional gravel arose out of loss or damage caused

15   by earth movement, and (3) that MKB's claim was fortuitous.  (Dkt. # 165-40 at 213:8-

16   22.)  The court reviews these issues for a legally sufficient evidentiary basis for the jury's

17

18   Nevertheless, American Zurich's Rule 50(a) motion was not inartful or ambiguously stated.  To
19   the contrary, American Zurich was clear, precise, and specific with respect to the grounds upon
     which it based its Rule 50(a) motion.  Given the clarity and the specificity of American Zurich's
20   motion, the court declines to stretch American Zurich's motion beyond its unambiguous bounds.
     *See, e.g.*, *Smith v. Sumner*, 994 F.2d 1401, 1407 (9th Cir. 1993); *Arnold v. Pfizer, Inc.*, No. 3:10-
21   cv-01025-AC, 2015 WL 268967, at *20 (D. Or. Jan. 21, 2015).  "Whatever safety net might exist
     via *GoDaddy*'s reference to an 'ambiguous' or 'inartfully made' Rule 50(a) motion generally,
22   does not apply . . . here."  *Blumhorst v. Pierce Mfg., Inc.*, No. 4:10-cv-00573-REB, 2014 WL
     1319717, at *5 (D. Idaho Mar. 28, 2014).

ORDER- 8

1    verdict when viewing the evidence in the light most favorable to MKB and drawing all

2    evidentiary inferences in MKB's favor.  Fed. R. Civ. P. 50(a); *Ostad*, 327 F.3d at 881.

3       **1. Earth Movement**

4       American Zurich argues that (1) there was no evidence at trial to support the

5    conclusion that settlement of the soil underlying the building pad constituted earth

6    movement under the policy, (2) MKB presented no expert testimony establishing earth

7    movement, and (3) any settlement that occurred was man-made and therefore not covered

8    under the policy.  (Rule 50(b) Mot. at 14.)  In making these arguments, American Zurich

9    relies on the testimony on cross-examination of James Tony Wilson, MKB's expert

10   witness in land surveying, that the site "settled" or "subsided" due primarily to the weight

11   of the gravel placed on top of the "spongy" or "soggy" soil.  (*See id.* at 14, n.68 (citing

12   Dkt. # 165-40 at 115:10-20).)  American Zurich argues that such settlement is not earth

13   movement under the policy as a matter of law.  (*Id.* at 14.)

14      The policy specifically states that an "earth movement" covered cause of loss

15   includes "[a]ny earth movement" "such as . . . earth sinking, rising or shifting."  (Videa

16   Decl. (Dkt. # 162) Ex. 3 (attaching Trial Exhibit 31) ("AZ Policy") at 10.)  In accordance

17   with this language, the court specifically instructed the jury that earth movement included

18   "sinking, rising or shifting."  (Jury Instr. No. 22.)  Nothing in the language of the policy

19   requires that the earth movement at issue not be man-made.  (*See* AZ Policy at 10.)

20   Indeed, the policy language refers to "any" earth movement and does not specifically

21   reference any distinction between a natural or man-made event.  (AZ Policy at 10.)  Thus,

22   even if the court were to accept American Zurich's premise that the sinking of the tundra

1   under the building pad was "man-made," there is nothing in the policy language that

2   negates coverage on that basis or undermines the jury's verdict.[4]

3          The court agrees with MKB that there was no need to present expert testimony

4   that "settling" or "subsidence" of the soil constitutes "sinking" or "shifting" under the

5   policy.  What constitutes "sinking" or "shifting" was a factual issue to "be settled by the

6   common experience of jurors."  *See Graham v. Pub. Emps. Mut. Ins. Co.*, 656 P.2d 1077,

7   1079-80 (Wash. 1983) (approving trial court's decision to leave the determination of

8   whether the movement of Mt. St. Helens was an "explosion" under the policies at issue to

9   the jury because "the true meaning of 'explosion' in each case must be settled by the

10  common experience of jurors."); *Oroville Cordell Fruit Growers, Inc. v. Minneapolis*

11  *Fire & Marine Ins. Co.*, 411 P.2d 873, 877 (Wash. 1956) (holding that the term explosion

12  "in an insurance policy is to be construed in its popular sense, and as understood by

13  ordinary men and not by scientific men").  Expert testimony was not necessary.  The

14  evidence at trial was sufficient for the jury to conclude that the subsidence or settling of

15

16      [4] In support of its argument, American Zurich cites an Alaskan decision, *West. v. Umialik Ins. Co.*, 8 P.3d 1135, 1141 (Alaska 2000).  In *West*, the Alaska Supreme Court rejected the insurance company's broad interpretation of an earth movement exclusion to include only external or natural and not man-made phenomena.  *Id.* at 1141-43.  *West* is distinguishable,

17  however, because the *West* court was construing a policy exclusion, *id.* at 1141, whereas the insuring language at issue here was contained within an endorsement that created an exception to the exclusion for earth movement (*see* AZ Policy at 9-10).  Here, the unambiguous language of

18  the policy applied stated that it applied to "[a]ny earth movement," and there is no language limiting the coverage to external or natural phenomena.  (*Id.* at 10.)  Even if the language were

19  ambiguous, however, unlike the exclusion in *West*, which must be interpreted narrowly, an exception to a policy exclusion is interpreted broadly.  *See Clear, LLC v. Am. And Foreign Ins.*

20  *Co.*, No. 3:07-cv-00110 JWS, 2008 WL 818978, at *9 (D. Alaska Mar. 24, 2008) (citing *Fejes v. Alaska Ins. Co., Inc.*, 984 P.2d 519, 522 (Alaska 1999)); *Hayden v. Mut. Of Enumclaw Ins. Co*.,

21  1 P.3d 1167 (Wash. 2000) ("Policy ambiguities, particularly with respect to exclusions, are to be strictly construed against the insurer.")  Thus, the *West* court's analysis is inapposite here.

22

ORDER- 10

the soil under the building pad constituted "sinking" or "shifting" under the policy.  Thus,

the court denies American Zurich's motion for a judgment as a matter of law on this

issue.

### 2.  Additional Gravel

In its December 28, 2012, letter to American Zurich, MKB stated its claim for

additional gravel as follows:

> MKB delivered and placed 26,384 cubic yards of foundational material.
> The original plan quantity was 23,626 cubic yards therefore MKB delivered
> and placed an additional 2,758 cubic yards (4,773 Tons) of foundational
> material.

(Dkt. # 165-7 at 2.)  As a result, MKB claimed the cost of the 4,773 tons of gravel as a

loss under its Builder's Risk policy with American Zurich.  American Zurich asserts that

there is a legally insufficient evidentiary basis for the jury to find that the 2,758 cubic

yard (4,773 tons) of gravel that MKB placed in excess of 23,626 cubic yards represented

a loss under the policy, when (according to American Zurich) the evidence at trial

demonstrated that MKB was contractually required to place 26,641 cubic tons of gravel

at the site.  (*See id.* at 6; Rule 50(b) Reply (Dkt. # 179) at 5.)

American Zurich asserts that the evidence at trial proves that MKB calculated the

original plan quantity of 23,626 cubic yard of gravel inaccurately based on distorted

drawings.  (Rule 50(b) Mot. at 7-8.)  American Zurich argues, based in part on a

calculation by Earthworks Services (which was MKB's consultant), that the actual

amount of gravel required under MKB's contract with LYSD was 26,641 cubic tons of

gravel.  (*Id.* at 8.)  Thus, "MKB could only have a loss [under the policy] if it purchased

1    and placed more gravel at the site than it voluntarily agreed to in its contract [with

2    LYSD] (i.e., 26,641 cubic yards of compacted gravel)." (*Id.* at 9.)  MKB claimed it only

3    placed 26,384 cubic yards at the site. (*See* Dkt # 165-7 at 2.)  Accordingly, American

4    Zurich argues that MKB voluntarily agreed under its LYSD contract to provide all of the

5    gravel it placed at the site, and thus, MKB did not incur a loss under the Builder's Risk

6    policy. (*Id.* at 10.)

7            The court, however, dealt with this issue on summary judgment and ruled that

8    MKB need not show that it fully performed its contract with LYSD to have a covered

9    claim under its policy with American Zurich. (SJ Order (Dkt. # 128) at 33-34.)  Rather,

10   MKB was charged with proving it had suffered direct physical loss or damage to covered

11   property.  The jury was so instructed.  (Jury Instr. No. 23 ("With respect to its breach of

12   contract claim, MKB must prove that it suffered direct physical loss or damage to

13   covered property, but it does not have to prove that it fully performed the Phase I contract

14   with the Lower Yukon School District to have a covered claim under the insurance

15   contract.").)  Nevertheless, the court noted that the dispute between the parties was not

16   really one of law, but one of fact.  (SJ Order at 33.)  MKB asserted and sought to

17   introduce evidence that the ground beneath the building pad settled which resulted in

18   damage to the pad and losses that it was entitled to recover under its policy.  (*Id.* at 33-

19   34.)  American Zurich argued and sought to introduce evidence that any shortage in

20   gravel was the result not of sinking under the building pad, but of poor planning on

21   MKB's part with respect to its contractual obligations and miscalculations on the amount

22   of gravel needed to fulfill the contract.  (*Id.* at 34.)  In its order on summary judgment, the

1  court ruled that both parties were entitled to present their evidence and theories of the

2  case to the jury.  (*Id.*)  Both sides did just that at trial.

3        American Zurich presented evidence and argued to the jury that MKB did not

4  suffer any loss under the policy because MKB would have had to bring all the gravel it

5  placed at the site anyway under its contract with LYSD irrespective of any ground

6  settlement under the pad.  MKB, however, made a different argument to the jury.  MKB

7  presented evidence and argued that the earth beneath the building pad settled more than

8  the two inches that LYSD told MKB to expect and that this sinking of the earth below the

9  pad damaged the pad, which is covered property under the policy.  Tony Wilson testified

10  unequivocally that the pad sank more than two inches (Dkt. # 165-40 at 110:4-17), and

11  MKB's expert witness, Maria Kampsen, who is a geotechnical engineer (*id.* at 119:18-

12  19), testified that the pad sank nearly 12 inches in total rendering 6,500 cubic yards of

13  gravel below ground (*id.* at 134:5-10).  As MKB points out, even reducing this amount to

14  account for the expected two inches of settlement would render a loss of gravel more than

15  twice the amount requested by MKB from American Zurich and under its breach of

16  contract claim.  (Rule 50(b) Resp. at 6.)  Viewing the evidence and drawing all inferences

17  in favor of MKB, the jury was entitled to rely upon Ms. Kampsen's testimony in

18  justifying its award of a smaller amount to MKB.  Indeed, MKB asked for the jury to

19  award the smaller figure at trial based on its original claim to American Zurich.[5]  MKB

20

21  _____

22  [5] Because MKB failed to timely disclose its supplemental damages calculation, the court
excluded MKB from relying upon it at trial.  (*See* 9/29/14 Order (Dkt. # 129).)  Accordingly,

1    explained to the jury that "now that we're a couple of years down the road, that number

2    [in MKB's original demand to American Zurich] is smaller than Ms. Kampsen's

3    number." (Dkt. # 165-41 at 150:2-24.)

4         Indeed, the jury could reasonably rely on Ms. Kampsen's number to support its

5    award even if the jury also believed American Zurich's evidence.  Whether MKB brought

6    sufficient gravel to the site to complete its contract with LYSD is a separate issue from

7    whether earth movement occurred below the building pad, damaging it and entitling

8    MKB to recover its losses for that damage from American Zurich.  American Zurich

9    identified no provision of the policy that required MKB to complete its contract with

10   LYSD prior to having a covered loss under the policy.  The policy states and the court

11   instructed the jury that American Zurich agreed to pay MKB for direct physical loss or

12   damage to covered property caused by earth movement, which includes sinking.  (*See*

13   Jury Instr. No. 22.)  Thus, the jury could have concluded that MKB had not brought

14   enough gravel to the site to complete its contract with LYSD and also found that MKB

15   had experienced a covered loss for which it was entitled to recover from American

16   Zurich.

17        Finally, even if one were to accept American Zurich's premise that MKB must

18   show that it placed gravel at the site in excess of the amounts necessary to fulfill its

19   contractual obligations to LYSD, there was legally sufficient evidence upon which the

20

21   MKB relied upon its original damages calculation at trial which included only 2,758 cubic yards
22   (4,773 Tons) of gravel.  (*See* Dkt. # 165-41 at 150:2-24.)

1  jury could have reasonably relied to find such an overage—especially when the evidence

2  is viewed in the light most favorable to MKB.  First, the jury could have relied upon Mr.

3  Jensen's pre-bid estimate of 23,626 cubic yards of gravel, which would support a 4,773

4  ton overage.  (*See* Dkt. # 165-7 at 2.)  American Zurich asserts that it would unreasonable

5  for the jury to rely on Mr. Jensen's estimate because American Zurich presented evidence

6  that the drawings upon which Mr. Jensen based his estimate were distorted.  (*See* Rule

7  50(b) Mot. at 8.)  As MKB points out, however, American Zurich never quantified the

8  effect of that distortion.  (Rule 50(b) Resp. at 10; *see also* Dkt. # 165-40 at 155:11-

9  166:1).)  Thus, it is conceivable that the distortion had no effect or only a negligible

10  effect on Mr. Jensen's calculations.

11       Instead of quantifying the effect of the distortion in the drawings on Mr. Jensen's

12  calculations, American Zurich relied upon an estimate that was based on AutoCAD data

13  to show that the LYSD contract actually required the placement of 26,983 cubic yards of

14  gravel and not just 23,626 cubic yards as Mr. Jensen had calculated.  (Rule 50(b) Mot. at

15  9 (citing Dkt .## 165-19, 165-40 at 198:21-199:6).)  The AutoCAD estimate that

16  American Zurich relied upon, however, also had a checkered past.  The consulting firm,

17  Ninyo & Moore, that produced the AutoCAD estimate was hired by American Zurich to

18  investigate MKB's claim.  (*See* Dkt. # 165-40: 181:1-182:5; *see* Dkt. # 165-19.)  Mr.

19  Scott Johnson, of Ninyo & Moore, originally estimated the required volume for

20  completion of the contract to be 23,775 cubic yards.  (Dkt. # 165-40 at 198:21-25.)  This

21  original estimate would have largely confirmed Mr. Jensen's estimate of 23,626 cubic

22  yards.  (*See* Dkt. # 165-40 at 192:17-193:22.)  Ninyo & Moore, however, later revisited

1   its work on the matter, revised its original estimate based on more detailed AutoCAD

2   data, and produced a new estimate indicating that 26,983 cubic yards of gravel would be

3   needed under MKB's contract with LYSD.  (Dkt ## 165-40 at 189:19-200:15; 165-19.)

4   Although American Zurich argues that the jury should have relied upon the later

5   estimated based on more detailed AutoCAD data, the jury was not obligated to do so.

6   The fact that American Zurich's consulting firm revised an initial estimated volume of

7   gravel that was favorable to MKB to one that was not favorable may have raised

8   reasonable credibility issues for the jury with respect to the second estimate.  Indeed,

9   based solely on the number of estimates of gravel volume provided to the jury, it is the

10  consulting firm's later estimate of 26,983 cubic yards that could be considered the outlier.

11          Finally, Mr. Jensen testified that he compared his estimate to one done by Mike

12  Blake, who is "one of the firm's senior project managers and routinely is involved in

13  estimating for MKB."  (Dkt. # 165-39 at 71:23-72:10.)  Mr. Blake did not use the same of

14  drawings, which have been criticized by American Zurich as distorted, when he derived

15  his estimate.  (*Id.* at 72:7-13.)  Mr. Jensen also double-checked and compared his

16  estimate to the estimates of two other subcontractors, and he testified that his estimate

17  was consistent with theirs.[6]  (*Id.* at 68:21-70:19.)  There was no evidence at trial that

18  either of these subcontractors based their estimates on distorted drawings.  Thus, Mr.

19  _____

20          [6] In their reply memorandum, American Zurich argues that MKB cannot rely upon this
    evidence because the court excluded it as hearsay.  (Rule 50(b) Reply (Dkt. # 179) at 5.)  The
    court, however, only excluded the documents containing the subcontractors' bids as hearsay.

21  (Dkt # 165-39 at 69:11-22, 71:20-22.)  The court expressly allowed Mr. Jenkins to provide
    testimony about his comparison of his estimate to these bids.  (*Id.* at 69:21-22 ("I'm going to

22  sustain the objection.  You can ask the question without reference to the document.").)

1    Jenkins had three corroborating estimates to support the accuracy of his own estimate.

2    Accordingly, based on all of the foregoing evidence, and viewing it in the light most

3    favorable to MKB, the court concludes that there was legally sufficient evidence for jury

4    to find a contract overage in the amount of gravel placed by MKB, and the court denies

5    American Zurich's motion for judgment as a matter of law on this issue

6        **3.  Fortuity**

7        American Zurich admits that the court "correctly instructed the jury on the

8    principle of fortuity."  (Rule 50(b) Mot. at 15.)  The court instructed the jury that "[a]n

9    insurance contract does not provide insurance for a loss that is reasonably certain or

10   expected to occur during a policy." (Jury Instr. No. 24.)  The court further instructed that

11   the "doctrine is premised on the principle that an insured cannot collect on an insurance

12   claim for a loss that the insured subjectively knew would occur at the time the insurance

13   was purchased."  (*Id.*)

14       Although American Zurich acknowledges that the forgoing instruction was

15   correct, it nevertheless argues that the evidence demonstrates that MKB knew before it

16   entered into its May 4, 2012, contract with LYSD and before the insurance policy period

17   began on June 15, 2012, that there was going to be settlement at the site and that it was

18   going to need gravel in excess of its 23,626 cubic yard estimate.  (Rule 50(b) Mot. at 15-

19   16.)  In support of its argument that MKB knew it would need more gravel, American

20   Zurich relies primarily upon (1) an April 26, 2012, report from Earthwork Services, Inc.

21   to MKB indicating that the fill volume required at the site was 26,767 cubic yards (Dkt

22   # 165-14), (2) a May 17, 2012, letter (sent via email) from MKB to the Larson

ORDER- 17

1    Consulting Group, LYSD's engineer for the project, stating that it had confirmed that the

2    drawing it utilized to formulate its bid was "in error" and that MKB now estimated that

3    an additional 4,700 cubic yards of fill would be required (Dkt. # 165-18), (3) a June 5,

4    2012, letter from MKB to LYSD in which MKB indicated that based on certain

5    AutoCAD files, MKB (in conjunction with analysis performed by Earthwork Services)

6    had determined that an additional 6,583 cubic yards of gravel fill would be needed to

7    perform the LYSD contract (Dkt. # 165-10), (4) and certain portions of Mark Jensen's

8    testimony about these documents and information he had about settlement at the site

9    (Dkt. ## 165-39 at 117:18-118:9, 165-41 at 73:23-25).

10           In response to the foregoing evidence, MKB argues that the issue is not whether

11   MKB knew it would need more gravel due to an error in its pre-contract calculations, but

12   rather whether MKB subjectively expected a loss of fill because of earth movement

13   during the policy period.  (Rule 50(b) Resp. at 7.)  Indeed, as MKB points out, the later is

14   precisely how American Zurich phrased the fortuity issue in its denial letter to MKB:

15   "[A]ny claim for the amount of loss due to the settlement in excess of 2 inches is [sic]

16   would not be covered on the basis that said loss was not fortuitous as settlement up to 12

17   inches of settlement was expected as documented in NGE/TTT's pre-construction

18   report."  (12/08/14 Mullenix Decl. (Dkt. # 177) Ex. 5 (Trial Exhibit No. 172) at 2.)[7]

19

20           [7] MKB also points out that the relevant time period is not whether MKB subjectively
21   knew the loss at issue would occur prior to the policy period, but rather whether MKB
     subjectively knew the loss would occur prior to the time the insurance was purchased.  (*See* Jury
22   Instr. No. 24 ("This doctrine is premised on the principle that an insured cannot collect on an
     insurance claim for a loss that the insured subjectively knew would occur at the time the

1    In support of its argument that MKB knew there would be settlement of the

2   ground beneath the building pad, American Zurich relies upon Addendum 02, authored

3   by the Larsen Consulting Group, which refers to "historically . . . substantial settlement"

4   "in and around Emmonak," but states that there will "[t]here will be some initial

5   settlement of about two inches that will occur during construction but the majority of the

6   settlement will occur over a few years." (Dkt. # 165-9 at 2 (Stipulated Fact No. 9).) In

7   addition, a report from Northern Geotechnical, Inc., was attached to Addendum 02,

8   which stated "[s]ettlements of 3 to 9 inches should be expected in area [sic] within [sic]

9   30 inches of fill and 5 to 12 inches is [sic] areas with 72 inches of fill." (*Id.* at 3

10   (Stipulated Fact No. 26).)

11    Mark Jensen, however, testified that he took the information in Addendum 02 into

12   account by allowing for about two inches of settlement in his bid. (Dkt. # 165-39 at

13

14   insurance was purchased.")); *see Hillhaven Props, Ltd. v. Sellen Contr. Co.*, 948 P.2d 796, 799 (Wash. 1997) ("[A]n insured cannot collect on an insurance claim for a loss that the insured

15   subjectively knew would occur at the time the insurance was purchased."); *Pub. Util. Dist. No. 1 v. Int'l Ins. Co.*, 881 P.2d 1020, 1030 (Wash. 1994) (same); *Frank Coluccio Constr. Co., Inc. v.*

16   *King Cnty.*, 150 P.3d 1147, 1156 (Wash. App. 2007) ("[I]n deciding whether a loss was fortuitous, a court should examine the parties' perception of risk at the time the policy was

17   issued; . . . ordinarily, a loss which could not reasonably be foreseen by the parties at the time the policy was issued was fortuitous."). MKB submitted evidence to the jury that Mark Jensen gave

18   instructions to MKB's broker to bind the policy on May 17, 2012. (12/08/14 Mullinex Decl. (Dkt. # 177) Ex. 1 (Trial Ex. No. 25) at 2.) The evidence American Zurich submits concerning

19   MKB's knowledge of its calculation error based on distorted drawings is after this date. Thus, MKB asserts that there is no evidence that MKB reasonably expected to suffer a loss related to a

20   gravel shortfall prior to the policy's date of purchase. American Zurich responds that the evidence MKB submits does not prove the policy was purchased on May 17, 2012, but only that

21   MKB gave its broker instructions on that date to bind the policy. (Rule 50(b) Reply (Dkt. # 179) at 10, n.37.) However, viewing the evidence in the light most favorable to MKB and drawing all

22   reasonable evidentiary inferences in MKB's favor, *Ostad*, 327 F.3d at 881, the court concludes that this evidence is sufficient for the jury to find that MKB did not anticipate a shortfall of gravel at the time it purchased the policy.

ORDER- 19

74:20-25; *see also id.* at 106:7-10 ("Q:  And so before you even submitted a bid, MKB

knew there was going to be settlement during the construction of Phase 1 of the project,

correct?  A:  Yes. Approximately two inches.").)  As MKB points out, even American

Zurich's own witness, Carl John, agreed that it would be reasonable for MKB to rely

upon the Addendum 02 and the report from Northern Geotechnical for an expectation of

only two inches of soil settlement:

> Q:  And so you agree it would be reasonable for MKB to rely on Larsen
> and Northern Geotech?
>
> A:  Right.
>
> Q:  For the two inch settlement?
>
> A:  Correct.
>
> Q:  They shouldn't have looked at that and said, there's probably going to
> be more than two inches of settlement during Phase I?
>
> A:  Correct.

(Dkt. # 164-41 at 100:25-101:8.)   Thus, there was substantial evidence under the

standards applicable to a Rule 50(b) motion to support the notion that MKB reasonably

did not expect more than two inches of soil settlement at the time it entered into its

contract with LYSD and at the time it purchased its Builder's Risk insurance policy from

American Zurich.

Further, as MKB points out, the test for fortuity is not objective, but rather

subjective.   (*See* Jury Instr. No. 22); *Frank Coluccio Constr. Co.*, 150 P.3d at 1156 ("The

test for fortuity is a subjective, not objective, one and involves questions of fact.").  The

court agrees with MKB that there is substantial evidence, when viewed in the light most

1 favorable to MKB, to support a jury finding that MKB did not subjectively know that

2 there was a gravel volume problem when it purchased its policy from American Zurich.

3 Specifically, Mark Jensen testified as follows:

4      Q:  Okay. Mr. Jensen, if you knew there was a problem with the drawings
       or the AutoCAD, why did you go forward in April with signing the
5      agreement [with LYSD]?

6      A:  We did not know there was a problem with the drawings or the
       AutoCAD, or maybe more appropriately, the quantity of fill we didn't view
7      as a "problem."  What we had was we had our estimate that was double-
       checked in-house, and we had two other estimates.  Regardless of how the
8      quantities got there, all the estimates were very similar to each other in
       quantity.
9
            Conversely, what we had on the other side was an AutoCAD version of
10     it.  And this was discussed with the school district.  What I have on one side
       is a number of estimates that are all the same regardless of whether the
11     drawings—my drawings are distorted or not, the other ones aren't.

12          Conversely, what I have is one AutoCAD estimate.  And I was asking
       the district:  What is it?  That's why I brought it to their attention.  And they
13     said:  Until we have a contract signed, we can't really get into discussions
       what may be right and what may be wrong with AutoCAD or the drawings.
14
       Q:  Back on April 27, 2012, did you think there was a problem with the
15     AutoCAD file or with the drawings?

16     A:  AutoCAD.

17     Q:  Could you read the highlighted portion of that e-mail from April 27,
       2012, by you?
18
       A:  "We have been informed the CAD file is not accurate and the digitizer
19     is working on a solution in order to determine a computerized fill model
       with corresponding fill quantities."
20
   (Dkt. # 165-39 at 142:7-143:11.)  Thus, even if the appropriate issue is whether MKB
21
   expected a gravel quantity issue due to its use of distorted drawings in calculating gravel
22

ORDER- 21

1   volume and not a gravel loss due to earth movement, the evidence supports a finding that

2   MKB did not subjectively know that it would have a gravel volume problem due to either

3   issue at the time it purchased the policy.  Accordingly, viewing the evidence in a light

4   most favorable to MKB and drawing all inferences in its favor, the jury properly rejected

5   application of the fortuity doctrine here.

6   **C.  Grounds Not Preserved for Rule 50(b) Motion**

7           The following grounds in American Zurich's Rule 50(b) motion for judgment as a

8   matter of law were not preserved in its pre-verdict Rule 50(a) motion.  (*See* Dkt. # 165-40

9   at 213:8-22.)  Thus, the court reviews the following grounds for judgment as a matter of

10  law under a less stringent standard.  The court reviews the following issues only "for

11  plain error, and [will] reverse only if such plain error would result in a manifest

12  miscarriage of justice."  *See GoDaddy Software, Inc.*, 581 F.3d at 961-62.  The court's

13  review is limited to considering "whether there [i]s *any* evidence to support the jury's

14  verdict."  *See id.* at 962 (italics in original).

15  **1.  LYSD Paid for the Amounts Awarded by the Jury**

16          American Zurich argues that the insurance policy only pays for "actual costs of

17  repairing" any damaged property and does not pay "for any part of a loss that has been

18  paid or made good by others."  (Mot. at 11 (citing Dkt. # 165-8 at 26 ("General Condition

19  F. Valuation"); *id.* at 34 ("E.6. Loss Payment")).)  American Zurich asserts that the

20  evidence at trial demonstrated that LYSD paid for the placement of gravel to make up for

21  the shortfall of gravel placed by MKB.  (Mot. at 11.)

22

1    First, Mr. Jensen specifically testified that MKB incurred all the costs asserted in

2    its December 28, 2012, letter to American Zurich.  (Dkt. # 165-39 at 95:17-96:6 ("Q:

3    [A]re these the cost items you submitted to [American] Zurich?  A:  Yes.  Q:  And did

4    you incur each of these?  A:  Yes."); *see also* Dkt. # 165-7 (attaching trial exhibit number

5    A-116, which is MKB's December 28, 2012, letter to American Zurich outlining its costs

6    with respect to its claim under the insurance policy).)  Moreover, as MKB points out,

7    American Zurich's argument that MKB did not pay for the damages it asserted is

8    dependent on American Zurich's argument that MKB did not prove a contract overage.

9    (Rule 50(b) Resp. at 15.)  As discussed above, MKB was not required to prove that it had

10   fully performed its contract with LYSD in order to have a covered claim (*see supra* §

11   III.B.2; *see also* Jury Instr. No. 23.)  Nevertheless, the court has concluded that there was

12   sufficient evidence for the jury to find that MKB experienced a contract overage with

13   respect to the quantity of gravel it placed.  (*See supra* § III.B.2.)  There is no "manifest

14   miscarriage of justice" here.  *See GoDaddy Software, Inc.*, 581 F.3d at 961-62.

15   Accordingly, the court denies American Zurich's motion for judgment as a matter of law

16   on this unpreserved ground.

17       **2.  The Exclusion for Faulty, Inadequate, or Defective Planning, Design, or
         Specifications**

18

19       American Zurich argues that MKB cannot recover under the policy because its

20   additional costs were caused either by (1) MKB's use of distorted drawings in deriving its

     estimate that it would be required to place 23,626 cubic yards of gravel to fulfill its

21

22   contract with LYSD (Rule 50(b) Mot. at 17 (citing Dkt. ## 165-17, 165-18, 165-10 at 2,

ORDER- 23

1   or (2) by LYSD's defective estimate of two inches of settlement at the site during the

2   period of MKB's contract.  (Rule 50(b) Mot. at 17-18.)  In either event, American Zurich

3   argues that coverage for MKB's claim would fall within the policy's exclusion for any

4   loss due to faulty, inadequate, or defective planning, design, specification, or

5   workmanship.  (*Id.* at 17 (citing Dkt. # 165-8 (attaching Trial Ex. No. 31, which is the

6   insurance policy at issue) at 42 (§ B.3.c (1) & (2)).)

7          MKB counters that under the policy and Jury Instruction No. 22, all damage to

8   covered property that was not fortuitous is covered if earth movement was the "dominant

9   cause" of the loss.  (Rule 50(b) Resp. at 17; *see also* Jury Instr. No. 22; Dkt. # 165-8 at 17

10  ("E. . . . If a Covered Cause of Loss is the dominant cause of such loss, we will not deny

11  coverage on the basis that a secondary cause in that chain is not a Covered Cause of

12  Loss.").)  Thus, MKB need not prove that MKB's distorted drawings or LYSD's estimate

13  of two inches of settlement played no role in MKB's loss; rather, MKB need only prove

14  that earth movement was the "dominate cause" of its loss.  (*See* Jury Instr. No. 22.)

15  MKB argues that there was sufficient evidence for the jury to conclude that, even if

16  LYSD's estimate of two inches of settlement was in error or MKB's original estimate of

17  the amount of gravel necessary for its contract with LYSD played some role in its loss,

18  the movement of earth beneath the building pad was the dominate cause of MKB's loss.

19  (Rule 50(b) Resp. at 17.)

20         In support of its argument, MKB cites to Trial Exhibit No. 82, which is an email

21  exchange between Mr. Richard Dugo, who was handling MKB's claim on behalf of

22  American Zurich, and Mr. David VanDerostyne, American Zurich's structural

engineering expert. (*See* 12/08/14 Mullenix Decl. Ex. 3.) In this email, Mr. Dugo

compliments Mr. VanDerostyne on his report concerning MKB's claim and then asks:

"Based on your comments, the loss was not due to workmanship, materials, or design – is

that correct?" (*Id.*) In response, Mr. VanDerostyne states: "We see no indications that

this was due to workmanship or materials." (*Id.*) He also states that "poor design

information provided by the geotechnical engineer caused MKB to import more soil than

they anticipated," and that "[w]hile design information did not cause the settlement, it did

not properly identify it." (*Id.*) In addition, Mr. VanDerostyne also testified about the

email exchange in part as follows:

> Q: So you thought the geotechnical engineer who gave information to the
> bidders was not accurate?
>
> A: At that time, based off of our understanding that there was a foot of
> settlement that occurred.

(Dkt. # 164-40 at 169:10-13.) MKB argues that this email from Mr. VanDerostyne

supports a finding that the excluded causes for faulty, inadequate, or defective planning,

design, specification, or workmanship did not predominate over earth movement. (Rule

50(b) Resp. at 17.)

The court agrees. However, in addition to this email, the jury was entitled to listen

to all of the various evidence presented by the parties concerning the LYSD's estimated

two inches of settlement during the initial contract period, MKB's use of distorted plans

in deriving its estimate of gravel quantities, and the settlement of soil at the construction

site beneath the pad, and conclude that of all the possible causes of MKB's loss, earth

movement predominated. Again, the court finds that there was evidence to support the

1    jury's verdict based on the standard articulated above and the verdict does not represent a

2    "manifest miscarriage of justice." *See GoDaddy Software, Inc.*, 581 F.3d at 961-62.

3    Accordingly, the court denies American Zurich's motion for judgment as a matter of law

4    on this unpreserved ground.

5    **3.  Additional Barging Costs**

6    As part of its claim for 4,773 tons of additional foundational materials or gravel,

7    MKB included its costs for barging this material.  (*See* Dkt. # 165-6 at 4 (§ A.2 (noting

8    $362,791.96 for "[b]arge charter, fuel, tug, equipment to unload" related to "Increased

9    Foundational Material Quantity over Planned (4,773 tons)")).)  In addition, however,

10   MKB included $129,959.50 in additional barging costs that it bore because it had to

11   acquire a portion of its gravel from Nome instead of a much closer gravel pit at St.

12   Mary's.  (*See id*. (§ B.1 (noting "[i]ncrease in barge cost from Nome" related to "Earth

13   Moving Incidental Costs)).)  American Zurich argues that MKB actually incurred these

14   costs "to fulfill its original estimate of 23,626 cubic yards of gravel" and not as a cost for

15   placing the additional 4,773 tons of gravel that MKB claims was due to earth movement

16   or settlement under the building pad.  (*See* Rule 50(b) Mot. at 19; Rule 50(b) Reply at

17   11.)  To make this argument, American Zurich relies upon the testimony of its expert

18   witness, Richard Norman.  (Rule 50(b) Mot. at 18-19, n.86 (citing Dkt. #165-39 at 47:25-

19   49:21).)

20   American Zurich's argument, however, is not entirely consistent with Mr.

21   Norman's testimony.  Mr. Norman did not testify that MKB incurred the barging costs at

22   issue from transporting its original estimate of 23,626 cubic yards of gravel.  Rather, he

1    testified that the 4,773 tons of additional gravel that MKB claimed it was required to

2    place due to earth movement was not extra gravel but gravel that MKB was obligated to

3    place on the pad pursuant to its contract with LYSD.  (Dkt. # 165-39 at 44:17-47:24.)

4    Thus, Mr. Norman's testimony that MKB's barging costs "were just a cost of doing

5    business" was derived from his prior analysis that the 4,773 tons of gravel at issue was

6    nothing more than "contract gravel."  (*See* Dkt. # 165-39 at 48:20-23 ("However, if the

7    [4,773 tons of ] gravel as claimed in Section A is contract gravel, then the increased barge

8    costs [claimed in Section B] are contract costs as well, and not extra costs.").)

9           Immediately after the foregoing testimony, however, Mr. Norman attempted to

10   distinguish the additional barging costs that MKB claimed for shipping the 4,773 tons of

11   additional gravel from the $126,959.50 of barging costs that MKB claimed as a result of

12   the additional expenses it incurred when it shipped materials from Nome.  (*Id.* at 49:2-

13   21.)  Mr. Norman testified that the $126,959.50 costs associated with barging materials

14   from Nome "is absolutely contract gravel" and was not incurred for shipping any of the

15   additional 4,773 tons of material because "at the time this was shipped in, even after this

16   load was delivered to the site, [MKB] still had not reached the amount of gravel that is

17   shown in [its] documents as being required to fulfill the contract work."  (*Id.* at 49:12-

18   17.)  When counsel asked Mr. Norman whether the claimed $126,959.50 in increased

19   barging costs were "incurred to repair physical loss or damage," he responded

20   unequivocally:  "No.  It was to ship contract-required gravel to the site."  (*Id.* at 49:18-

21   21.)

22

1      The basis for the last portion of Mr. Norman's testimony, however, is unclear.  He

2   never explained how he is able to conclude that the $126,959.50 in additional costs for

3   barging from Nome was incurred as a result of shipping portions of MKB's originally

4   estimated 23,626 cubic yards of gravel and not the 4,773 tons of additional gravel at

5   issue.  He acknowledges on cross examination that he was "not opining on the settlement,

6   if any, on the pad," and that he does not know if pad sank or settled.  (*Id.* at 54:5-6,

7   54:23-25.)  He also acknowledged that he would defer to others, specifically a

8   geotechnical engineer, for any settlement of the pad, and that he is not an expert on

9   insurance coverage issue.  (*Id.* at 54:7-22.)

10      The court has already ruled that there was legally sufficient evidence for the jury

11   to conclude that there was a contract overage.  (*See supra* § III.B.2.)  Thus, the jury was

12   not obligated to accept Mr. Norman's premise that the 4,773 tons of gravel that

13   underpinned MKB's claim for additional barging costs was "contract gravel."  Further, in

14   response to Mr. Norman's testimony, Mr. Jensen explained why MKB claimed the

15   increased barging costs from Nome:

16         We had three separate barging contractors, and they were -- the material
           was being barged from St. Mary's.  When we notified the school district of
17         the settlement and need for additional fill, St. Mary's was advising us of an
           imminent shutdown of their pit.  We had to renegotiate the contracts with
18         the barging outfits.  They were guaranteed a certain quantity from St.
           Mary's.  Absent that quantity, their profitability was shifted.  So when we
19         shifted to Nome, we had to renegotiate their contracts.  And in doing so we
           encountered premiums that we didn't have originally.  So it wasn't as easy
20         as just shifting the barges, it had to do with quantities, their profitability.
           The more you haul -- or the less you haul from a given area, the less
21         profitable you are.  Whereas Nome was quite a different distance away
           from the site.

22

ORDER- 28

1   (Dkt. # 165-39 at 96:22-97:11.)  In his testimony, Mr. Jensen specifically ties these

2   barging costs to the additional fill needed as a result of settlement at the site.  (*Id.* at

3   96:23-25.)  The jury was entitled to credit Mr. Jensen's testimony and reject Mr.

4   Norman's in awarding these costs to MKB.

5          American Zurich also argues that these costs were not fortuitous and therefore not

6   covered under the policy because MKB intentionally ordered 6,000 to 7,000 tons fewer

7   tons of gravel from St. Mary's than it thought it needed, and thus, the need to order

8   additional gravel at the end of the season was expected.  (Rule 50(b) Mot. at 19 (citing

9   Dkt. # 165-9 at 3 (Stipulated Fact No. 29:  "MKB intentionally understated the order of

10  gravel from St. Mary's."), Dkt. # 165-40 at 95:13-17).)  However, this argument ignores

11  the evidence at trial that MKB had planned to buy fill from other suppliers all along,

12  including excess fill from another MKB project nearby.  (Dkt. # 165-39 at 62:21-63:4,

13  82:25-84:16.)  Thus, the jury was not required to conclude that MKB expected to order

14  additional gravel at the end of the season simply because it had intentionally ordered less

15  than it needed for the project from St. Mary's.

16         Finally, American Zurich argues that it is entitled to judgment as a matter of law

17  with respect to these costs because Mr. Jensen testified that MKB used an incorrect

18  conversion factor when determining how much gravel to order for the LYSD project.

19  (Rule 50(b) Mot. at 20; Dkt. # 165-39 at 109:1-110:13.)  American Zurich argues that

20  MKB's initial order from St. Mary's was too low due to MKB's use of this faulty

21  conversion factor.  (Rule 50(b) Mot. at 20.)  Thus, American Zurich argues that MKB's

22  claim for increased barging costs is barred by the exclusion for faulty, inadequate or

defective planning and workmanship.  (*Id.*)  As discussed above, however, the policy

states that American Zurich will not deny coverage on the basis of a secondary cause that

is not covered under the policy if a covered cause of loss (here, earth movement) is the

dominant cause of loss.  (Dkt. # 165-8 at 17 ("E. . . . "If a Covered Cause of Loss is the

dominant cause of such loss, we will not deny coverage on the basis that a secondary

cause in that chain is not a Covered Cause of Loss.").)  Even if MKB understated its

order of gravel due to its use of an incorrect conversion factor, and MKB's use of the

faulty conversion factor constituted faulty planning or workmanship, the jury was not

required to find that this excluded cause of loss predominated over earth movement.

Viewing all of the evidence, the jury was entitled to conclude that earth movement

predominated as a cause of MKB's loss over all other excluded causes.  The court

perceives no "manifest miscarriage of justice" here, s*ee GoDaddy Software, Inc.*, 581

F.3d at 961-62, and accordingly, denies American Zurich's motion for judgment as a

matter of law with respect to MKB's claim for additional barging costs.

### 4.  Equipment Left in Emmonak

American Zurich argues that MKB may not recover the $158,917.13 loss MKB

claimed for leaving equipment in Emmonak, Alaska.  American Zurich argues that there

is no evidence that MKB actually incurred these costs and that they represent "loss of

use" or loss due to a contract dispute with LYSD—neither of which is not covered by the

policy.  (Rule 50(b) Mot. at 20-22.)

First, Mr. Jensen was asked to confirm that MKB did not actually incur the

$158,917.13, and he refused to do so.  (Dkt. # 165-39 at 140:9-142:2.)  When asked to

1  identify the actual costs MKB paid for the equipment that was left behind, he testified

2  that MKB has "to depreciate [its] equipment quarterly.  [MKB has] to pay depreciation

3  value . . . [and] bank loans on it. . . . There's maintenance costs for [the equipment] to be

4  sitting there."  (*Id.* at 141:4-7.)  Mr. Jensen stated that his claim for $158,917.13 was

5  based on:

6            The bluebook [which] is an industry-wide determination of the cost to
             contractors for owning such equipment.  In fact, the bluebook specifically
7            says it is not reflective of rental rates, but rather the cost of ownership.

8  (*Id.* at 141:24-142:2.)  The court agrees with MKB that this testimony viewed in the light

9  most favorable to MKB is sufficient to establish that MKB incurred the $159,251.47 in

10  costs that MKB sought.

11         Second, the court agrees that, viewing the evidence in the light most favorable to

12  MKB, there was sufficient evidence for the jury to conclude that MKB left its equipment

13  in Emmonak, Alaska, not due to a contract dispute with LYSD, but rather due to earth

14  movement that had occurred under the pad, the resulting loss of thousands of yards of fill,

15  and the work that would be necessary to repair the pad as a result of that damage.  (*See*

16  Dkt. # 165-40 at 87:24-88:23.)  Further, the court agrees with MKB that the jury was not

17  required to categorize this cost as a "loss of use" as opposed to a cost of repair or

18  overhead.  (*See* Rule 50(b) Resp. at 21 (citing Dkt. # 165-8 at 26 (quoting the policy:

19  "We will pay the actual cost of repairing . . . the Covered Property . . . . The actual cost

20  includes labor, reasonable profit, and overhead.").)  Although there may be other

21  interpretations of the testimony and evidence at issue as American Zurich suggests, it is

22  not the province of the court to weigh the evidence on a renewed motion for judgment as

1  a matter of law, but rather to view that evidence in the light most favorable to MKB.

2  *Ostad*, 327 F.3d at 881.  Viewing the evidence through that prism, the court finds no

3  "plain error" in the jury's verdict here or any "manifest miscarriage of justice" with

4  respect to the jury's award of this cost.  *See GoDaddy Software, Inc.*, 581 F.3d at 961-62.

5       **5.  Demobilization**

6       MKB withdrew its claim for demobilization costs.  The parties do not dispute that

7  the jury did not award any damages for demobilization.  (*See* Rule 50(b) Mot. at 22; Rule

8  50(b) Resp. at 13; Rule 50(b) Reply at 13.)  Despite the fact that American Zurich

9  includes a section on demobilization costs in its motion, there is no basis for judgment as

10  a matter of law with respect to costs that the parties agree were withdrawn by MKB at

11  trial and not awarded by the jury.

12      **6.  Survey Costs**

13      American Zurich argues that MKB hired Edge Surveying and Design ("Edge") to

14  do a preliminary, interim, and final survey for the Emmonak project.  (Dkt. # 165-39 at

15  84:21-25.)  However, MKB also hired Edge to do "extra work" "to determine the amount

16  of sinkage" at the Emmonak site.  (Dkt. # 165-49 at 116:19-117:5.)  Tony Wilson of

17  Edge testified that it would be possible, based on the company's hourly time cards, to

18  apportion the costs charged by Edge between the two activities, but that he had not done

19  so.  (Dkt. # 165-40 at 116:15-18.)  Because MKB never entered Edge's time cards into

20  evidence, American Zurich argues that there is no evidence that survey costs claimed by

21  MKB were done for a purpose that was covered under the policy.  (Rule 50(b) Mot. at

22  22-23.)

1    Just because Mr. Wilson did not segregate the costs between the work Edge

2  performed under MKB's contract with LYSD and the extra work that Edge performed for

3  MKB to evaluate the settlement of soil at the site does not mean that no one segregated

4  the costs.  Mr. Jensen testified that, in addition to Edge's survey work for the LYSD

5  contract, MKB "remobilized Edge" to return to the site "and resurvey and start checking

6  for settlement." (Dkt. # 165-39 at 97:19-22.)  Mr. Jensen specifically testified that the

7  $19,158.00 in costs that MKB sought for Edge's surveying expenses were for "Edge's

8  extra efforts, not contract efforts." (*Id.* at 97:22-23.)  Viewing the evidence in the light

9  most favorable to MKB, there was evidence upon which the jury could award this cost to

10  MKB under the policy.  The court, therefore, denies American Zurich's motion on this

11  unpreserved ground.

12     **7.  Markup and Overhead**

13     MKB asserted as part of its insurance claim $208,880.62 in overhead and markup

14  costs. (Dkt. # 165-7 at 2.)  American Zurich asserts, without citation to the record or

15  otherwise, that "MKB presented no evidence of what the Markup and Overhead was for

16  or what caused it," and that the amount MKB claimed "was an unspecified percentage of

17  the other items claimed." (Rule 50(b) Mot. at 23.)

18     Mr. Norman, American Zurich's costs experts, testified that Mr. Jensen provided

19  him with "verification" of the "markups for overhead, profit, insurance, that type of

20  thing" in the form of a "spreadsheet of the markup percentages" during the claim

21  investigation process. (Dkt. # 165-39 at 31:22-25.)  The spreadsheet itself was admitted

22

1  into evidence.  (Dkt. # 186-6 at 32.)  The spreadsheet identified the percentages MKB

2  utilized.  (*See id.*)

3        The policy at issue promises to pay "reasonable profit" and "overhead."  (Dkt.

4  # 165-8 at 26 ("We will pay the actual cost of repairing . . . the Covered Property . . . The

5  actual cost includes labor, reasonable profit, and overhead.").)  The policy does not

6  delineate how "reasonable profit" and "overhead" should be derived.  Absent some other

7  requirement in the policy, American Zurich presents no meaningful argument as to why it

8  was unreasonable for MKB to derive these figures based on a given percentage of its

9  other costs or for the jury to award them on that basis.  Indeed, American Zurich points to

10  no testimony in the record upon which such an argument could be based.  The court

11  discerns no "plain error" in the jury's verdict here or any "manifest miscarriage of

12  justice" with respect to the jury's award of this cost.  *See GoDaddy Software, Inc.*, 581

13  F.3d at 961-62.  Accordingly, the court denies American Zurich's motion with respect to

14  these costs.

15  **8.  IFCA**

16        American Zurich argues that there was insufficient evidence to support the jury's

17  conclusion that American Zurich violated IFCA.  IFCA requires a first-party insured,

18  such as MKB, to provide 20-days written notice of the basis for a cause of action to the

19  insurer and the Office of the Insurance Commissioner before the first-party insured files

20  suit.  RCW 48.30.015(8)(a), (b).  In its order on summary judgment, the court ruled that

21  MKB had met this procedural prerequisite to suit.  (9/25/14 Order (Dkt. # 128) at 43-45.)

22  American Zurich now asserts that the jury's verdict "for an IFCA violation must be based

ORDER- 34

1    on the specific violations set forth in MKB's 20-day notice letter." (Rule 50(b) Mot. at

2    23.)  MKB listed a variety of specific violations with respect to five separate provisions

3    of the Washington Administrative Code in its 20-day notice letter. (*See* Dkt # 183-1 at

4    48-55.)[8]  American Zurich argues that there is insufficient evidence on any of the specific

5    violations listed in MKB's 20-day notice letter to support the jury's IFCA verdict. (*See*

6    Rule 50(b) Mot. at 24-29.)

7            The court instructed the jury that to prove a claim under IFCA, MKB had the

8    burden of proving that (1) American Zurich "unreasonably denied a claim for coverage or

9    unreasonably denied payment of benefits, (2) MKB was damaged, and (3) American

10   Zurich's American act was the proximate cause of MKB's damage.[9]  (Jury Instr. No. 30.)

11   Zurich did not take exception to this instruction. (*See* Dkt. # 165-40 at 4:15-6:23; *see*

12   *also* Jury Instr. No. 30.)  In any event, one of the specific bases for an IFCA violation

13   listed in MKB's 20-day notice was "[r]efusing to pay claims without conducting a

14   reasonable investigation." (*See* Dkt. # 183-1 at 50-51 (citing WAC 284-30-330(4)).)

15   MKB asserted that American "Zurich denied coverage without first conducting a

16   reasonable investigation into the following questions necessary to determine MKB's

17   claims for coverage: . . . 2. Whether earth movement was the dominant cause of loss of

18   _____

19       [8] Docket number 183 is a precipe for docket number 165-2, which is part of the
     November 21, 2014, declaration of Elaine Videa that American Zurich filed in conjunction with
20   its Rule 50(b) motion. (*See supra* note 2.)

21       [9] Although the court also instructed the jury that, in considering whether American
     Zurich acted unreasonably, it could consider whether American Zurich violated one or more of
22   certain statutory or regulatory requirements listed in Jury Instruction No. 29, it did not require
     the jury to do so. (*See* Jury Instr. Nos. 29-30.)

1   the damage to the building pad; 3. Ignoring the Ninyo [& Moore] report conclusion that

2   'settlement of the ground surface beneath the fill' was a cause of the loss to the building

3   pad; . . . and 6. Whether MKB subjectively foresaw, at the time the policy was purchased,

4   the substantial possibility that ground settlement of more than two inches would occur

5   before the completion of its contract." (*Id.*)

6       As MKB detailed in its response to American Zurich's motion, there was

7   substantial evidence, particularly when viewed in the light most favorable to MKB, that

8   American Zurich did not conduct a reasonable investigation.  First, MKB notes that

9   American Zurich relied upon its consultant, Mr. Richard Norman, for policy

10   interpretation, despite the fact that Mr. Norman testified that his "only role" in the case

11   was to "capture the cost data" related to MKB's claim and "produce a spreadsheet" so

12   that American Zurich could adjust the loss.  (Dkt. # 165-39 at 25:1-26:6; *see also id.* at

13   26:18-20 ("In this instance I'm a numbers guy, yes.  I capture costs, present them for the

14   adjuster to do the adjusting of the loss.").)  Indeed, Mr. Norman specifically testified that

15   his role did not involve insurance coverage.  (*Id.* at 26:7-8 ("I do no insurance coverage,

16   no.  That's not my job.").)

17       Despite his limited role in the investigation, Mr. Norman nevertheless opined to

18   American Zurich that "MKB under-estimated the tonnage of contract required gravel fill

19   material," and that this "becomes important when evaluating MKB's claim for providing

20   and placing additional gravel due to earth movement, specifically settlement of the

21   underlying soils."  (12/08/14 Mullinex Decl. Ex. 4.)  Mr. Norman concluded that "[i]t is

22   apparent that the total tonnage . . . placed by MKB is . . . short of the calculated contract-

1    required tonnage." (*Id.*)  In effect, Mr. Norman was interpreting the policy as precluding

2    MKB from suffering a covered loss until MKB has fully performed its contract with

3    LYSD.  Policy interpretation was beyond his role in the investigation as he defined it.

4    (Dkt # 165-39 at 25:1-26-20.)  Nevertheless, American Zurich adopted Mr. Norman's

5    interpretation in its March 26, 2013, denial letter to MKB.  (*See* 12/08/14 Mullinex Decl.

6    Ex. 5 at 1 ("MKB simply did not order enough fill material to complete the project.").)

7    Nothing in the policy required MKB to prove that it had fully performed its contract with

8    LYSD to have a covered claim; rather the policy required MKB to prove that it suffered

9    "direct physical loss or damage" to covered property.  (*See* 9/25/14 Order (Dkt. # 128) at

10   33 (quoting the policy).)  It was within the jury's province to find that American Zurich's

11   reliance on Mr. Norman for policy interpretation during its investigation of MKB's claim

12   was unreasonable.

13          In addition, at the time that American Zurich sent its denial letter to MKB, Ninyo

14   & Moore had produced a geotechnical report that concluded both that MKB had

15   underestimated by 16,000 tons the amount of fill required to complete its contract with

16   LYSD and that the ground beneath the building pad had settled on average five and one-

17   half inches, resulting in a loss of 6,100 tons of fill.  (Dkt. # 165-31 at 17-18.)  With regard

18   to ground settlement, the report specifically stated:

19          The results of our evaluation indicated that the ground surface beneath the
            fill settled on average approximately 51/2 inches due to the placement of
20          fill.  This amount is in excess of the 2 inches of settlement allowed for in
            the contract documents.  In our opinion, the settlement of the ground
21          resulted in an additional approximately 6,100 tons of fill required to
            complete the project.

22

1   (*Id.* at 18.)  Despite Ninyo & Moore's conclusion that 6,100 tons of fill had been lost due

2   to ground settlement, American Zurich referenced only Ninyo & Moore's conclusions

3   about MKB's underestimation of the amount of fill necessary to complete the LYSD

4   contract in its March 26, 2013, denial letter to MKB.  (12/0814 Mullinex Decl. Ex. 5 at 1

5   ("[Ninyo & Moore] concluded in its report that the lack of gravel fill at the project site

6   was a result of an underestimate by MKB of the amount of fill reqruied to complete the

7   building pad."), 2 ("MKB's 'loss' was caused by its failure to adequately estimate the

8   amount of fill needed for the project.").)  As discussed above, nothing in the policy

9   required MKB to complete its contractual obligations to LYSD prior to claiming a loss

10  otherwise covered under the policy.

11         Indeed, MKB's claims handling expert witness testified that, at this point,

12  assuming both causes of loss identified by Ninyo & Moore were true, then American

13  Zurich should have at least paid the portion of MKB's claim that fell within the policy's

14  coverage for earth movement while it continued to investigate other aspects of the claim.

15  (Dkt. # 165-38 at 142:24-143:21.)  He also testified that he found no criticism of Ninyo &

16  Moore's work expressed in the claims file up to the point of American Zurich's denial of

17  MKB's claim.  (*Id.* at 145:3-8.)  Indeed, on March 10, 2013, an American Zurich's

18  claims handler sent an email stating that he believed that Ninyo & Moore had "nailed"

19  the cause and origin of MKB's loss and asking Mr. Norman to calculate how much

20  money 6,100 tons of gravel would represent.  (*See* Dkt. # 165-38 at 145:16-146:19.)

21  Nevertheless, only five days later, American Zurich's claims handler notified MKB that

22  American Zurich was going to deny MKB's claim in total.  (*Id.* at 149:8-9.)  Based on

1   this evidence, it was within the province of the jury to conclude that American Zurich's

2   refusal to acknowledge Ninyo & Moore's parallel conclusion that an additional 6,100

3   tons of gravel were needed due to soil settlement rendered American Zurich's

4   investigation of MKB's claim unreasonable.

5          Further, in its March 26, 2013, denial letter, American Zurich expressly relied

6   upon policy exclusions for poor planning, workmanship, and design in denying MKB's

7   claim.  (*Id.* Ex. 5 at 2.)  American Zurich relied upon these exclusions despite having

8   received an email from Mr. David VanDerostyne, a structural engineer that American

9   Zurich had assigned to preliminarily investigate MKB's claim, stating that he saw "no

10  indications that [MKB's claim] was due to workmanship or materials."  (*See* 12/08/14

11  Mullinex Decl. Ex. 3; Dkt. # 165-40 at 158:9-12, 159:17-21.)  Mr. VanDerostyne's email

12  also stated that although "poor design information provided by the geotechnical engineer

13  caused MKB to import more soil that [it] anticipated," and "did not properly identify [the

14  settlement]," "the design information did not cause the settlement."  (12/08/14 Mullenix

15  Decl. Ex. 3; *see also* Dkt. # 165-40 at 168:14-169:18.)  MKB's expert witness concerning

16  claims handling testified that he found nothing in American Zurich's claims file between

17  the date of Mr. VanDerostyne's email and March 29, 2013, the date that American Zurich

18  denied MKB's claim, that contradicted Mr. VanDerostyne's conclusions.  (Dkt. # 165-38

19  at 137:14-138:16.)  Viewing this evidence in the light most favorable to MKB, it was

20  within the province of the jury to conclude that American Zurich's dismissal of Mr.

21  VanDerostyne's conclusions without explanation rendered American Zurich's

22  investigation unreasonable.

ORDER- 39

1        Despite the foregoing evidence, American Zurich implies that the sheer length of

2   its claims file is evidence of the reasonableness of its investigation of MKB's claim.

3   Indeed, the file associated with MKB's claim is over 900 pages long.  (*See* Dkt. # 183

4   (attaching Trial Exhibit A-3, which is a copy of the claim file).)  The breadth and depth

5   of an insurer's investigation is certainly one factor that a court or jury might consider

6   when evaluating the reasonableness of an insurer's investigation.  However, the sheer

7   volume of paper in the file is not determinative of the issue.  How an insurer utilizes and

8   analyzes the information it collects can also be a consideration when evaluating the

9   reasonableness of an investigation.  It does no one any good to gather information if that

10  information is subsequently ignored or dismissed without explanation.  It was within the

11  province of the jury to consider how American Zurich utilized and analyzed the

12  information it collected with respect to MKB's claim in evaluating the reasonableness of

13  American Zurich's investigation.

14       MKB presented expert opinion testimony from Mr. Dennis Smith concerning

15  American Zurich's handling of MKB's claim, which summarized the foregoing issue as

16  follows:

17            You've got to have a justifiable reason not to pay the claim. . . . [the
           adjuster is] not there to play an adversarial relationship or to selectively
18         pick and choose what evidence might help the company.  And in this case
           we have Mr. VanDerostyne saying that it was reasonable to rely on the two
19         inches, and that the settlement in excess of that is not the responsibility of
           MKB.  Now, that was preliminary.  We have Mr. Norman saying it's either
20         not enough gravel or excessive settlement.  Then we have Ninyo & Moore
           saying it's both.  And part of that includes the fact that 6,100 tons is a
21         reflection of settlement that exceeded that which was in the contract
           documents, and as I understand it, the very basis of MKB's claim.

22

1          So that information was all out there.  There was really nothing that I
2      found in the claim file which justified a total denial of this claim.  So I
       think it's unreasonable that they did that.

3   (Dkt. # 165-38 at 160:8-161:3.)  This evidence, viewed in the light most favorable to

4   MKB, supports the jury's verdict finding a violation of IFCA.  Accordingly, the court

5   denies American Zurich's Rule 50(b) motion on this unpreserved issue.

6          **9.   IFCA Damages**

7          The jury awarded MKB $274,482.47 in damages for American Zurich's IFCA

8   violation.  (Jury Verdict (Dkt. # 151) at 4.)  This sum represents the fees and costs MKB

9   incurred in its arbitration with LYSD after March 26, 2013 (*see* Dkt. ## 165-33, 165-34),

10  which is the date of American Zurich's letter to MKB denying MKB's claim under the

11  policy (12/08/14 Mullinex Decl. Ex. 5).  Ultimately, LYSD paid the contract balance to

12  MKB in a settlement of the arbitration proceedings.  (Dkt. # 165-41 at 75:15-76:2; 96:23-

13  97:1.)

14         American Zurich argues that the $274,482.47 that the jury awarded in IFCA

15  damages were not proximately caused by American Zurich's IFCA violation because (1)

16  the arbitration between MKB and LYSD began on November 29, 2012, before American

17  Zurich denied MKB's claim and before MKB had even submitted its claim to American

18  Zurich, (2) the cause of the arbitration was LYSD's termination of its contract with MKB

19  and its withholding of the contract price, and (3) the court ruled and instructed the jury

20  that MKB was not entitled to recover the contract balance that LYSD had withheld from

21  MKB prior to LYSD's settlement with MKB.  (Rule 50(b) Mot. at 29-30.)

22

ORDER- 41

1    American Zurich's argument is flawed in several respects.  First, as MKB points

2  out, the court correctly instructed the jury that there can be more than one proximate

3  cause of an injury.  (Jury Instr. No. 26.)  The fact that one proximate cause of MKB's

4  arbitration costs and fees was LYSD's termination of its contract with MKB does not

5  preclude American Zurich's denial of MKB's insurance claim from being another.  MKB

6  asserted virtually identical damages in the arbitration with LYSD that it asserted in its

7  insurance claim to American Zurich.  Indeed, Mr. Jensen testified that had American

8  Zurich paid MKB's claim, LYSD and MKB would have terminated their arbitration.

9  (Dkt. # 165-39 at 99:12-100:23 ("Had [American Zurich] paid [MKB] for the insurable

10  loss, [MKB] wouldn't have had to arbitrate against [LYSD] for the same loss.").)  Thus,

11  MKB claims only those fees and costs incurred after American Zurich's formal denial of

12  its claim.

13    In addition, the court did not instruct the jury that MKB could not recover the

14  contract balance because the contract balance was excluded under the policy; rather, the

15  court instructed the jury that MKB could not recover the contract balance because MKB

16  had already recovered this amount in settlement of the arbitration with LYSD and to

17  allow MKB to recover this amount again would amount to a double recovery.  (*See* Jury

18  Instr. No. 32 ("MKB . . . is not entitled to recover as damages its claim for $1,436,419.40

19  in withheld contract payments from [LYSD] because MKB . . . has already been

20  reimbursed for this amount by [LYSD]."); *see* 09/25/14 Order (Dkt. # 128) at 18-19 ("If

21  MKB were to move forward with its claim that American Zurich should nevertheless

22  reimburse it for the contract balance that lYSD has already paid, then . . . MKB would be

1  seeking a double recovery and a significant windfall, in violation of the most basic

2  principle of insurance.").)  Further, MKB was seeking other damages in the arbitration in

3  addition to the unpaid contract balance.  As noted above, those claims were nearly

4  identical to the costs MKB set forth in its claim to American Zurich.  Based on this

5  evidence, when viewed in the light most favorable to MKB, the jury could find that

6  American Zurich's IFCA violation in unreasonably denying MKB's claim was a

7  proximate cause of MKB's arbitration costs and fees.

8       **10. Bad Faith Liability**

9       American Zurich argues that "the only 'bad faith' issue material to the jury verdict

10  is the allegation that American Zurich unreasonably denied MKB's December 28, 2012[,]

11  insurance claim."  (Rule 50(b) Mot. at 31.)  MKB asserts that the standards the jury

12  considers with respect to claims of bad faith and a claim for violation of IFCA are

13  "materially the same."  (Rule 50(b) Resp. at 27.)  The court agrees.  (*Compare* Jury Instr.

14  No. 27 (bad faith claim) *with* Jury Instr. No. 30 (IFCA violation).)  Based on the evidence

15  discussed above with respect to the jury's verdict on IFCA (*see supra* § III.B.8.), the

16  court concludes that legally sufficient evidence supports the jury's verdict with respect to

17  bad faith liability as well.

18       **11. Bad Faith Damages**

19       MKB asked the jury to make a single of award of $274,482.47 in damages for

20  both its IFCA and bad faith claims combined.  This sum represented the amount of

21  MKB's attorney fees and costs in pursuing its arbitration against LYSD after the date of

22  American Zurich's denial of MKB's insurance claim.  The jury awarded all of those

1  damages with respect to MKB's IFCA claim, but then, contrary to MKB's request,

2  awarded an additional $138,000.00 in damages for the bad faith claim.  (Jury Verdict at

3  3.)  American Zurich argues that there is no basis for the jury's award of an additional

4  $138,000.00 in bad faith damages because the jury awarded all of MKB's requested

5  damages for both claims under IFCA, and one can only speculate as to how the jury

6  arrived at the additional amount it awarded for bad faith  (*See* Rule 50(b) Mot. at 30-31.)

7      MKB responds that jury could have parsed the evidence in such a way as to

8  conclude that MKB's claim for the cost of the 4,773 tons of gravel that was lost as a

9  result of earth movement actually should have included an additional 2,404.23 tons.

10  (Rule 50(b) Resp. at 28-29.)  Multiplying this additional tonnage by $56.50, which is the

11  price per ton that a contractor charged MKB for fill in MKB's second-to-last shipment,

12  and using a conversion factor between 1.73 t/cy and 1.85 t/cy,[10] one could derive a price

13  for the additional gravel of between $135,839.00 to $144,320.78.  (*See id.*)  Thus, MKB

14  argues that there is factual basis that one can derive from the evidence for the jury's

15  award of $138,000.00 in bad faith damages.  (*See id.*)

16      The problem with MKB's argument is that it did not ask or argue for these

17  damages before the jury, and no witness explained to the jury why such damages should

18  be awarded for American Zurich's bad faith, how these damages were proximately

19  caused by American Zurich's bad faith, or how they should be calculated.  Indeed, MKB

20  fails to explain to the court in its responsive memorandum how these damages were

21

22      [10] A conversion factor relates tons of gravel to cubic yards of gravel.

1   proximately caused by American Zurich's bad faith.  Further, as American Zurich points

2   out in its reply memorandum, MKB never disclosed these damages in its required Rule

3   26(a)(1)(A) "computation of each category of damages."  Fed. R. Civ. P. 26(a)(1)(A).

4   Rule 37(c)(1) "forbid[s] the use at trial of any information required to be disclosed by

5   Rule 26(a) that is not properly disclosed."  *R & R Sails, Inc. v. Ins. Co. of Pa.*, 673 F.3d

6   1240, 1246 (9th Cir. 2012) (quoting *Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259

7   F.3d 1101, 1106 (9th Cir. 2001) and *Hoffman v. Constr. Protective Servs., Inc.*, 541 F.3d

8   1175, 1179 (9th Cir. 2008)).  It would be inconsistent and inequitable to disallow the use

9   of this category of damages at trial, but then permit MKB to argue in response to a Rule

10  50(b) motion after trial that such damages could be properly awarded by the jury

11  nevertheless.

12          More importantly, however, MKB specifically told the jury in closing arguments

13  that if the jury awarded the damages MKB requested under IFCA, the jury should not

14  "duplicate" or award "anything additional" for bad faith damages.  (Dkt. # 165-41 at

15  158:9-159:8.)  Specifically, MKB stated and explained the verdict form to the jury with

16  respect to the bad faith and IFCA as follows:

17          The next question [Question 3] is, do you find by a preponderance of the
            evidence that plaintiff, MKB Constructors, has proven its claim that
18          defendant, American Zurich Insurance Company, violated the Washington
            Insurance Fair Conduct Act?  You say yes to that, if you think the denial
19          they made was unreasonable.  Viewed in light of the rules as the judge
            explained it to you, and Mr. Dugo, and Mr. Smith, and Mr. Evans, I would
20          submit the answer to that is yes.

21          Question 4 is, well, what's the damages there?  And that's the damages the
            judge has told you cannot come from breach of contract, but can come from
22          the Insurance Fair Conduct Act violations, the money they spent out of

ORDER- 45

1  pocket to pursue their claim against the school district, because they didn't
2  get their money from the insurance company.  And those numbers add up to
   $274,482.47.

3  Question 5 is, have we proven our case against Zurich for failure to act in
   good faith?  Instructions are similar there.  You can look at them, it's still a
4  question of reasonableness.  It's still unreasonable what happened here.

5  Question 6 is, what are the damages for that?  Well, if you find the damages
   under the Insurance Fair Conduct Act, you don't duplicate the damages
6  here.  So you wouldn't put anything additional here, if you found them
   there.  If you didn't find them there, you could put them here if you wanted
7  to.

8  (Dkt. # 165-41 at 158:9-159:8.)

9          MKB's counsel's statement in closing arguments that, if the jury awarded MKB's

10  requested damages under the IFCA claim, then MKB was not entitled to "duplicate"

11  damages or "anything additional" under its bad faith claim, is a judicial admission that is

12  binding upon MKB.  *See United States v. Bentson*, 947 F.2d 1353, 1356 (9th Cir. 1991)

13  (holding that an attorney's statement in closing argument can constitute a judicial

14  admission and rejecting, in criminal tax case, the defendant's assertion that the

15  government failed to offer evidence sufficient to prove he did not file valid returns where

16  the defendant's counsel admitted in closing that he was not claiming he filed valid

17  returns); *see also United States v. McKeon*, 738 F.2d 26, 30 (2d Cir. 1984) ("Statements

18  made by an attorney concerning a matter within his employment may be admissible

19  against the party retaining the attorney . . . a proposition which extends to arguments to a

20  jury"); *Rhoades, Inc. v. United Air Lines*, 340 F.2d 481, 484 (3d Cir. 1965) ("[A]n

21  admission of counsel in the course of trial is binding on his client[.]").  Having admitted

22  in closing arguments that it is not entitled to "anything additional" for bad faith damages,

ORDER- 46

1  the court will not now hear MKB to assert otherwise after the verdict and believes that to

2  do so would be fundamentally unfair.

3       Accordingly, even though American Zurich failed to preserve this issue in its Rule

4  50(a) motion during trial, the court is convinced that there is "plain error" in the portion

5  of the jury's verdict awarding $138,000.00 in additional bad faith damages over and

6  above the damages the jury award for American Zurich's IFCA violation.  Further, the

7  court is convinced that, unless this portion of the verdict is reversed, the plain error will

8  "result in a manifest miscarriage of justice." *GoDaddy Software, Inc.*, 581 F.3d at 961-62.

9  Therefore, the court grants this portion of American Zurich's Rule 50(b) motion and sets

10  aside the jury's $138,000.00 award for bad faith damages.

11      **12. Enhanced Damages under IFCA**

12       IFCA provides for an award of enhanced damages not to exceed three times the

13  insured's actual damages upon a finding that the insurer has acted unreasonably in

14  denying a claim for coverage or payment of benefits.  RCW 48.30.015(2).  The jury

15  awarded $862,000.00 in enhanced damages under IFCA.  (Jury Verdict at 4.)  American

16  Zurich argues this award exceeded the Constitutional limits of procedural due process

17  because the award was "grossly excessive."  (Rule 50(b) Mot. at 32-33.)

18       To comport with due process under the Constitution, state-law punitive damages

19  awards are subject to review for excessiveness.[11]  *BMW of N. Am., Inc. v. Gore*, 517 U.S.

20

---

21     [11] For purposes of deciding American Zurich's Rule 50(b) motion, the court assumes that

22  IFCA's enhanced damages provision is punitive in nature.  At least one court in this district has
     suggested that IFCA's enhanced damages provision may not be punitive, but rather

1   559, 569 (1996).  Three considerations guide the excessiveness inquiry:  "(1) the degree

2   of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or

3   potential harm suffered by the plaintiff and the punitive damages award; and (3) the

4   difference between the punitive damages awarded by the jury and the civil penalties

5   authorized or imposed in comparable cases."  *State Farm Mut. Auto. Inc. Co. v.*

6   *Campbell*, 538 U.S. 408, 418 (2003).

7        The most important guidepost in assessing the reasonableness of an award of

8   punitive damages is the reprehensibility of the defendant's conduct.  *Id.* at 419.  To

9   impose an award of enhanced damages, IFCA requires only a finding that the insurer

10  acted unreasonably in denying a claim for coverage or payment of benefits.  RCW

11  48.30.015(2).  At least one court in this district has found "[i]n light of the treble

12  damages limit, unreasonable conduct is a sufficient 'degree of reprehensibility' for

13  enhanced IFCA damages."  *F.C. Bloxom Co.*, 2012 WL 5992286, at *8.  The Supreme

14  Court, however, has counseled that in determining whether a defendant's misconduct is

15  sufficiently reprehensible to support a punitive damages award, courts should consider

16  whether:

17        the harm caused was physical as opposed economic; the tortious conduct
          evinced an indifference to or a reckless disregard of the health or safety of
18        other; the target of the conduct had financial vulnerability; the conduct
          involved repeated actions or was an isolated incident; and the harm was the
19        result of intentional malice, trickery, or deceit, or mere accident.

20

21  compensatory, in nature, or may "fall somewhere on a 'spectrum between purely compensatory
    and strictly punitive.'"  *See F.C. Bloxom Co. v. Fireman's Fund Ins. Co.*, No. C10-1603RAJ,
22  2012 WL 5992286, at *7 (W.D. Wash. Nov. 30, 2012).

1 | *Campbell*, 538 F.3d at 419.

2 |      Most of the reprehensibility factors referenced by the Supreme Court in *Campbell*

3 | are not present here.  There is no question that the harm at issue was economic and that

4 | there was no disregard for the health or safety of others.  Further, MKB's own expert

5 | witness on bad faith conduct, Mr. Smith, testified that he was not suggesting that

6 | American Zurich acted dishonestly in any way.  (Dkt. #165-38 at 163:12-15.)

7 |      The court, however, is not convinced that the remaining two reprehensibility

8 | factors listed by the *Campbell* court are absent.  First, MKB, as a first-party insured under

9 | the builders' risk policy at issue, was by definition a vulnerable target under Washington

10 | law.  *See Campbell*, 538 F.3d at 419 (indicating that the court should consider whether

11 | "the target of the conduct had financial vulnerability").  Washington law creates a "quasi-

12 | fiduciary relationship between an insurer and its insured," which requires an insurer to

13 | "deal fairly with an insured, giving equal consideration in all matters to the insured's

14 | interests as well as its own."  *Van Noy v. State Farm Ins. Co.*, 16 P.3d 574, 578-79

15 | (Wash. 2001).  As the Washington Supreme Court has stated:

16 |     [T]he fiduciary relationship existing between insurer and insured . . . exists
not only as a result of the contract between insurer and insured, but because

17 | of the high stakes involved for both parties to an insurance contract and the
elevated level of trust underlying insureds' dependence on their

18 | insurers. . . . This dependence and heightened level of trust exists not only
where the insurer and the insured's interests are aligned, as in the third-

19 | party context, but also, and perhaps even more so, in the first-party context,
where the insurer's interests might be opposed to the insured's and the

20 | insured is particularly vulnerable and dependent on the insurer's honest and
good faith.

21 |

22 |

1 | *Id.* at 579, n.2 (internal quotations and citations omitted).  Thus, the target of American

2 | Zurich's conduct was a financially vulnerable one under Washington law.

3 |      Second, although there is no evidence that American Zurich's conduct here was

4 | repeated with other insureds, there is evidence that American Zurich repeatedly ignored

5 | multiple sources of evidence in its own claims file that supported MKB's position or

6 | failed to explain why those sources of evidence did not mandate a different coverage

7 | decision.  (*See supra* § III.B.8.)  Thus, the court finds that American Zurich's misconduct

8 | had a sufficient "degree of reprehensibility" to warrant the jury's award of enhanced

9 | IFCA damages here.

10 |      The second *Campbell* factor in assessing the constitutionality of an award of

11 | punitive damages—the disparity between the actual or potential harm suffered by the

12 | plaintiff and the punitive damages award—also does not counsel in favor of

13 | excessiveness.  The jury's award of $862,000.00 represents less than a 1:1 ratio of

14 | punitive to actual damages and the Ninth Circuit has previously found that such a ratio

15 | "plainly falls within constitutional bounds."  *In re S. Cal. Sunbelt Developers, Inc.*, 608

16 | F.3d 456, 466 (9th Cir. 2010); *see also Moore v Am. Family Mut. Ins. Co.*, 576 F.3d 781,

17 | 791 (8th Cir. 2009) ("Since the award of punitive damages was equal to the amount

18 | awarded on the bad faith claim, it appears to us that the jury's verdict was not the result

19 | of passion or prejudice but represented an effort to deter future bad faith denials of

20 | insurance claims by [the insurer].").

21 |      American Zurich argues that final guidepost—the difference between the punitive

22 | damages awarded by the jury and the civil penalties authorized or imposed in comparable

1 cases—weighs against the jury's punitive damages award here.  (Rule 50(b) Mot. at 35-

2 36.)  American Zurich argues that a fine imposed by the Insurance Commissioner for an

3 IFCA violation is $250.00 for each violation, which is disproportionate to the jury's

4 enhanced damages award of $862,000.00.  (*See id.*)  MKB offers to opposition to this

5 argument.  (*See* Rule 50(b) Resp. at 32-35.)  The court is inclined to agree with American

6 Zuich with respect to this factor, but in light of the outcome of the first two factors, does

7 not find that the jury's enhanced IFCA damages award was constitutionally excessive or

8 that the award represented "plain error [that] would result in a manifest miscarriage of

9 justice." *GoDaddy Software, Inc.*, 581 F.3d at 961-62.  Accordingly, the court denies

10 American Zurich's renewed motion for judgment as a matter of law on this unpreserved

11 ground.

12 **D. Standards for Motion for a New Trial**

13      The standard under which the court considers American Zurich's motion for a new

14 trial is distinct from the standards under which it considers American Zurich's motion for

15 judgment as a matter of law.  Under Rule 59(a)(1)(A), the "court may, on motion, grant a

16 new trial on all or some of the issues—and to any party . . . after a jury trial, for any

17 reason for which a new trial has heretofore been granted in an action at law in federal

18 court."  Fed. R. Civ. P. 59(a)(1)(A).  "Rule 59 does not specify the grounds on which a

19 motion for new trial may be granted." *Molski v. M.J. Cable, Inc.*, 481 F.3d 724, 729 (9th

20 Cir. 2007).  Rather, the court is "bound by those grounds that have been historically

21 recognized." *Id.* "Historically recognized grounds include, but are not limited to, claims

22

1    'that the verdict is against the weight of the evidence, that the damages are excessive, or

2    that, for other reasons, the trial was not fair to the party moving.'"  *Id*. (citation omitted).

3          Courts apply a lower standard of proof to motions for new trial than they do to

4    motions for judgment as a matter of law.  Thus, even if the court declines to grant

5    judgment as a matter of law, it may order a new trial under Rule 59.  A verdict may be

6    support by substantial evidence, yet still be against the clear weight of evidence.  *Id*.

7    Unlike a motion for judgment as a matter of law, in addressing a motion for a new trial,

8    "[t]he judge can weigh the evidence and assess the credibility of witnesses, and need not

9    view the evidence from the perspective most favorable to the prevailing party."  *Id*.

10   Instead, if, "having given full respect to the jury's findings, the judge on the entire

11   evidence is left with the definite and firm conviction that a mistake has been committed,"

12   then the motion should be granted.  *Id*. at 1371-72.

13         However, a motion for new trial should not be granted "simply because the court

14   would have arrived at a different verdict."  *Pavao v. Pagay*, 307 F.3d 915, 918 (9th Cir.

15   2002); *U.S. v. 40 Acres*, 175 F.3d 1133, 1139 (9th Cir. 1999).  Indeed, when a motion for

16   a new trial is based on insufficiency of the evidence, "a stringent standard applies" and a

17   "new trial may be granted . . . only if the verdict is against the great weight of the

18   evidence" or "it is quite clear that the jury has reached a seriously erroneous result."

19   *Digidyne Corp. v. Data Gen. Corp*., 734 F.2d 1336, 1347 (9th Cir. 1984) (internal

20   quotations and citations omitted).  Further, the court should uphold a jury's award of

21   damages unless the award is based on speculation or guesswork. *See City of Vernon v. S.*

22   *Cal. Edison Co*., 955 F.2d 1361, 1371 (9th Cir. 1992).  Finally, the court notes that

ORDER- 52

1  "denial of a motion for a new trial is reversible 'only if the record contains no evidence in

2  support of the verdict' or if the district court 'made a mistake of law.'" *GoDaddy*

3  *Software, Inc.*, 581 F.3d at 962 (9th Cir.2009) (citing *Molski v. M.J. Cable, Inc.*, 481 F.3d

4  724, 729 (9th Cir. 2007)).

5  **E.  Grounds Raised for a New Trial**

6        American Zurich raises two independent issues in its motion for a new trial:  (1)

7  that the jury improperly decided issues concerning policy interpretation when it decided

8  that MKB had proven its claim for breach of contract, and (2) that the court and not the

9  jury should have decided the question of enhanced damages under IFCA.  (Rule 59 Mot.

10  at 1.)  The court addresses each in turn.[12]

11        **1.  Breach of Contract**

12        Under Washington law, construction of an insurance policy is a question of law

13  for the court.  *Queen City Farms, Inc. v. Central Nat'l Ins. Co.*, 882 P.2d 703, 712 (Wash.

14  1994).  On the basis of this statement of law, American Zurich asserts that it was error for

15  the court to submit the question of whether American Zurich breached its insurance

16  policy when it denied MKB's claim to the jury.  (*See* Rule 59 Mot. at 3-7.)  As discussed

17  below, American Zurich's argument is both legally and logically flawed, and the court

18  rejects it.

19  ───────────────

20        [12] American Zurich also moves for a new trial on the basis that the verdict is unsupported
     by the evidence for all of the reasons stated in its Rule 50(b) motion for judgment as a matter of

21  law.  (Rule 59 Mot. at 11.)  For all of the reasons stated above when considering American
     Zurich's motion for judgment as a matter of law, the court also independently finds that

22  American Zurich has not met the standard for a new trial under Rule 59(a) and therefore denies
     the same.

1    The issue of policy construction—including whether and how a term in an

2  insurance policy should be construed—is distinct from whether a carrier has breached its

3  duty under the policy to provide coverage for a particular loss.  Although the two issues

4  may be intertwined in some cases, they must be analyzed separately.  American Zurich

5  conflates the two issues in its argument.  Under Washington law, courts may construe

6  language or a term in an insurance policy only when the language or a term is ambiguous.

7  Indeed, where there are ambiguities, Washington courts generally construe those

8  ambiguities in favor of the insured.  *Abott v. Gen. Accident Grp.*, 693 P.2d 130, 133

9  (Wash. Ct. App. 1985) (citing *McDonald Indus., Inc. v. Rollins Leasing Corp.*, 631 P.2d

10  947, 950 (Wash. 1981)).  "However, language in an insurance policy which is clear and

11  unambiguous must be given effect in accordance with its plain meaning and may not be

12  construed by the courts."  *Id.* (citing *Progressive Cas. Ins. Co. v. Jester*, 683 P.2d 180,

13  181 (Wash. 1984)); *see also Moody v. Am. Guarantee & Liability Ins. Co.*, 804 F. Supp.

14  2d 1123, 1125 (W.D. Wash. 2011) ("Ambiguities in insurance policies are to be

15  interpreted in favor of the insured, but clear and unambiguous language must be given

16  effect according to its plain meaning and may not be construed by the courts.") (citing

17  Washington law).  American Zurich has never asserted that any terms in its policy are

18  ambiguous, and thus, has no basis for asserting that the court improperly eschewed its

19  duty to construe the policy here.

20    In contrast to policy construction, the issue of breach of an insurance contract may

21  be decided by the court only where there are no factual disputes concerning the breach.

22  Indeed, Washington courts have expressly held that whether an insured has breached its

ORDER- 54

1   obligations under an insurance contract ordinarily is a determination for the trier of fact.

2   *Pederson's Fryer Farms v. Transamerica Ins. Co.*, 922 P.2d 126, 131 (Wash. Ct. App.

3   1996).  Only where the evidence is not materially in dispute is breach by an insured a

4   legal question for the court.  *See Pilgrim v. State Farm Fire & Cas. Ins. Co.*, 950 P.2d

5   479, 484 (Wash. Ct. App. 1997).  It would be a surprising result indeed if an insured's

6   breach of an insurance contract was ordinarily a question of fact for the jury but an

7   insurer's breach was not.

8          Significantly, American Zurich has produced no Washington case indicating that a

9   court errs in utilizing Washington's pattern jury instruction for breach of contract with

10  respect to breach of an insurance policy where there are issues of fact concerning the

11  carrier's breach of contract.  Any doubt about the court's approach here, however, is

12  dispelled by the decision in *Pederson's Fryer Farms*.  In *Pederson's Fryer Farms*, the

13  insurer moved for a directed verdict on grounds that the court had instructed the jury in

14  error concerning the burden of proof.  922 P.2d at 447-48.  In response, the court held

15  "that the trial court properly instructed the jury that [the insured] had to prove a loss

16  covered by the policy," and that the insured "has the burden of proving . . . that the loss is

17  within the coverage of the insurance policy."  *Id.*; *see also Espinoza v. Am. Commerce*

18  *Ins. Co.*, 336 P.3d 115, 124 (Wash. Ct. App. 2014) (stating that even if motions seeking

19  judgment as a matter of law on the insured's extracontractual claims are granted, "the

20  jury must still decide [the insured's] claim that [the insurer] breached its insurance

21  policy"); *see, e.g.*, *Millies v. Landamerica Transnation*, No. 31521-5-III, 2015 WL

22  213681, at *7-*8 (Wash. Ct. App. Jan. 15, 2015) (noting that both plaintiff and defendant

1    title insurer proposed a jury instruction for the plaintiff's breach of contract claim based

2    on the Washington model jury instruction for breach of contract, and that the trial court

3    utilized the instruction proposed by the defendant title insurer which included reference

4    to an affirmative defense) (citing 6A *Washington Practice:  Washington Pattern Jury*

5    *Instructions:  Civil* 300.02 at 186 (6th ed. 2012)).[13]

6

7    _____

8    [13] Although it seems axiomatic, courts in other jurisdictions have likewise noted that, where there are evidentiary disputes, the issue of breach of an insurance policy is a factual one reserved to the trier of fact.  *See, e.g.*, *La Joya Gardens, LLC v. Chubb Custom Ins. Co*., No. 4:06-CV-598-Y, 2007 WL 1461449, at *4 (N.D. Tex. May 17, 2007) ("[W[hether [the insurer] breached the insurance policy is a question of fact."); *Russell v. Reliance Ins. Co.*, 645 S.W.2d 166, 170 (Mo. Ct. App. 1982) ("The question of recovery upon a policy as written may be presented to a jury.").

10         Further, the foreign authority that American Zurich relies upon does not undermine the court's decision to submit the issue of breach to the jury or the jury's resolution of that issue.  First, American Zurich relies upon *D.R. Sherry Construction, Ltd. v. American Family Mutual Insurance Co.*, 316 S.W.3d 899, 902 (Mo. 2010), despite the fact that it recites law on policy interpretation that is contrary to Washington law.  As noted above, in Washington, if the language of a policy is ambiguous, courts construe that language as a matter of law in favor of the insured.  *Abott*, 693 P.2d at 133.  Yet, in *D.R. Sherry Construction*, the court held that "[t]he issue of coverage becomes a jury question only when the court determines that the contract is ambiguous and that there exists a genuine factual dispute regarding the intent of the parties."  *Id.*  Thus, in Missouri an ambiguous term in a policy becomes a jury issue whereas in Washington such a term is construed by the court as a matter of law in favor of the insured.  *Sherry*, therefore, is of limited, if any, utility here.  In any event, in *Sherry*, the court declined to grant the insurer's motion for a directed verdict because even if the court should not have submitted the question to the jury under Missouri law, the policy covered the claim and there was substantial evidence to support the insured's position.  *Id.* at 904.  Here too, the court has found that there is substantial evidence to support the jury's verdict on every issue challenged by American Zurich, except for bad faith damages.  Accordingly, *Sherry* provides little succor to American Zurich and is certainly no basis upon which the court would grant a new trial.

19         The other authorities relied upon by American Zurich are also distinguishable.  In both *California Shoppers, Inc. v. Royal Globe Insurance Co.*, 175 Cal. App. 3d 1, 35 (1985), and *Opies Milk Haulers, Inc. v. Twin City Fire Insurance Co.*, 755 S.W.2d 300, 302-03 (Mo. Ct. App. 1988), there were no factual disputes to submit to the jury.  In *Opies*, the court stated that there was no ambiguity in the policy and "no conflict in the evidence on the facts to be considered in resolving the question of coverage."  *Id.* at 302.  Likewise, in *California Shoppers*, the appellate court found that "there [wa]s no dispute about what happened," and consequently, the insurer's "liability on the coverage issue, solely a question of law, should have been the

1        In any event, the court properly instructed the jury with respect to both the

2   relevant policy provisions and MKB's breach of contract claim.  The court instructed the

3   jury regarding the specific terms of the policy at issue, including the relevant provisions

4   concerning coverage and also the particular exclusions to coverage asserted by American

5   Zurich.  (*See* Jury Instr. No. 22.)  In accord with its ruling on summary judgment, the

6   court also instructed the jury that MKB must prove that it suffered direct physical loss or

7   damage to covered property, but MKB did not have to prove that it fully performed its

8   contract with LYSD to have a covered claim.  (*Compare* 9/25/14 Order at 33-34 *with*

9   Jury Instr. No. 23.)  In addition, the court specifically instructed the jury with respect to

10  fortuity in the manner proposed by American Zurich.  (*Compare* Jury Instr. No. 24 *with*

11  Joint Prop. Jury Instr. (Dkt. # 137) at 29 (stating American Zurich's unopposed proposed

12  instruction on fortuity).)  Finally, in accord with its ruling on summary judgment, the

13  court also instructed the jury that MKB could not recover the costs and fees it incurred in

14  its arbitration with LYSD as a part of its breach of contract claim.  (*Compare* 9/25/14

15  Order at 15 *with* Jury Instr. No. 33.)  Thus, the court properly instructed the jury with

16

17  _____

18  subject of a motion for a directed verdict, or, more logically, of a motion for partial summary
    adjudication . . . ."  175 Cal. App. 3d at 35.  In contrast to those cases, there were numerous
19  factual issues relevant to the issue of breach that precluded summary judgment here, including,
    among others, whether the pad was damaged, whether the earth under the pad sank and by how
20  much, how much gravel was lost to earth movement as opposed to other causes, whether the
    damage to the pad was expected by MKB at the time it purchased its policy, whether the damage
21  incurred was caused by earth movement, MKB, or LYSD.  These factual issues precluded
    summary judgment with respect to breach of contract and required the court to submit MKB's
22  breach of contract claim to the jury for resolution.

ORDER- 57

1    respect to MKB's breach of contract claim prior to the court's submission of that claim to

2    the jury in the verdict form.

3         Further, American Zurich's proposed verdict form was unworkable, confusing,

4    and unfair. (*See* Disputed Jury Instr. (Dkt. # 139) at 167-77.) American Zurich proposed

5    an 11-page verdict form with 30 separate factual questions, all but three of which

6    pertained to MKB's breach of contract claim. (*See id.*) In addition, three of the questions

7    contained six subparts and two of the questions had eight subparts. (*See id.* at 168-171,

8    173, 175.) The questions with subparts asked the jury to select one of the six or eight

9    subparts in response. (*See id.*) All but one of the possible responses in these questions

10   favored American Zurich. (*See id.*)

11        The use of special or general verdict forms is within the discretion of the court,

12   and this discretion extends to the form of the special verdict. *See* Fed. R. Civ. P. 49(b);

13   *Mateyko v. Felix*, 924 F.2d 824, 827 (9th Cir. 1990) (holding that the trial court was

14   within its discretion in submitting a special verdict form to the jury when the verdict

15   form, considered in combination with the jury instructions, fairly presented the issue the

16   jury was called upon to decide); *Reeves v. Tuescher*, 881 F.2d 1495, 1503 (9th Cir. 1989).

17   The court was not required to adopt and did not err in rejecting American Zurich's

18   elaborate, confusing, and slanted special verdict form in favor a simpler form for the jury

19   to use in combination with the court's instructions based in part on Washington's pattern

20   jury instruction for breach of contract. *See Micrel, inc. v. TRW, Inc.*, 486 F.3d 866, 882

21   (6th Cir. 2007) (concluding that district court did not abuse its discretion in refusing

22   plaintiff's 25 jury interrogatories on elements of breach of contract claims in favor of four

1    interrogatories asking whether the parties had proved breach, and if so, what amount of

2    damages would compensate the party for its actual loss).  Based on the foregoing, the

3    court finds no basis for a new trial arising out of the jury verdict form and denies

4    American Zurich's motion for a new trial on this ground.

5    **2.  Enhanced IFCA Damages**

6        American Zurich argues that a new trial should be granted with respect to the

7    jury's award of enhanced IFCA damages because the statute because vests the authority

8    to increase actual damages with the court.  *See* RCW 48.30.015(2) ("The superior court

9    may . . . increase the total award of damages to an amount not to exceed three times the

10   actual damages.").  The court is persuaded that when an IFCA claim is raised in federal

11   court, the issue of enhanced damages must be resolved by the jury to pass muster under

12   the Seventh Amendment.

13       The Seventh Amendment states, in pertinent part:  "In Suits at common law . . .

14   the right of trial by jury shall be preserved, and no fact tried by a jury, shall be otherwise

15   re-examined in any Courts of the United States, than according to the rules of common

16   law."  U.S. Const., Amend. VII.  The Seventh Amendment applies solely to federal

17   courts.  *R.J. Reynolds Tobacco Co. v. Shewry*, 423 F.3d 906, 924 (9th Cir. 2005) ("[T]he

18   Seventh Amendment's guarantee of the right to a civil trial by jury does not apply to the

19   states and was not incorporated into the Fourteenth Amendment.").  As a result, although

20   the Washington State Legislature may be able to direct state court judges to decide

21   whether to award enhanced damages, this court may not enhance damages under IFCA

22   unless it would be allowed to do so by the Seventh Amendment.  *See also* Fed. R. Civ. P.

1   38(a) ("The right of trial by jury, as declared by the Seventh Amendment to the

2   Constitution—or as provided by federal statute—is preserved to the parties inviolate.").

3         In *Curtis v. Loether*, 415 U.S. 189 (1974), the United States Supreme Court held

4   that it was improper under the Seventh Amendment for a district court to award punitive

5   damages under the Civil Rights Act; rather, the Court held that a jury should have made

6   this determination because suits seeking "actual and punitive damages" "are traditional

7   form[s] of relief offered in courts of law. *Id.* at 196. Relying in part on *Curtis,* two

8   judges in this district have held that the Seventh Amendment and Rule 38(a) require that

9   a jury determine the issue of enhanced damages under IFCA when such a claim is

10  litigated in federal court. *Nw Mut. Life Ins. Co. v. Koch*, 771 F. Supp. 2d 1253, 1256

11  (W.D. Wash. 2009); *F.C. Bloxom Co. v. Fireman's Fund Ins. Co.*, No. C10-1603RAJ,

12  2012 WL 5992286, at *3-*6 (W.D. Wash. 2012). No judge in this district has held to the

13  contrary.

14         The Ninth Circuit has yet to rule on this issue. Nevertheless, the Third Circuit,

15  relying again on *Curtis*, has ruled that the punitive damages remedy in a statutory bad

16  faith action based on a Pennsylvania statute that is similar to IFCA[14] "triggers the

17  Seventh Amendment jury trial right." *Klinger v. State Farm Mut. Auto. Ins. Co.*, 115

18  F.3d 230, 236 (3d Cir. 1997).

19

20 ――――――――――――――――

21     [14] *See* 42 Pa.C.S.A. § 8371 ("In an action arising under an insurance policy, if the court finds that the insurer acted in bad faith toward the insured, the court may take all of the following actions: . . . (2) Award punitive damages against the insurer.")

22

American Zurich argues that the correct authority is not *Curtis* but rather *Tull v. United States*, 481 U.S. 412 (1997).  (*See* Rule 59 Mot. at 5-6.)  In *Tull*, the Supreme Court held that the assessment of a civil penalty under the Clean Water Act did not involve the common law right to a trial by jury, and thus, Congress could assign the right to assess civil penalties to trial judges.  *Id.* at 426.  The Third Circuit, however, specifically rejected that applicability of *Tull* to the Pennsylvania statute, stating:

> [In *Tull*,] the Supreme Court held that the amount of a statutory civil penalty under the Clean Water Act could be decided by the trial court . . . even though the issue of liability implicated the right to trial by jury under the Seventh Amendment. . . . It reasoned that, because Congress itself may fix the civil penalties, it may delegate that determination to trial judges, noting that calculations of civil penalties involve exercises of discretion traditionally performed by judges.
>
> We find *Tull* inapposite.  Rather, we believe that the appropriate precedent is *Curtis*, in which the Court held that a damages action under [the Civil Rights Act] is analogous to a number of tort actions recognized at common law.   More important, the relief sought here—actual and punitive damages—is the traditional relief offered in the courts of law. . . . Thus, we conclude that the punitive damages remedy in a statutory bad faith action under [the Pennsylvania statute] triggers the Seventh Amendment jury trial right . . . .

*Klinger*, 115 F.3d at 235-36 (alterations, quotations, internal citations omitted); *see also Feltner v. Columbia Pictures Television, Inc.*, 532 U.S. 340, 355 (1998) (distinguishing *Tull* because there is "no evidence that juries historically had to determine the amount of civil penalties to be paid to the Government," whereas "there is clear and direct historical evidence that juries, both as a general matter and in copyright cases, set the amount of damages awarded to a successful plaintiff.")

1    The court is persuaded by the analysis of the two previous courts in this District

2    which held that a claim for enhanced damages under IFCA must be tried to a jury in

3    federal court, as well as the analysis of the Third Circuit in an analogous case, and adopts

4    that reasoning here.  *See Koch*, 771 F. Supp. 2d at 1256; *F.C. Bloxom Co.*, 2012 WL

5    5992286, at *3-*6; *Klinger*, 115 F.3d at 235-36.  Accordingly, the court denies American

6    Zurich's motion for a new trial based on the jury's consideration of enhanced damages

7    under IFCA.

8    **F.  Prejudgment Interest, Nontaxable Litigation Costs, and Attorneys Fees**

9    The court previously entered an order granting in part and denying in part MKB's

10    motion for prejudgment interest, nontaxable litigation costs, and attorney's fees.  (1/27/15

11    Order (Dkt. # 181).)  In that order, the court directed the parties to file a proposed order

12    awarding fees, costs, and prejudgment interest that was consistent with the court's order

13    on the issues.  (*Id.* at 32-33.)  In their response, both parties indicate that their proposed

14    order might need modification following the court's entry of this order.  (Prop. Ord.

15    (Dkt. # 182) at 1-2.)  Accordingly, the court directs the parties to submit an amended

16    proposed order with any necessary alterations within 10 days of the date of this order.  As

17    before, if the parties cannot agree on a joint amended proposed order, then they may

18    submit a single brief that includes separate paragraphs with each party's suggested award

19    with respect to each category delineated in the court's January 17, 2015, order.[15]  The

20    

21    [15] MKB has indicated that it intends to seek additional fees it incurred after November 1,
2014.  (Prop. Ord. at 2.)  If the parties cannot agree on the appropriate amount of those additional

22    fees based on the court's prior rulings (*see* 1/27/15 Order), then MKB may file a motion with

1    court understands that the filing of such an amended joint proposed order is without

2    prejudice to any objection either party may have to the court's January 17, 2015, order or

3    this order on appeal.

4                                    **IV. CONCLUSION**

5            Based on the foregoing, the court GRANTS in part and DENIES in part American

6    Zurich's Rule 50(b) motion for judgment as a matter of law (Dkt. # 164).  The court

7    upholds the jury's verdict in all respects except for its award of $138,000.00 in bad faith

8    damages.  The court sets aside the jury's award of $138,000.00 in bad faith damages as a

9    matter of law.  The court DENIES American Zurich's Rule 59(a) motion for a new trial

10   in total (Dkt. # 161).  Finally, the court directs the parties to file an amended proposed

11   order with respect to prejudgment interest, nontaxable litigation costs, and attorney's fees

12   within 10 days of the date of this order as delineated in more detail above.

13           Dated this 14th day of March, 2015.

14

15

16           _____

17           JAMES L. ROBART
             United States District Judge

18

19

20

21   respect to those additional fees only within 10 days of the date of this order and note that motion
     appropriately on the court's calendar.  If MKB files such a motion, then the parties may defer the
22   filing of their amended joint order.

ORDER- 63